```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       MCALLEN DIVISION
 3      JUANA CRUZ, OFELIA            )
        BENAVIDES, JOSE ELIAS         )
 4      N.G, GABRIELA VELAZQUEZ,      )
        HELESIO CRUZ, ANGELICA        )
 5      CHAVEZ, CONCEPCION PEREZ,     )
        OLGA PEREZ, MAVRIGO           )
 6      SAENZ, JORGE MAOLEON,         )
        HECTOR SANCHEZ, HECTOR        )
 7      GONZALEZ, YESSY PEREZ         )
        MARTINEZ, MARIA DE            )
 8      LOURDES CRUZ, RESENDO         )
        LIEVANOS, ELIZABETH LARA,     )
 9      LUIS ALBERTO ZUNIGIA          )
        CASTILLO, MIGUEL              )
10      CABALLERO SANCHEZ, CARLOS     )  CASE NO: 7:23-CV-00343
        DANIEL LOPEZ, GILDA           )
11      RIVAS, ARMANDO MORALES DE     )     JURY DEMANDED
        LLANO, LAZARO GARCIA,         )
12      MARIA DE JESUS MEDINA,        )
        RICHARD ESQUIVEL, RAFAEL      )
13      SANCHEZ, GUILLERMO RUIZ,      )
        ROSA QUINTANILLA,             )
14                                    )
                    PLAINTIFFS,       )
15                                    )
        VS.                           )
16                                    )
        DELGAR FOODS, LLC A/K/A       )
17      DELIA'S TAMALES,              )
                                      )
18                  DEFENDANT.        )
     ***********************************************************
19                      ORAL DEPOSITION OF
20                   ARMANDO MORALES DE LLANO
21                        June 26, 2024
     ***********************************************************
23              ORAL DEPOSITION of ARMANDO MORALES DE
24   LLANO, produced as a witness at the instance of the
25   Defendant, and duly sworn, was taken in the above-styled
```

Page 1

## Page 2

1  and numbered cause on the 26th day of June 2024, from
2  2:04 p.m. to 4:55 p.m., before Priscilla R. Maldonado,
3  CSR, in and for the State of Texas, reported by reported
4  by stenograph, at the Law Offices of Ricardo Gonzalez,
5  124 S. 12th Ave, Edinburg, Texas, pursuant to the
6  Federal Rules of Civil Procedure and the provisions
7  stated on the record or attached.

## Page 4

```
             INDEX
                              PAGE
Appearances....................  3
ARMANDO MORALES DE LLANO
    Examination By Mr. Quezada...............  8
Changes and Signature...........................  51
Reporter's Certification........................  53

             EXHIBITS
NUMBER   DESCRIPTION                        PAGE
Exhibit 1 Declaration                        30
Exhibit 2 Request for Production             45
```

## Page 3

```
           A P P E A R A N C E S
COUNSEL FOR THE PLAINTIFFS:
    RICARDO GONZALEZ
    OXFORD & GONZALEZ
    124 SOUTH 12TH AVENUE
    EDINBURG, TEXAS 78539
    Tel: 956-383-5654
    RIC@OXFORDGONZALEZ.COM

COUNSEL FOR THE DEFENDANT:
    STEPHEN J. QUEZADA
    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
    500 DALLAS ST., STE 3000
    HOUSTON, TEXAS 77002
    Tel: 713-655-5757
    STEPHEN.QUEZADA@OGLETREE.COM

    LORENA D. VALLE
    PORTER HEDGES LLP
    1000 MAIN STREET, 36TH FLOOR
    HOUSTON, TEXAS 77002-6341
    Tel: 713-226-6000
    LVALLE@PORTERHEDGES.COM
    ELIZABETH SANDOVAL CANTU
    RAMON WORTHINGTON NICOLAS & CANTU, PLLC
    1506 SOUTH LONE STAR WAY, SUITE 5
    EDINBURG, TEXAS 78539
    Tel:  945-294-4800
    ECANTU@RAMONWORTHINGTON.COM

ALSO PRESENT:
    NICOLAS GIBLER, INTERPRETER
    MIGUEL CABALLERO, PLAINTIFF
    LUIS ZUNIGA, PLAINTIFF
    OLGA PEREZ, PLAINTIFF
    CARLOS LOPEZ, PLAINTIFF
```

