```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                        MCALLEN DIVISION
 3      JUANA CRUZ, OFELIA           )
        BENAVIDES, JOSE ELIAS        )
 4      N.G, GABRIELA VELAZQUEZ,     )
        HELESIO CRUZ, ANGELICA       )
 5      CHAVEZ, CONCEPCION PEREZ,    )
        OLGA PEREZ, MAVRIGO          )
 6      SAENZ, JORGE MAOLEON,        )
        HECTOR SANCHEZ, HECTOR       )
 7      GONZALEZ, YESSY PEREZ        )
        MARTINEZ, MARIA DE           )
 8      LOURDES CRUZ, RESENDO        )
        LIEVANOS, ELIZABETH LARA,    )
 9      LUIS ALBERTO ZUNIGIA         )
        CASTILLO, MIGUEL             )
10      CABALLERO SANCHEZ, CARLOS    )  CASE NO: 7:23-CV-00343
        DANIEL LOPEZ, GILDA          )
11      RIVAS, ARMANDO MORALES DE    )      JURY DEMANDED
        LLANO, LAZARO GARCIA,        )
12      MARIA DE JESUS MEDINA,       )
        RICHARD ESQUIVEL, RAFAEL     )
13      SANCHEZ, GUILLERMO RUIZ,     )
        ROSA QUINTANILLA,            )
14                                   )
                        PLAINTIFFS,  )
15                                   )
        VS.                          )
16                                   )
        DELGAR FOODS, LLC A/K/A      )
17      DELIA'S TAMALES,             )
                                     )
18                      DEFENDANT.   )
        ****************************************************
19                      ORAL DEPOSITION OF
20                      MIGUEL CABALLERO
21                        June 26, 2024
22      ****************************************************
23              ORAL DEPOSITION of MIGUEL CABALLERO,
24      produced as a witness at the instance of the Defendant,
25      and duly sworn, was taken in the above-styled and
```

Page 1

EXHIBIT

A-5

1  numbered cause on the 26th day of June 2024, from
2  9:02 a.m. to 10:43 a.m., before Priscilla R. Maldonado,
3  CSR, in and for the State of Texas, reported by
4  stenograph, at the Law Offices of Ricardo Gonzalez, 124
5  S. 12th Ave, Edinburg, Texas, pursuant to the Federal
6  Rules of Civil Procedure and the provisions stated on
7  the record or attached.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

1                    INDEX
2                              PAGE
3  Appearances.....................................  3
4  MIGUEL CABALLERO
5      Examination By Mr. Quezada...............  5
6  Changes and Signature...........................  45
7  Reporter's Certification........................  47
8
9              EXHIBITS
10  NUMBER       DESCRIPTION                     PAGE
11  Exhibit 1    Declaration                      35
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1         A P P E A R A N C E S
2  COUNSEL FOR THE PLAINTIFFS:
3      RICARDO GONZALEZ
         OXFORD & GONZALEZ
4      124 SOUTH 12TH AVENUE
         EDINBURG, TEXAS 78539
5      Tel: 956-383-5654
         RIC@OXFORDGONZALEZ.COM
6
7  COUNSEL FOR THE DEFENDANT:
8      STEPHEN J. QUEZADA
         OLGETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
9      500 DALLAS ST., STE 3000
         HOUSTON, TEXAS 77002
10     Tel: 713-655-5757
         STEPHEN.QUEZADA@OGLETREE.COM
11
         LORENA D. VALLE
12     PORTER HEDGES LLP
         1000 MAIN STREET, 36TH FLOOR
13     HOUSTON, TEXAS 77002-6341
         Tel: 713-226-6000
14     LVALLE@PORTERHEDGES.COM
15     ELIZABETH SANDOVAL CANTU
         RAMON WORTHINGTON NICOLAS & CANTU, PLLC
16     1506 SOUTH LONE STAR WAY, SUITE 5
         EDINBURG, TEXAS 78539
17     Tel: 945-294-4800
         ECANTU@RAMONWORTHINGTON.COM
18
19  ALSO PRESENT:
20     NICOLAS GIBLER, INTERPRETER
         ARMANDO MORALES, PLAINTIFF
21     LUIS ZUNIGA, PLAINTIFF
         ELIAS GUTIERREZ, PLAINTIFF
22     OLGA PEREZ, PLAINTIFF
23
24
25