## Page 5

1        THE REPORTER:  We are now on the record.
2  Today is June 26, 2024, and the time is 2:04 p.m.
3        This is the deposition of Armando Morales
4  De Llano, produced at the request of the Defendant in
5  Case No. 7:23-CV-00343, styled Juana Cruz et. al. versus
6  Delgar Foods, LLC D/B/A Delia's.
7        My name is Priscilla Maldonado, CSR 12025,
8  representing Veritext.
9        Would counsel please state their appearance
10 for the record?
11       MR. QUEZADA:  Stephen Quezada, for the
12 Defendant.
13       MS. VALLE:  Lorena Valle, for the
14 Defendant.
15       MR. GONZALEZ:  Ricardo Gonzalez, on behalf
16 of the Plaintiffs.
17       ARMANDO MORALES DE LLANO,
18 having been first duly sworn, testified through the
19 duly-sworn interpreter as follows:
20           EXAMINATION
21 BY MR. QUEZADA:
22    Q.  Good afternoon, Mr. Morales.
23    A.  Good afternoon.
24    Q.  So Mr. Morales, I know that you seem to
25 understand English fairly well.  We're using a

```
 1    Q.  What's the highest level of education you've
 2  received?
 3    A.  High school.
 4    Q.  And in what country was that?
 5    A.  In Mexico.  Nuevo Leon, Mexico.
 6    Q.  Okay.  And you worked for Delia's from 2012
 7  until May 2, 2023; is that right?
 8    A.  That is correct.
 9    Q.  And your title was supervisor?
10    A.  That is correct.
11    Q.  Were you a supervisor the whole time?
12    A.  No.  When I came in I was a manager for about
13  two months, and then I became a supervisor.
14    Q.  Okay.  And so can -- just so we understand the
15  hierarchy, it's supervisor, then under supervisor is a
16  manager, then under manager is team leaders?
17    A.  That is correct.
18    Q.  Who was your supervisor?
19    A.  At the beginning or lately?
20    Q.  At -- at the end of your employment.
21    A.  Guadalupe Franco.
22    Q.  Okay.  And during your employment, you were
23  paid $1,326 per week, that was your last rate?
24    A.  Yes.  That is correct.
25    Q.  And for how long did you have that salary?
                                                  Page 10
```

```
 1  What years?
 2    A.  I do not recall, exactly.
 3    Q.  Okay.  And you supervised three employees; is
 4  that right?
 5    A.  I supervised all employees.
 6    Q.  About how many?
 7    A.  Between 30 to 35.  It would vary.
 8    Q.  And at what -- what restaurants or what stores?
 9    A.  At 495 and Jackson.
10    Q.  Was it just one store?
11    A.  That's correct.
12    Q.  Okay.  And just so I'm clear, the 30 to 35
13  employees were your direct reports?
14    A.  It depends on the case.
15    Q.  Okay. So about how many employees directly
16  reported to you?
17    A.  The managers.  There's two.
18    Q.  So two managers reported directly to you?
19    A.  That is correct.
20    Q.  And those were full-time managers?
21    A.  That is correct.
22    Q.  And then, under those full-time mangers were
23  the remaining 30 to 33 employees, fair?
24    A.  Yes.  That is correct.
25    Q.  While you were a supervisor, you hired people,
                                                  Page 11
```

```
 1  correct?
 2    A.  Lately, yes.
 3    Q.  Okay.  And you also terminated people?
 4    A.  Well, lately, I had to have the consent of
 5  human resources.
 6    Q.  Okay.  So you could recommend someone for
 7  termination, and then human resources approved?
 8    A.  That is correct.
 9    Q.  And while you were a supervisor for Delia's,
10  you did, in fact, hire some people, correct?
11    A.  That is correct.
12    Q.  And you did, in fact, make the -- make the
13  decision to terminate some people, correct?
14    A.  Correct.
15    Q.  And you also -- sorry.
16        MR. QUEZADA:  You got the correct?
17    Q.  (BY MR. QUEZADA)  And you also made decisions
18  about disciplining people?
19    A.  When authorized by human resources as well.
20    Q.  You could recommend it to human resources and
21  then they approved it?
22    A.  That is correct.
23    Q.  Was there ever a hiring, termination, or
24  disciplinary decision, that you made, that human
25  resources rejected?
                                                  Page 12
```

```
 1    A.  Never.
 2    Q.  And with regard to the store for which you were
 3  responsible, other than executive level employees, were
 4  you the highest-ranking employee responsible for that
 5  store?
 6    A.  That is correct.
 7    Q.  And you were responsible for the finances of
 8  the store?
 9    A.  That is correct.
10    Q.  And that means making sure cash was being
11  counted correctly and deposited?
12    A.  That is correct.
13    Q.  Reconciling the cash register sales for that
14  day?
15    A.  That is correct.
16    Q.  You were responsible for managing -- you had
17  ultimate responsibility for managing the inventories?
18    A.  That is correct.
19    Q.  Did you have ultimate responsibility to make
20  sure employees were following rules?
21    A.  That is correct.
22    Q.  And that includes rules about attendance?
23    A.  Correct.
24    Q.  Rules about punching in and punching out
25  accurately?
                                                  Page 13
```