Page 3

1         THE REPORTER:  We are now on the record.
2  The time is 9:02 a.m., and today is June 26, 2024.
3         This is the deposition of Miguel Caballero,
4  produced at the request of Defendant in Civil Case No.
5  7:23-CV-00343, styled Juana Cruz et. al. versus Delgar
6  Foods, LLC D/B/A Delia's, commencing at 9:02 a.m.
7         My name is Priscilla Maldonado, Certified
8  Court Reporter No. 12025, representing Veritext.
9         Would counsel please state their appearance
10  for the record?
11      MR. QUEZADA:  Stephen Quezada with the
12  Defendant.
13      MR. GONZALEZ:  Ricardo Gonzalez, on behalf
14  of the Plaintiffs.
15         MIGUEL CABALLERO,
16  having been first duly sworn, testified through the
17  duly-sworn interpreter as follows:
18             EXAMINATION
19  BY MR. QUEZADA:
20    Q.  Good morning, Mr. Caballero.
21    A.  Good morning.
22    Q.  So today we're using a translator to translate
23  from English to Spanish and Spanish to English.  Okay?
24    A.  Yes.  That's fine.
25    Q.  And so that's so that we can fully understand

Page 5

2 (Pages 2 - 5)

1    Q.  And you and I have never spoken about your
2  wages or hours or your work for Delia's and how you were
3  paid, fair?
4    A.  Yes.  No, we haven't.  We haven't talked about
5  that at all.
6    Q.  Okay.  What's your current address, please?
7    A.  3010 Gold Avenue in Mission.
8    Q.  And that's Gold like oro?
9    A.  Yes.
10   Q.  Have you ever been a party to a lawsuit before?
11   A.  No.
12   Q.  What's the highest level of education you've
13 completed?
14   A.  I studied in Mexico and I got up to middle
15 school, or secondary school.
16   Q.  Okay.  Can you tell the jury why you're suing
17 Delia's?
18   A.  Because I was fired unjustly.
19   Q.  Okay.  Who told you about this lawsuit?
20   A.  Fellow workers.
21   Q.  Which fellow workers?
22   A.  Well, they're called Ofelia -- I don't know her
23 last name.  And Angelica.  I don't know her last name
24 either.  Only them two.
25   Q.  Okay.  What is your understanding of the

Page 10

1  allegations in this lawsuit?
2    A.  Well, first of all that we were fired or
3  terminated overnight without any -- without any notice.
4    Q.  Any other reason why you're suing Delia's?
5    A.  No.  Only for that.
6    Q.  And what's your date of birth, sir?
7    A.  It's 10/28/73.
8    Q.  Your employment with Delia's started
9  December 5, 2005.  Does that sound about right?
10   A.  Yes.
11   Q.  Okay.  And you were continuously employed by
12 Delia's until your employment ended on May 2, 2023?
13   A.  Yes.
14   Q.  And do you understand the reason why your
15 employment was terminated?
16   A.  Because of papers.  Just -- just papers.  I
17 didn't have any.
18   Q.  Okay.  And did you understand that that was
19 based on an instruction from the government?
20   A.  No.
21   Q.  Okay.  Your position with Delia's was
22 production worker, correct?
23   A.  Yes.
24   Q.  And more specifically, you prepared masa the
25 majority of your time?

Page 11

1    A.  Yes.
2    Q.  Anything else that you did with regard to
3  production?
4    A.  Well, only the -- only the masa, or the dough.
5  But sometimes, I mean, maybe they, at one point or
6  another, they put me in the kitchen.
7    Q.  Do you recall when that was that you were
8  working in the kitchen, as opposed to working making the
9  masa?
10   A.  No.  I -- I don't recall the date.  That's the
11 truth.
12   Q.  Okay.  Fair enough.  Your employment with
13 Delia's was continuous from December 5, 2005 to May 2,
14 2023; is that correct?  Or did you have any leaves of
15 absence or any times that you left and came back?
16   A.  No.  The entire time I was there.  From the
17 moment that I joined until I was dismissed.
18   Q.  Did you receive any benefits from Delia's?  I'm
19 sorry.  Let me clarify that question.  Did you receive
20 benefits like health insurance, vision insurance, dental
21 insurance, 401(k) from Delia's?
22   A.  Yes.
23   Q.  And what were those that you received while
24 working for Delia's?
25   A.  Only that they gave us health insurance.  That