**Page 14**

1  A. That is correct.
2  Q. Rules about wearing the correct attire?
3  A. That is correct.
4  Q. Rules about managing the food properly?
5  A. That is correct.
6  Q. You'd also -- were the ultimate authority over,
7  perhaps, customer complaints; is that right?
8  A. That is correct.
9  Q. Were you responsible for overseeing health
10 inspections?
11 A. That's correct.
12 Q. And you were also responsible for receiving
13 shipments from suppliers and vendors?
14 A. Well, I was responsible for that, but the one's
15 who actually inspected it were the managers.
16 Q. Got it. Would you -- would you order supplies
17 and goods to make food?
18 A. Well, the managers did. And I was the one who
19 checked the reports.
20 Q. Okay. What kind of reports did you review and
21 approve for the store?
22 A. All kinds.
23 Q. Can you give us some examples, please?
24 A. Fax, calling attention to the employees'
25 tardiness, customer complaints.

**Page 15**

1  Q. Okay. Would you check -- well, would you
2  manage the finances of a store? In other words, making
3  sure that the store was operating in a way that
4  generated revenue and profit for the company?
5  A. That is correct.
6  Q. Did you have to sign off on any sort of
7  financial reports?
8  A. All of them.
9  Q. For that store?
10 A. That's right.
11 Q. And once you signed it and approved it, that
12 report went to corporate office?
13 A. That is correct.
14 Q. And you were the ultimate approver of those
15 financial documents before they went to the corporate
16 office, correct?
17 A. That is correct.
18 Q. And with all the decisions that we've discussed
19 that you made in your position as a supervisor, you had
20 the independent discretion and judgment to make those
21 decisions, correct?
22 A. Well, it depends. In some of them, as I said
23 before, and I repeat again, I had to check with human
24 resources.
25 Q. Okay. So except for the ones that you