Page 12

1  was about it.  I don't think I ever needed anything for
2  my eyes or for dentistry either.
3    Q.  And the company paid -- Delia's paid for those
4  health insurance benefits, correct?
5    A.  Yes.
6    Q.  Were you ever suspended or disciplined while
7  working for Delia's?
8    A.  No.
9    Q.  At any time, did you take any regular
10 vacations, like for summer or spring breaks or anything
11 like that during your employment?
12   A.  Yes.  Yes over the vacations.
13   Q.  And what were -- what were those normal
14 vacations that you took?
15   A.  They gave us two weeks a year.  So I took one
16 week before the middle of the year.  And another week
17 after the half of the year.
18   Q.  And those were two weeks paid vacation,
19 correct?
20   A.  Yes.
21   Q.  And while working for Delia's, you're -- you
22 were able to take the vacations -- the paid vacations
23 that you wanted to take?
24   A.  Yes.
25   Q.  Okay.  And you were paid an hourly rate while

Page 13

4 (Pages 10 - 13)

1  working for Delia's, correct?
2     A.  Only since 2007 and on.  Because when I just
3  came in, they paid us by the shift.
4     Q.  Okay.  Let me -- let me ask you a better
5  question.  From 2020 until your employment ended, you
6  were paid an hourly rate, correct?
7     A.  No.  It was before.
8     Q.  Okay.  So I believe what you're saying then,
9  from 2017 until your employment ended, you were paid an
10  hourly rate -- sometime in 2017.
11     A.  Well, that's when they started paying me by
12  check, because before that they paid me in cash.
13     Q.  Understood.  But what I'm trying to clarify is
14  when you started receiving payment by check, and, I
15  believe, based on what you've described, that sometime
16  in 2017, correct?
17     A.  Well, I really -- I don't remember, but it was
18  before.  It could have been 2008 to 2009.  I don't
19  remember.  But that's -- that's when they started paying
20  us by the hour.
21     Q.  Okay.  Okay.  When you were last working at
22  Delia's, in May of 2023, you were being paid an hourly
23  rate, correct?
24     A.  Yes.
25     Q.  And what was that, your last hourly rate?

Page 14

1     A.  11.25.
2     Q.  And from the time you started being paid by
3  check, whatever that time was, you started receiving an
4  hourly rate for your work, correct?
5     A.  Yes.  By the hour.  Yes.
6     Q.  And the only position that you held while
7  working for Delia's was that of production, correct?
8     A.  Yes.  Except for the time when I was put on --
9  in the -- taken away from that to be put in the kitchen.
10     Q.  Got it.  Who was your supervisor?
11     A.  Luis Briones.
12     Q.  So I'd like to ask you about how you were paid
13  by check.  Okay?
14     A.  Yes.
15     Q.  You were aware that there was a timekeeping
16  system at the restaurant, correct?
17     A.  Yes.
18     Q.  And you clocked in using your finger or thumb?
19     A.  Or with a key code.
20     Q.  Or with a password?
21     A.  Yes.  A password.
22     Q.  Okay.  And that was a password that was unique
23  to you?
24     A.  Yes.
25     Q.  And you never shared it with anyone?

Page 15

1     A.  No.
2     Q.  No, you did not share it?
3     A.  No.
4     Q.  Okay.  And you understood that when you were
5  working for Delia's you would punch in with your finger
6  or your thumb or the password?
7     A.  Yes.
8     Q.  And you always did that while you were working
9  for Delia's?
10     A.  Yes.  As of the time when they installed the
11  computer, yes.
12     Q.  And you knew that you would punch in before you
13  start working, correct?
14     A.  Yes.
15     Q.  And that's what you did each day you went to go
16  work for Delia's?
17     A.  Yes.
18     Q.  And you understood that when you stopped
19  working, you should punch out and that was the end of
20  work, right?
21     A.  Yes.
22     Q.  And that's what you did every day that you
23  worked at Delia's, correct?
24     A.  Yes.
25     Q.  And you understood that when you took lunch or

Page 16

1  certain breaks, that you also needed to clock out and
2  clock back in, correct?
3     A.  Yes.
4     Q.  And that's what you did everyday you went to
5  work for Delia's, right?
6     A.  Yes.
7     Q.  Okay.  Was Luis Briones on site at the
8  restaurant with you?
9     A.  Yes.
10     Q.  About how many other people would Mr. Briones
11  supervise?
12     A.  The entire line and the production.
13     Q.  About how many people was that?
14     A.  I would say that more than 30.
15     Q.  Okay.  In your position as a production worker,
16  you were responsible for helping set up the equipment
17  used to make the masa?
18     A.  Only the ingredients.
19     Q.  Okay.  So not the equipment?
20     A.  Well, it was only one machine.  You didn't have
21  to prepare anything in it.
22     Q.  Just turn it on and it went?
23     A.  Yes.
24     Q.  Fair enough.  So you would gather the spices, I
25  take it?