**Page 16**

1  indicated to us that you had to seek approval from human
2  resources, you still had the discretion and independent
3  judgment to make those decisions?
4  A. No. The rest I would have to consult or check
5  with my supervisor above me.
6  Q. Okay. And was that just for approval?
7  A. That's correct.
8  Q. And let's talk about that process. Would you
9  take the decision to your supervisor, tell the
10 supervisor what it was you wanted to do, and the
11 supervisor said okay?
12 A. No. She had to consult with somebody else.
13 Q. Okay. Were there any decisions that you felt
14 you could not make with your own judgment or discretion?
15 A. Too many.
16 Q. Okay. Well, when you would recommend a
17 decision to your supervisor, would that decision
18 normally be followed?
19 A. All the time.
20 Q. Okay. And that was for the entire time that
21 you were a supervisor, correct?
22 A. That is correct.
23 Q. And you became supervisor some -- a couple
24 months after you were hired by the company in 2012?
25 A. That is correct.

**Page 17**

1  Q. Did you have vacation at the company?
2  A. Yes.
3  Q. How much?
4  A. Twice a year. Two weeks.
5  Q. So two weeks paid vacation per year?
6  A. Yes.
7  Q. And you took that paid vacation?
8  A. Yes.
9  Q. You had health insurance at the company?
10 A. Yes.
11 Q. And the company paid your premium for you?
12 A. Yes.
13 Q. You had vision benefits at the company?
14 A. Yes.
15 Q. And the company paid that premium for you?
16 A. Yes.
17 Q. You had dental insurance at the company?
18 A. It was optional.
19 Q. Did you choose to have that?
20 A. No.
21 Q. Did you have a 401(k) at the company?
22 A. No.
23 Q. Okay. Can you tell us why you are suing
24 Delia's?
25 A. Discrimination and wrongful termination.

```
 1    Q.  And any other reason?
 2    A.  No.
 3    Q.  And when you're talking about discrimination
 4  and wrongful termination, for both things, you're
 5  talking about the termination decision?
 6    A.  That is correct.
 7    Q.  And that's the termination decision that you
 8  were informed off on May 2, 20 --
 9    A.  That is correct.
10    Q.  And that was 2023.  I don't know if I got that.
11    A.  Yes.  2023.
12    Q.  Okay.  Got it.  Do you understand that the
13  reason your employment was terminated was because the
14  government informed Delia's that it could no longer
15  continue employing you?
16          MR. GONZALEZ:  Objection; form.
17    A.  No.
18    Q.  (BY MR. QUEZADA)  What do you believe is the
19  basis for the discrimination or the wrongful
20  termination?
21    A.  What the basis?  What do you mean?
22    Q.  Do you believe that there's -- are you saying
23  that you believe it is simply unfair?  Or is there a
24  basis that you believe caused the discrimination or
25  wrongful termination?
                                                    Page 18
```

```
 1    Q.  Did you-all have a armed vehicle service that
 2  came and picked up the cash from the store?
 3    A.  No.
 4    Q.  Did you deposit on behalf of the store?
 5    A.  Yes.