Page 17

5 (Pages 14 - 17)

1    A.  Yes.
2    Q.  And the masa itself, was it already like
3  pre-made masa?  Or was it the ground corn and you'd have
4  to add water and do all that?
5    A.  The masa was already ready.  It was already
6  prepared.
7    Q.  So you were just spicing it?
8    A.  Yes.
9    Q.  And what -- what would you do after you put the
10  spices?
11    A.  Well, it was done in parts.  There was a
12  process.  It was not just dumping things, you know?
13    Q.  I see.  Okay.  Did you have to prepare any of
14  the meats?
15    A.  No.  Not the meat.
16    Q.  Did you actually make any tamales?
17    A.  No.
18    Q.  So you were the masa guy?
19    A.  Yes.
20    Q.  Okay.  Would you set up or clean up before
21  or -- before you started making the masa or after you
22  started making the masa?
23    A.  When I arrived, no.  Because my fellow worker
24  was already there doing it.  So what I did was just took
25  over and continued.  But when I was done at the end,

Page 18

1    Q.  Okay.  Thank you.  And all the duties we've
2  been discussing were duties that you accomplished
3  between the time that you clocked in for work and
4  clocked out at the end of the day, correct?
5    A.  Yes.
6    Q.  Were you aware of any policies that Delia's had
7  while you working there?
8    A.  No.
9    Q.  Okay.  One more question about the duties that
10  I forgot to ask you, sir.  Did -- did your duties change
11  over time or were they what we just discussed the entire
12  time you worked for Delia's, except for the time you
13  worked in the kitchen?
14    A.  Well, only the fact that when I actually
15  started there, the masa was done by hand.
16    Q.  Okay.  And -- and would you say that you -- and
17  would you say that your experience was typical, in terms
18  of punching in, starting work, punching out at the end
19  of work, it was typical for you as it was the other
20  employees?
21        MR. GONZALEZ:  Objection; form.
22    A.  Yes.
23    Q.  (BY MR. QUEZADA)  And that's true for the folks
24  sitting in the room today with us, correct?  Except for
25  Mr. Morales who was not hourly?

Page 20

1  then I would have to clean up.
2    Q.  Okay.  Were there any other duties that you had
3  that we have not discussed?
4    A.  No.  That's it.  Only the masa.
5    Q.  And the preparation of the masa?
6    A.  Except that if there was -- if we didn't have
7  any people, then they would have me take away the tamale
8  baskets.
9    Q.  Okay.  Any other duties?  Whether they were
10  everyday duties or duties that weren't part of your
11  normal routine that you did?
12    A.  No.
13    Q.  And you understand I'm also asking about
14  cleaning, setting up, disassembling anything that you
15  were using at the end of the day or at the beginning of
16  the day?
17    A.  Well, sometimes we did -- sometimes we did do
18  the cleaning.
19    Q.  Okay.  Any other duties then, that I have not
20  covered?
21    A.  No.
22    Q.  And you did all those duties?
23    A.  Unless perhaps I needed to get a pallet of masa
24  from the cooler from -- then I would get the fork lift
25  and bring it out.