 6    Q.  And would you ever go get cash from the bank
 7  for the store?
 8    A.  No.
 9    Q.  You just deposited it?
10    A.  That is correct.
11    Q.  Who told you about the lawsuit -- this lawsuit?
12    A.  No.  I asked -- well, there was a comment and I
13  asked for information.  So I resorted to the lawyer and
14  asked for information.
15    Q.  Okay.  From whom did you hear the comment?
16    A.  I asked a co-worker.
17    Q.  And what co-worker was that?
18    A.  Carlos Lopez.
19    Q.  Who's in the room with us right now?
20    A.  Yes.  That is correct.
21    Q.  And what did Mr. Lopez tell you?
22    A.  That he was going to find out about the phone
23  of the attorney.
24    Q.  When you were a supervisor -- well, let me ask
25  you this.  In this case, there's an allegation that
                                                    Page 20
```

```
 1    A.  I believe is -- I think it's discrimination
 2  because other people who were in my same conditions
 3  remained.
 4    Q.  And when you say "in your same condition", the
 5  condition that you're talking about -- you're talking
 6  about lacking authorization to work in the United
 7  States?
 8    A.  That is correct.
 9    Q.  Do you know whether any of those people you are
10  thinking of were also identified to Delia's, by the
11  government, as being unable to continue employment?
12    A.  No.  Because they never wanted to show us
13  the -- the alleged list that the government allegedly
14  sent them.
15    Q.  And -- oh.  You had keys to the restaurants,
16  correct?
17    A.  No.  Not now.
18    Q.  I'm sorry.  When -- when you were employed by
19  Delia's?
20    A.  Yes.
21    Q.  And did you have codes to the alarm systems?
22    A.  Yes.
23    Q.  Did you have -- I don't even know if there is
24  one, but did you have codes to any safe in the store?
25    A.  Yes.
                                                    Page 19
```

```
 1  Delia's kept two sets of books.  Are you aware of that
 2  allegation?
 3    A.  What books are you referring to?
 4    Q.  I honestly don't know.
 5    A.  Honestly, I don't either.
 6    Q.  Okay.  And certainly as a supervisor, you were
 7  not keeping two sets of books, correct?
 8    A.  No.  Well, it depends.  Because I had -- there
 9  were lots of different kinds of books.  But in this
10  case, you're referring to two sets of books.  I don't
11  know what you're referring to.
12    Q.  What kind of books did you keep?
13    A.  Well, there were different books that I had
14  separately.  Reports, for instance, absenteeism, manager
15  reports, dates of purchases, or expiration dates of
16  certain items.  Different kinds of books like that.
17    Q.  And when you gave the general category of
18  reports, is there a more specific report that you can
19  identify for us?
20    A.  No.
21    Q.  Buy you're not aware of two sets of financial
22  books, correct?
23    A.  Correct.
24    Q.  And you're not aware of any two sets of books
25  regarding pay, correct?
                                                    Page 21
```