Page 19

1        MR. GONZALEZ:  Objection; form.
2    A.  No.  They were -- they were salary.
3    Q.  (BY MR. QUEZADA)  Or do you know?
4    A.  Not much.
5    Q.  Okay.  Fair enough.  So when you were paid by
6  check, you were paid weekly, correct?
7    A.  Yes.
8    Q.  And when you clocked in and clocked out, you
9  were able to see, on the screen for the timekeeping
10  machine, the time in and the time out and the hours
11  worked, correct?
12    A.  No.  I couldn't.
13    Q.  Okay.
14    A.  No.  I couldn't see that.  No.  I mean, I just
15  came in and punched in.  I really didn't --
16    Q.  Okay.  I'm -- I'm just asking about what you --
17  what you were able to see on the screen, or what you did
18  see on the screen.
19    A.  No.  I mean, just -- just my name.  I mean, I
20  would punch in, I'd see my name, and I'd get to work.
21    Q.  Okay.  And you punched in only for yourself --
22  excuse me.  You punched in and punched out only for
23  yourself, correct?
24    A.  Yes.
25    Q.  And nobody else punched in or punched out for

Page 21

6 (Pages 18 - 21)

1   you, correct?
2       A.   No.
3       Q.   And nobody altered your time, correct?
4       A.   Only when I forgot to punch in.  And I just
5   went in and I would talk to the supervisors or the
6   managers and asked them to punch in the time that I had
7   come in.
8       Q.   Fair.  And you know you were able to do that,
9   while working at Delia's, right?
10      A.   Yes.  I would go to them and say, you know, I
11  forgot to punch in.  Would you please fix my entry time?
12      Q.   And they fixed it, correct?
13      A.   Yes.
14      Q.   There were no problems?
15      A.   No.
16      Q.   And is that the same for if you forgot to punch
17  out?
18      A.   I'm sorry.  I didn't understand.
19      Q.   Just the way you described the process of
20  correcting a forgotten punch in, if you forgot to also
21  punch out, you could follow that same process to correct
22  it?
23      A.   Yes.  Yes.  There were occasions in which I
24  forgot.
25      Q.   And that got fixed for you?

Page 22

1       A.   Yes.
2       Q.   So every time there was a missed punch or you
3   forgot to punch, it was corrected to your satisfaction,
4   right?
5       A.   Yes.
6       Q.   The process that you just described of
7   correcting a forgotten punch in or correcting a
8   forgotten punch out, how did you learn about that
9   process?
10      A.   Well, when I arrived and I tried to punch in
11  one day, it would indicate that I hadn't punched the
12  earlier day.
13      Q.   And when you say "it would indicate", you mean
14  the timekeeping system?
15      A.   Yes.
16      Q.   Do you know what the name of the timekeeping
17  system was?
18      A.   No.
19      Q.   Does -- does the name Focus ring a bell?
20      A.   Oh, yes.  Yes.  Yes.
21      Q.   That was the timekeeping system you used?
22      A.   Yes.
23      Q.   And you understood how to use it?  You were
24  able to use it?
25      A.   Yes.

Page 23

1       Q.   Was there ever a time that you were confused,
2   or perhaps did not understand how to use it?
3       A.   No.
4       Q.   So then you feel that since that timekeeping
5   system was put in place, that you used it to correctly
6   and accurately record your time worked?
7       A.   Yes.
8       Q.   Did you ever explain to anyone how to use that
9   timekeeping system?
10      A.   No.
11      Q.   Did anyone ever ask you about how to use it?
12      A.   Well, only when somebody was trying to put
13  their thumbprint there and they actually needed to do
14  something else in order to punch in.
15      Q.   Okay.  Did you receive training on how to use
16  the timekeeping system?
17      A.   No.  Not training.  Simply Don Luis made the
18  explanation and told me you either use your fingerprint
19  or you use the number here, and this is where you punch
20  to go in and this is where you punch to go out.  And it
21  was only once.
22      Q.   Okay.  And did you feel that was adequate?
23      A.   Well, yes.
24      Q.   Okay.  While working for Delia's, you never
25  made a complaint about being paid incorrectly; is that

Page 24

1   true?
2       A.   Okay.  Well, I never complained.  But there was
3   some times when I forgot to punch in or when Don Luis
4   would actually right down the times, I felt that they
5   were giving me fewer hours.
6       Q.   Okay.  Sitting here today, can you tell the
7   jury what pay periods that issue occurred?
8       A.   Well, no.  Actually, that was when they were
9   doing -- before the system, when they were doing it by
10  hand.  He would have a list of when we punched in, came
11  out, and so on.  And sometimes I realized or felt that
12  my hours, according to my records, didn't match the
13  hours that he had.  So I would tell him and he said, oh,
14  I'm sorry.  Or he would correct it and he would say,
15  look, I'm gonna add them to you -- for next week.  And
16  then if he did -- well, I never complained.  I just, you
17  know, told him about it.
18      Q.   And then it still got fixed, correct?
19      A.   Yes.
20      Q.   And that was before the timekeeping system was
21  put into place in 2017?
22      A.   Yes.
23      Q.   Was Luis Briones your supervisor the entire
24  time you worked at Delia's?
25      A.   No.  Well, no, not all the time.  I -- I don't