6 (Pages 18 - 21)

```
 1   A.  No.  Never.
 2   Q.  And that was for at least the last three years
 3  of your employment, right?
 4   A.  That is correct.
 5   Q.  Did you ever miss a paycheck?
 6   A.  No.  Never.
 7   Q.  And you were paid the -- I think what you're
 8  telling us is that you were paid the same salary,
 9  regardless of the number of days or number of hours
10  worked, correct?
11   A.  That is correct.
12   Q.  And that was true for at least the last three
13  years of your employment, correct?
14   A.  Yes.  That is correct.
15   Q.  I'm going to show you what I'm marking as
16  Exhibit 1, okay?  And I want you to review the document
17  and let me know when you're ready to discuss it.  But my
18  main question is going to be whether that's your
19  signature on the second page that we see.
20          (Exhibit No. 1 marked.)
21   A.  I'm ready.
22   Q.  (BY MR. QUEZADA)  Okay.  Is that your signature
23  we see on the second page?
24   A.  100 percent.
25   Q.  Okay.  The handwriting that we see on Items 1
```
Page 30

```
 1  through 9, is that your handwriting or someone else's?
 2   A.  Somebody else's.
 3   Q.  Whose handwriting is that?
 4   A.  The person who translated this thing for me.
 5   Q.  And who was that?
 6   A.  Mr. Valde.
 7   Q.  Mr. Balde?
 8   A.  Valde.
 9   Q.  How do you spell that?
10   A.  V-A-L-D-E, Valde.
11   Q.  Okay.  And where is that person, Mr. Valde?
12   A.  He's the other attorney of ours.  Or maybe he
13  works for this guy, Richard.
14   Q.  Okay.  Mr. Alamia?
15   A.  Yes.
16   Q.  Did you review Exhibit 1 before you signed it?
17   A.  Yes.
18   Q.  Are you able to read English?
19   A.  No.
20   Q.  Underneath your name, on the second page --
21  well, excuse me, underneath your signature, actually,
22  there's a date.  Did you write that date?
23   A.  No.
24   Q.  Okay.  Who wrote that?
25   A.  Mr. Valde.
```
Page 31

```
 1   Q.  As a supervisor, did you create the work
 2  schedules?
 3   A.  That is correct.
 4   Q.  And nobody told you how to do that, you did it
 5  with your own discretion?
 6   A.  Well, I based myself on the permissions that
 7  the employee's requested.
 8   Q.  And you knew that part of your duty as a
 9  supervisor was if an employee came to you and said their
10  pay was incorrect, that you needed to get it -- get that
11  corrected?
12   A.  No.  That was not part of my job.  I told them
13  to talk to human resources and that they took care of
14  that.
15   Q.  Got it.  Okay.  Would you do performance
16  evaluations of employees?
17   A.  Yes.
18   Q.  Okay.  Would you do employee training?
19   A.  Yes.  That too.
20   Q.  Did you do any budgeting for the store?
21   A.  How so?
22   Q.  Like at the end of the year or at the end of
23  the quarter or month, even, estimate that we're gonna
24  need X dollars of masa or whatever supplies?
25   A.  No.  Absolutely all of the merchandise was sent
```
Page 32

```
 1  to us from production.  We didn't spend any money on
 2  that at all.
 3   Q.  Do you feel that you did a good job of making
 4  sure employees followed workplace rules?
 5   A.  100 percent.
 6   Q.  After separating from Delia's -- after your
 7  employment ended with Delia's, for how long were you
 8  unemployed?
 9   A.  In order to get a stable job, like the one I
10  have right now, five months.
11   Q.  Okay.  Did you have any income of any kind in
12  that five-month period?
13   A.  Yes.  I tried for other jobs, but the pay was
14  very low.
15   Q.  Okay.  About how much pay did you receive in
16  that five-month period?
17   A.  Well, it would vary.  And, you know, I had two
18  or three jobs, and the pay was insufficient.  And I
19  didn't -- I mean, I didn't quite make ends meet, so I
20  had to use my savings and I ended up with nothing.
21   Q.  How much did you have in savings that you used?
22   A.  Approximately $15,000.
23   Q.  And did you have that in cash or was that in a
24  bank?
25   A.  At the bank.
```
Page 33