Page 25

7 (Pages 22 - 25)

1 recall exactly the date when he arrived, but he came in
2 at around maybe 2010 or 2012, perhaps.  I don't remember
3 when.  But then as of the time he arrived, then he was
4 my supervisor for the entire time.
5    Q.  Okay.  And Mr. Briones nor any other person at
6 Delia's instructed you to not record your time
7 accurately, true?
8    A.  Yes.
9    Q.  Yes, that's correct?
10    A.  Yes.
11    Q.  Okay.  Did you keep any notes or logs of hours
12 worked?
13    A.  Well, at the beginning, no.  But then when I
14 started feeling that I was not getting quite a -- the
15 number of hours, then another manager told me, no, you
16 know you should take down your -- you should take down
17 your hours, write them down someplace, because sometimes
18 it won't match.  And if they don't match, then you have
19 something to tell him about.
20    Q.  And that was before the timekeeping system was
21 put into place in 2017, correct?
22    A.  Yes.
23    Q.  And when Delia's put in the timekeeping system
24 in 2017, you started receiving over-time pay, correct?
25    A.  Yes.

Page 26

1 employment was May 2, 2023, correct?
2    A.  Yes.
3    Q.  You worked the morning shift; is that correct?
4    A.  No.
5    Q.  You worked the evening shift?
6    A.  Yes.
7    Q.  And what was that evening shift?
8    A.  Well, there were several -- several hours for
9 the shift.  Sometimes it was from 10 to 10.  Sometimes
10 it was 11 to 11.  Sometimes it was from 12 to 12, from
11 12 noon to 12 midnight or 12:00 a.m.  And then there --
12 unless there wasn't a lot of work at those times, then I
13 would probably leave a little earlier.
14    Q.  Okay.  And you understand I'm just asking about
15 just the general shift, not what you actually punched in
16 and punched out, right?
17    A.  Well, see, the thing is I worked there for 18
18 years.  So at first, I was only in the morning.  Then,
19 they bought the machine and they started doing double
20 shifts, I mean, so then I was in the morning, and
21 sometimes in the afternoon.  So at the end, I was only
22 working evenings.
23    Q.  Got it.  Did you have any other jobs for any
24 other employers while you were working for Delia's?
25    A.  No.

Page 28

1    Q.  And that was for hours worked over 40 in a work
2 week, correct?
3    A.  Yes.  Yes.
4    Q.  And when you worked over 40 hours in a work
5 week, you were paid time and a half for those hours,
6 correct?
7    A.  As of that date, yes.
8    Q.  As of the date of the timekeeping system,
9 correct?
10    A.  Well, yes.  At the beginning, we were paid by
11 the shift.  But then when they started paying us by the
12 hour, I remember they used to pay us all the same number
13 of hours -- or whatever hours we worked, they paid us at
14 the same rate.
15    Q.  So let me ask you a little bit about that.
16 What you described was that before the timekeeping
17 system was put into place in 2017?
18    A.  Yes.
19    Q.  Okay.  So let's talk about 2017 forward.  Okay?
20    A.  Okay.
21    Q.  From 2017, when the timekeeping system was put
22 into place, through the end of your employment, you
23 received overtime pay, correct?
24    A.  Yes.
25    Q.  Okay.  And, again, that was -- your last day of

Page 27

1    Q.  I may have already asked you, but I don't
2 remember, so apologies if I'm asking you again.
3    A.  Okay.
4    Q.  Were you ever written up or suspended or
5 anything like that?  Disciplined in any way while at
6 Delia's?
7    A.  Only once when I was working in the kitchen.  I
8 was -- I came in late, so they gave me a -- I guess, a
9 tardiness slip or something.  But other than that,
10 nothing.
11    Q.  Like a warning for being tardy?
12    A.  Yes.
13    Q.  And you mentioned that you worked at Delia's
14 for 18 years, correct?
15    A.  Yes.
16    Q.  And that was the only time you received any
17 sort of warning or anything like that?
18    A.  Yes.
19    Q.  So you felt comfortable working at Delia's?
20    A.  Yes.
21    Q.  It was a good job?
22    A.  Oh, yes.
23    Q.  You were treated with respect while working at
24 Delia's?
25    A.  Well, you could say yes.  I mean, we did have