9 (Pages 30 - 33)

```
 1  go ahead and call the judge now, actually.  And I'll
 2  also go ahead with Mr. Morales in the room, Ms. Perez --
 3  Olga Perez, Carlos Lopez, Luis Zuniga, and Miguel
 4  Caballero in the room, admonish and remind of the
 5  obligations to preserve communications and information.
 6  And remind everyone that you can't alter, delete, or
 7  destroy those.  Okay.  And with that, we'll --
 8            THE REPORTER:  Off the record?
 9            MR. QUEZADA:  Sure.
10            THE REPORTER:  Off the record at 3:30 p.m.
11            (Break taken from 3:30 p.m. to 4:46 p.m.)
12            THE REPORTER:  Back on the record.  The
13  time is 4:46 p.m.
14     Q.  (BY MR. QUEZADA) Okay, Mr. Morales, we're back
15  on the record.  And just a reminder that you are under
16  oath.  Okay?
17     A.  Okay.
18     Q.  When we went off the record, it was because we
19  were trying to resolve the issue with regard to some
20  WhatsApp messages, correct?
21     A.  Right.  Correct.
22     Q.  And since then, the judge overseeing this case
23  has entered an order that those WhatsApp messages should
24  be produced, save any privileged communications.  Do you
25  understand that?
                                                    Page 46
```

```
 1     A.  No.
 2           MR. GONZALEZ:  It doesn't matter.
 3     Q.  (BY MR. QUEZADA) Okay.  And specifically the
 4  order that the judge entered states telephone conference
 5  held regarding dispute during deposition of Plaintiff
 6  Armando Morales.  The Court ordered that Plaintiff shall
 7  produce all non-privileged messages in the group chat.
 8     A.  What is privileged mean?
 9     Q.  Privileged --
10     A.  Private?
11     Q.  No, sir.  Privileged as a communication between
12  you and an attorney.
13     A.  So we'll have to show my wife's and my children
14  and everybody else's?
15     Q.  No, sir.  It's just the chat about this
16  lawsuit.  I forget what the chat was titled.  I think
17  it's Asuntos Delia or something like that.
18     A.  Okay.
19     Q.  Okay.  All right.  And I've looked at some of
20  them and we're still trying to export them.  Okay?  But
21  you understand that it's important that you not delete
22  the chat or any specific messages within that chat,
23  correct?
24     A.  Okay.
25     Q.  Part of your pay at Delia's consisted of
                                                    Page 47
```

```
 1  bonuses, correct?
 2     A.  Yes.  They would give us bonuses.
 3     Q.  How frequently would you get bonuses?
 4     A.  Every year in January.
 5     Q.  And how much was that bonus?
 6     A.  Well, it would vary.  The last one, I don't
 7  remember if it was 12,000 or 13,000.
 8     Q.  Okay.  So including your bonus, what was your
 9  total annual compensation with your salary and your
10  bonus together?
11     A.  If I'm not mistaken it was around 63.
12     Q.  63 or 73?
13     A.  63.  I believe so.  I don't remember.
14     Q.  Oh.  We were on the declarations.  That's
15  right.
16           So on a weekly basis, what is your best
17  estimate of the normal hours worked per week -- what
18  were your regular hours worked per week?
19     A.  Between 60 and 65 hours.
20     Q.  Oh, what is your cell phone number and who is
21  the carrier?
22     A.  956-313-8224 and it's Cricket.
23     Q.  Okay.  And for how long have you had that
24  phone?
25     A.  When they took away the company one -- of
                                                    Page 48
```

```
 1  course, it was in May.  So it's one -- one year and two
 2  months.
 3     Q.  Okay.  And you had it -- so you had a Delia --
 4  a cell phone from Delia's, correct?
 5     A.  Yes.
 6     Q.  Was there any other company benefit that you
 7  had, in terms of pay or cell phone, or anything else
 8  that you received as a benefit?
 9     A.  No.  It was just a cell phone.
10     Q.  Okay.  You've understood my questions today,
11  sir?
12     A.  That is right.
13     Q.  And you've given me accurate responses?
14     A.  That is right.
15     Q.  Do you have any confusion or doubt about what
16  the Court ordered regarding that WhatsApp chat with the
17  other plaintiffs in the lawsuit?
18     A.  No.  Not at all.
19     Q.  Okay.
20           MR. QUEZADA:  At this point, I'll reserve
21  the balance of my question -- questions, once we have
22  the WhatsApp messages produced, to the extent I even
23  need to ask any.  The messages speak for themselves, but
24  I'll go ahead and -- and pass the witness.
25           MR. GONZALEZ:  We'll reserve ours until the
                                                    Page 49
```