Page 29

8 (Pages 26 - 29)

**Page 46**

1    I, MIGUEL CABALLERO, have read the foregoing
deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
4
5    _____
MIGUEL CABALLERO
6
7
8  THE STATE OF TEXAS )
9  COUNTY OF _____)
10    Before me, _____, on
this day personally appeared MIGUEL CABALLERO, known to
11  me (or proved to me under oath or through
_____)(description of identity card or
12  other document) to be the person whose name is
subscribed to the foregoing instrument and acknowledged
13  to me that they executed the same for the purposes and
consideration therein expressed.
14
    Given under my hand and seal of
15  office this _____ day of _____, 2024.
16
17
    _____
18    Notary Public in and for the State of Texas
19
20
21
22
23
24
25    Job No. HOU6734283

**Page 48**

1    I further certify that pursuant to
FRCP Rule 30(f)(1) that the signature of the deponent:
2
    __X__ was requested by the deponent or a
3  party before the completion of the deposition and that
the signature is to be before any notary public and
4  returned within 30 days from date of receipt of the
transcript.  If returned, the attached Changes and
5  Signature Page contains any changes and the reasons
therefor;
6
    _____ was not requested by the deponent
7  or a party before the completion of the deposition.
8    I further certify that I am neither
counsel for, related to, nor employed by any of the
9  parties or attorney in the action in which this
proceeding was taken, and further that I am not
10  financially or otherwise interested in the outcome of
the action.
11
12    Certified to by me this July 11, 2024.
13
14
15
16    Priscilla Maldonado, CSR 12025
Expiration Date:  06-30-2025
17    Veritext Legal Solutions
Firm Registration No. 571
18    300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
19    817-336-3042
20
21
22
23
24
25

**Page 47**

1    IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
2    MCALLEN DIVISION
3  JUANA CRUZ, OFELIA    )
BENAVIDES, JOSE ELIAS    )
4  N.G, GABRIELA VELAZQUEZ,  )
HELESIO CRUZ, ANGELICA    )
5  CHAVEZ, CONCEPCION PEREZ, )
OLGA PEREZ, MAVRIGO    )
6  SAENZ, JORGE MAOLEON,    )
HECTOR SANCHEZ, HECTOR  )
7  GONZALEZ, YESSY PEREZ    )
MARTINEZ, MARIA DE    )
8  LOURDES CRUZ, RESENDO    )
LIEVANOS, ELIZABETH LARA, )
9  LUIS ALBERTO ZUNIGIA    )
CASTILLO, MIGUEL    )
10  CABALLERO SANCHEZ, CARLOS )  CASE NO: 7:23-CV-00343
DANIEL LOPEZ, GILDA    )
11  RIVAS, ARMANDO MORALES DE )    JURY DEMANDED
LLANO, LAZARO GARCIA,    )
12  MARIA DE JESUS MEDINA,  )
RICHARD ESQUIVEL, RAFAEL )
13  SANCHEZ, GUILLERMO RUIZ, )
ROSA QUINTANILLA,    )
14        )
    PLAINTIFFS,  )
15        )
VS.        )
16        )
DELGAR FOODS, LLC A/K/A    )
17  DELIA'S TAMALES,    )
        )
18    DEFENDANT.  )
*******************************************************
19
    REPORTER'S CERTIFICATION
20    DEPOSITION OF MIGUEL CABALLERO
June 26, 2024
21
    I, Priscilla Maldonado, Certified Shorthand
22  Reporter in and for the State of Texas, hereby certify
to the following:
23
    That the witness, MIGUEL CABALLERO,
24  was duly sworn by the officer and that the transcript of
the oral deposition is a true record of the testimony
25  given by the witness;

**Page 49**

1  RICARDO GONZALEZ
2  RIC@OXFORDGONZALEZ.COM
3    July 11, 2024
4  RE:   Cruz, Juana, Et Al v. Delgar Foods LLC, Et Al.
5    6/26/2024, Miguel Caballero (#6734283)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16   Return completed errata within 30 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22    Yours,
23    Veritext Legal Solutions
24
25

13 (Pages 46 - 49)

Veritext Legal Solutions
346-293-7000