## Page 50

1  time of trial.
2           MR. QUEZADA:  And I'll just note for the
3  record that the four individuals identified earlier are
4  still in the room.
5           THE REPORTER:  Off the record at 4:55 p.m.
6           (Deposition concluded at 4:55 p.m.)

## Page 52

1           I, ARMANDO MORALES DE LLANO, have read the
   foregoing deposition and hereby affix my signature that
2  same is true and correct, except as noted above.
3
4
5           _____
            ARMANDO MORALES DE LLANO
6
7
8  THE STATE OF TEXAS )
9  COUNTY OF _____)
10          Before me, _____, on
   this day personally appeared ARMANDO MORALES DE LLANO,
11 known to me (or proved to me under oath or through
   _____)(description of identity card or
12 other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
13 to me that they executed the same for the purposes and
   consideration therein expressed.
14
            Given under my hand and seal of
15 office this _____ day of _____, 2024.
16
17
   _____
18 Notary Public in and for the State of Texas
19
20
21
22
23
24
25    Job No. HOU6734283

## Page 51

1           CHANGES AND SIGNATURE
2  WITNESS NAME: ARMANDO MORALES DE LLANO
3  DATE OF DEPOSITION: 06/26/2024
4  PAGE   LINE     CHANGE              REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25    Job No. HOU6734283

## Page 53

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                    MCALLEN DIVISION
3  JUANA CRUZ, OFELIA       )
   BENAVIDES, JOSE ELIAS    )
4  N.G, GABRIELA VELAZQUEZ, )
   HELESIO CRUZ, ANGELICA   )
5  CHAVEZ, CONCEPCION PEREZ,)
   OLGA PEREZ, MAVRIGO      )
6  SAENZ, JORGE MAOLEON,    )
   HECTOR SANCHEZ, HECTOR   )
7  GONZALEZ, YESSY PEREZ    )
   MARTINEZ, MARIA DE       )
8  LOURDES CRUZ, RESENDO    )
   LIEVANOS, ELIZABETH LARA,)
9  LUIS ALBERTO ZUNIGIA     )
   CASTILLO, MIGUEL         )
10 CABALLERO SANCHEZ, CARLOS ) CASE NO: 7:23-CV-00343
   DANIEL LOPEZ, GILDA      )
11 RIVAS, ARMANDO MORALES DE )    JURY DEMANDED
   LLANO, LAZARO GARCIA,    )
12 MARIA DE JESUS MEDINA,   )
   RICHARD ESQUIVEL, RAFAEL )
13 SANCHEZ, GUILLERMO RUIZ, )
   ROSA QUINTANILLA,        )
14                          )
15       PLAINTIFFS,  )
                            )
16 VS.                      )
                            )
17 DELGAR FOODS, LLC A/K/A  )
   DELIA'S TAMALES,         )
                            )
18       DEFENDANT.   )
19 ****************************************************
20        REPORTER'S CERTIFICATION
           DEPOSITION OF ARMANDO MORALES DE LLANO
21              June 26, 2024
22     I, Priscilla Maldonado, Certified Shorthand
   Reporter in and for the State of Texas, hereby certify
23 to the following:
24        That the witness, ARMANDO MORALES DE
   LLANO, was duly sworn by the officer and that the
25 transcript of the oral deposition is a true record of
   the testimony given by the witness;

```
 1        I further certify that pursuant to
    FRCP Rule 30(f)(1) that the signature of the deponent:
 2
          __X__ was requested by the deponent or a
 3  party before the completion of the deposition and that
    the signature is to be before any notary public and
 4  returned within 30 days from date of receipt of the
    transcript.  If returned, the attached Changes and
 5  Signature Page contains any changes and the reasons
    therefor;
 6
          _____ was not requested by the deponent
 7  or a party before the completion of the deposition.
 8        I further certify that I am neither
    counsel for, related to, nor employed by any of the
 9  parties or attorney in the action in which this
    proceeding was taken, and further that I am not
10  financially or otherwise interested in the outcome of
    the action.
11
12        Certified to by me this July 11, 2024.
13
14
15
16        Priscilla Maldonado, CSR 12025
          Expiration Date:  06-30-2025
17        Veritext Legal Solutions
          Firm Registration No. 571
18        300 Throckmorton Street, Suite 1600
          Fort Worth, Texas 76102
19        817-336-3042
20
21
22
23
24
25
                                              Page 54
```

```
 1  RICARDO GONZALEZ
 2  RIC@OXFORDGONZALEZ.COM
 3           July 11, 2024
 4  RE:   Cruz, Juana, Et Al v. Delgar Foods LLC, Et Al.
 5    6/26/2024, Armando Morales DeLlano (#6734283)
 6    The above-referenced transcript is available for
 7  review.
 8    Within the applicable timeframe, the witness should
 9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16   Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22         Yours,
23         Veritext Legal Solutions
24
25
                                              Page 55
```