```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         MCALLEN DIVISION
 3     JUANA CRUZ, OFELIA              )
       BENAVIDES, JOSE ELIAS N.G,      )
 4     GABRIELA VELAZQUEZ, RICARDO     )
       GONZALEZ, HELESIO CRUZ,         )
 5     ANGELICA CHAVEZ, CONCEPCION     )
       PEREZ, OLGA PEREZ, MAVRIGO      )
 6     SAENZ, JORGE MAOLEON,           )
       HECTOR SANCHEZ, HECTOR          )
 7     GONZALEZ, YESSY                 )
       PEREZ-MARTINEZ, MARIA DE        )
 8     LOURDES CRUZ, RESENDO           )   CIVIL ACTION
       LIEVANOS, ELIZABETH LARA,       )   NO. 7:23-CV-00343
 9     LUIS ALBERTO                    )
       ZUNIGIA-CASTILLO, MIGUEL        )
10     CABALLERO SANCHEZ,              )   JURY DEMANDED
       GUILLERMO DE LA                 )
11     CRUZ-MENDOZA, CARLOS DANIEL     )
       LOPEZ, GILDA RIVAS, ARMANDO     )
12     MORALES DE LLANO, LAZARO        )
       GARCIA, MARIA DE JESUS          )
13     MEDINA, RICARDO ESQUIVEL,       )
       RAFAEL SANCHEZ, GUILLERMO       )
14     RUIZ, ROSA QUINTANILLA,         )
                                       )
15                 PLAINTIFFS,         )
                                       )
16     VS.                             )
                                       )
17     DELGAR FOODS LLC A/K/A          )
       DELIA'S TAMALES,                )
18                                     )
                   DEFENDANT.          )
19
20
       **********************************************************
21                      ORAL DEPOSITION OF
22                      ROSENDO LIEVANOS
23                       June 28, 2024
24     **********************************************************
25

                                                          Page 1
```

1  ORAL DEPOSITION of ROSENDO LIEVANOS, produced
2  as a witness at the instance of the Defendant, and duly
3  sworn, was taken in the above-styled and numbered cause
4  on the 28th day of June, 2024, from 12:27 p.m. to
5  1:56 p.m., before Anica Diaz, CSR, RPR, CRR, in and for
6  the State of Texas, reported by machine shorthand, at
7  the Law Offices of Ricardo Gonzalez, 124 South 12th
8  Avenue, Edinburg, Texas, pursuant to the Federal Rules
9  of Civil Procedure and the provisions stated on the
10 record or attached.

Page 2

```
                    I N D E X
                                            PAGE
Appearances....................     03
Exhibits.......................     04

ROSENDO LIEVANOS

    Examination by Mr. Quezada.................    05

Changes and Signature...........................    41
Reporter's Certificate..........................    43


                    E X H I B I T S
                                            PAGE

Defendant's Exhibit No. 1
    Questionnaire Filled out by
    Rosendo Lievanos......................    35

Defendant's Exhibit No. 2
    Affidavit of Rosendo Lievanos.........    36
```

Page 4

```
            A P P E A R A N C E S
COUNSEL FOR THE PLAINTIFFS:
    MR. RICARDO GONZALEZ
    OXFORD & GONZALEZ
    124 South 12th Avenue
    Edinburg, Texas 78539
    Tel: (956) 383-5654
    ric@oxfordandgonzalez.com

COUNSEL FOR THE DEFENDANT:
    MR. STEPHEN J. QUEZADA
    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
    500 Dallas Street, Suite 3000
    Houston, Texas 77002
    Tel: (713) 655-5757
    stephen.quezada@ogletree.com

    MS. LORENA D. VALLE
    PORTER HEDGES, LLP
    1000 Main Street, 36th Floor
    Houston, Texas 77002-6341
    Tel: (713) 226-6000
    lvalle@porterhedges.com

    MS. ELIZABETH SANDOVAL CANTU
    RAMON WORTHINGTON NICOLAS & CANTU, PLLC
    1506 South Lone Star Way, Suite 5
    Edinburg, Texas 78539
    Tel: (945) 294-4800
    ecantu@ramonworthington.com

ALSO PRESENT:
    Mr. Luis Gonzalez, Interpreter
    Ms. Olga Perez, Plaintiff
```

Page 3

1            P R O C E E D I N G S
2        (Proceedings began at 12:27 p.m.)
3        (Per agreement of all counsel, Federal
4  Rule 30(b)(5) Read-On was waived.)
5        THE REPORTER:  On the record at 12:27 p.m.
6        (Interpreter and Witness were sworn in.)
7        ROSENDO LIEVANOS,
8  having been duly sworn, testified through an Interpreter
9  as follows:
10            EXAMINATION
11 BY MR. QUEZADA:
12   Q.  Good afternoon, Mr. Lievanos.
13   A.  Lievanos.
14   Q.  Lievanos.
15        Good afternoon, Mr. Lievanos.  My name is
16 Stephen Quezada, I'm an attorney representing Delgar
17 Foods, L.L.C., and Delgar Foods, L.L.C. does business as
18 Delia's.  Okay?
19   A.  Yes.
20   Q.  And, actually, Delia's Tamales.
21   A.  Delia's Tamales, yes.
22   Q.  So you understand today that when I say
23 Delia's, we're referring to the Defendant in the lawsuit
24 that you're a part of, correct?
25   A.  Yes.  Yes.

Page 5

2 (Pages 2 - 5)

**Page 10**

1  A. Yes.
2  Q. And what did you study?
3  A. Industrial engineering.
4  Q. Lots of math, huh?
5  A. Physics and math.
6  Q. Better you than me.
7     Okay. Okay. You worked for Delia's as a
8  manager, correct?
9  A. I started in the kitchen, then I was promoted
10 to manager.
11 Q. And you were promoted to manager in May of
12 2016, correct?
13 A. Yes. That is right.
14 Q. And are you aware of a difference between a
15 production manager and a store manager?
16 A. Yes. I do know the difference.
17 Q. And those are two different positions, correct?
18 A. Yes, that is right.
19 Q. And you were a store manager, correct?
20 A. Yes.
21 Q. And you supervised about 20 employees, correct?
22 A. From 20 to 30.
23 Q. And you worked at the locations in -- well,
24 what locations did you work at?
25 A. At the six locations.

**Page 11**

1  Q. And would you move around from location to
2  location, or would you be assigned at one and go to
3  another?
4  A. When I started as a manager I was sent to
5  several locations, then I went to San Juan and Mission
6  in a stable manner.
7  Q. What was the last store to which you were
8  assigned when you were a manager at Delia's?
9  A. Mission. In Mission.
10 Q. Okay. And I believe your last rate of pay was
11 $1,100 per week?
12 A. Yes.
13 Q. And you also received a bonus from Delia's?
14 A. Yes.
15 Q. And about how much was that bonus?
16 A. It was several amounts since I began.
17 Q. Okay. What was the amount of the last bonus
18 you received?
19 A. 10,000.
20 Q. And you -- excuse me.
21    You would get that bonus in January?
22 A. Yes.
23 Q. So on an annual basis, what was the approximate
24 amount of your pay?
25 A. Approximately, 50,000.

**Page 12**

1  Q. And does that include the bonus or it does not
2  include the bonus?
3  A. It does not include.
4  Q. So with the bonus, about $60,000?
5  A. Approximately, yes.
6  Q. And that's certainly more than your pay when
7  you were a cook, correct?
8  A. Yes, That is right.
9  Q. And when you were a cook you didn't supervise
10 any employees, correct?
11 A. None.
12 Q. You also had health insurance when you were
13 working at Delia's?
14 A. Yes.
15 Q. And Delia's paid for that, correct?
16 A. Yes. Yes.
17 Q. Did you opt for the vision insurance?
18 A. No.
19 Q. But it was made available to you, correct?
20 A. Yes.
21 Q. Did you get the dental insurance from Delia's?
22 A. No.
23 Q. But it was made available to you?
24 A. Yes.
25 Q. So other than the bonus and the health

**Page 13**

1  insurance, did you receive any benefit from Delia's?
2  A. Life insurance.
3  Q. And did Delia's pay for the life insurance?
4  A. I don't remember.
5  Q. How much was the life insurance?
6  A. I don't remember.
7  Q. Okay. And, I'm sorry, I'm not necessarily like
8  a premium amount but what was the value, if you know?
9  Like if heaven forbid something were to happen, it would
10 be a $10,000, $20,000, $30,000, do you know?
11 A. 100,000.
12 Q. More than 100,000 or 100,000?
13 A. Around there. I don't quite remember. It was
14 a large amount.
15 Q. Okay. And that's something that's made
16 available to managers, right?
17 A. No, for everyone.
18 Q. Even the hourly employees?
19 A. Yes.
20 Q. And you also had two weeks of paid vacation; is
21 that right?
22 A. Yes.
23 Q. And you took those paid vacations?
24 A. Yes.
25 Q. Would you take them all at once, or would you

4 (Pages 10 - 13)

### Page 14

1  take it a little bit here and there?
2     A. One week the first half of the year, and the
3  other week the second half of the year.
4     Q. And did you do that the entire time you were a
5  manager?
6     A. Yes.
7     Q. I'd like to talk a little bit about what you
8  did as a manager, okay?
9     A. Okay.
10    Q. We already got that you supervised about 20 to
11 30 employees.
12    A. Yes, that's -- that's it. That's right.
13    Q. And these were employees who were hourly
14 employees working at the restaurant full-time, correct?
15    A. Yes, that is right.
16    Q. And were these employees back of the house, or
17 kitchen employees, or did they work in the front of the
18 store where the customers were?
19    A. I was in charge of kitchen employees and
20 cashier too.
21    Q. Okay. Could you tell us about how many were in
22 the kitchen and about how many were cashier?
23    A. It was about half and half, 15 and 15.
24    Q. And as a manager you could hire employees?
25    A. Yes.

### Page 15

1     Q. And you could also fire employees if you needed
2  to?
3     A. Yes, that too.
4     Q. If you saw -- well, Delia's has work policies
5  and procedures, correct?
6     A. Yes, That is right.
7     Q. And your job as a manager was to enforce those
8  policies and procedures, correct?
9     A. Yes.
10    Q. And those policies and procedures included how
11 to -- policies about how to make the foods?
12    A. Yes.
13    Q. Or probably more procedures, right?
14    A. Yes, more procedures.
15    Q. And you would enforce those as a manager?
16    A. I didn't quite understand that.
17    Q. You make sure that the procedures were followed
18 for making the food?
19    A. Yes, yes.
20    Q. And those also included policies for how
21 employees were supposed to behave at the store, correct?
22    A. Yes, that is right.
23    Q. So policies and procedures about how to
24 correctly and accurately clock in and clock out,
25 correct?

### Page 16

1     A. Yes, that is right.
2     Q. And you made sure employees followed those
3  procedures, right?
4     A. Yes.
5     Q. Also, included policies about how employees
6  should behave respectfully in the workplace?
7     A. Yes.
8     Q. Okay. And if an employee was violating those
9  policies or those procedures, you were able to tell them
10 to stop and correct them?
11    A. Yes. That is right.
12    Q. And if you saw the foods being produced in an
13 incorrect manner, you could stop that and correct it as
14 well, right?
15    A. Yes.
16    Q. And you had to use your experience and your
17 judgment and discretion to make those decisions?
18    A. Yes.
19    Q. The one question I forgot to ask you, what is
20 your address?
21    A. 1409 St. Francis Avenue in Alton, Texas.
22    Q. Where is Alton?
23    A. Next to Mission.
24    Q. And is that a house, sir?
25    A. Yes.

### Page 17

1     Q. And who lives there in the house with you?
2     A. My mother-in-law, my wife, and my two
3  daughters.
4     Q. If you had to pick one not to live there
5  anymore would it be the suegra? You don't have to
6  answer. You don't have to answer.
7     A. She's like my second mother.
8     Q. That's good. Then I'm sure the children love
9  it. Sorry.
10         Okay. Do you have a cell phone?
11    A. Yes.
12    Q. What is your cell phone number?
13    A. (956) 563-2918.
14    Q. 2919?
15    A. 2918. 563-2918, yes.
16    Q. Thank you. And who is the service provider?
17    A. Spectrum.
18    Q. And is it an iPhone or a Samsung?
19    A. Samsung.
20    Q. Okay. And have you had that -- for how long
21 have you had that phone number?
22    A. One year, one month.
23    Q. Has it always been with Spectrum?
24    A. I've been with Spectrum for one year, one
25 month, since I got the phone.

5 (Pages 14 - 17)

**Page 18**

1  Q.  Since you've been with Spectrum, have you had
2  the same device?
3  A.  Yes.
4  Q.  Okay.  Going back to your duties as a manager,
5  I'd like to ask you about a few more, okay?
6  A.  That's fine.
7  Q.  Would you resolve customer complaints or
8  issues?
9  A.  Yes.
10 Q.  So if a customer decided that their food wasn't
11 good for whatever reason and wanted a refund, you would
12 give them their money back?
13 A.  First, we offer credit in tamales.  If they
14 didn't want that, then we'd give them the refund.
15 Q.  Was there ever a situation where you thought
16 something was just really bad and so you just went
17 straight to refund?
18 A.  Yes.
19 Q.  And you used your experience and judgment to
20 make that decision?
21 A.  Yes, that is right.
22 Q.  Would you organize the shift schedules?
23 A.  No.
24 Q.  Okay.  If an employee got there late, would you
25 correct them and remind them of when they needed to be

**Page 19**

1  there?
2  A.  Yes.
3  Q.  Did you ever write anyone up?
4  A.  Yes.
5  Q.  And you would use your judgment and discretion
6  to do that?
7  A.  Yes, that is right.
8  Q.  If someone missed completely their shift, would
9  you be the person to note that and to take the
10 appropriate action?
11 A.  Yes.  That is right.
12 Q.  Would you approve vacation time for the
13 employees that reported to you?
14 A.  No.
15 Q.  Did you ever provide any performance reviews?
16 A.  Yes.
17 Q.  Would you do those annually?
18 A.  Not annually, but periodically.
19 Q.  Did you ever decide to give anyone a raise in
20 their pay?
21 A.  No.  I was not authorized.  That was the
22 supervisor.
23 Q.  Could you recommend that?
24 A.  Yes.
25 Q.  And would the supervisor follow your

**Page 20**

1  recommendations?
2  A.  Sometimes.
3  Q.  And sometimes not?
4  A.  Yes, no.
5  Q.  Okay.  What sort of trainings would you provide
6  new employees?
7  A.  Security training, how to perform job duties
8  and harassment too.
9  Q.  Okay.  Just so we're clear, how not to harass,
10 right?
11 A.  Yes, how not to harass.
12 Q.  Would you take lunch?
13 A.  Yes.
14 Q.  For how long did you have to eat?
15 A.  Half hour.
16 Q.  And you would take that lunch break?
17 A.  I'd generally wait for the other manager to
18 eat.
19 Q.  So that way there could be at least one manager
20 on duty, if you will?
21 A.  Yes, of course.
22 Q.  You received your pay by check, correct?
23 A.  Direct deposit.
24 Q.  And you would receive pay stubs?
25 A.  Yes.

**Page 21**

1  Q.  Would you look at your pay stubs to make sure
2  they were correct?
3  A.  Yes.
4  Q.  And you knew if they weren't correct you --
5  A.  It was the same amount.  It was a salary.
6  Q.  Nonetheless, if there was something wrong on
7  the check, you knew you could tell someone in human
8  resources?
9  A.  Yes.
10 Q.  And you never did that, correct?
11 A.  No issue -- the occasion never happened with an
12 issue.
13 Q.  Okay.  Fair enough.  Were you ever disciplined
14 in any way?
15 A.  Yes.
16 Q.  And what was that for?
17 A.  I took it as an opportunity to improve.
18 Q.  Okay.  And what -- and when was that?
19 A.  In San Juan.
20 Q.  Do you remember the year?
21 A.  2016 or '17.
22 Q.  And what did they do?  Just a write up and --
23 A.  Yes.  Back then the supervisor was Monica and
24 she wrote the warnings.  It was a work related, that's
25 all.

```
 1    Q.  Was -- was that when you were an hourly
 2 employee?
 3    A.  No.  I was a manager already.
 4    Q.  And would you say you were self-sufficient in
 5 your position?
 6    A.  Yes, that's right.
 7    Q.  As a manager, did your duties ever change
 8 overtime, or was it about the same the entire time you
 9 were a manager?
10         THE INTERPRETER:  May you repeat.
11    Q.  (By Mr. Quezada)  When you were manager, over
12 time, did your duties change, or were they about the
13 same the entire time you were a manager?
14    A.  They changed over time.
15    Q.  And in what way?
16    A.  Well, when I was a manager in Mission I had to
17 speak to them about safety, to avoid accidents, job
18 performance, and harassment.
19    Q.  So there towards the end you had more employee
20 relation duties?
21    A.  Yes.  We were told that the employee was the
22 most important part.
23    Q.  And that's the way you did your job?
24    A.  The employee was the most important.  Yes, that
25 is right.
                                                  Page 22
```

```
 1    Q.  Did you ever train an employee on how to use
 2 the Focus system?
 3    A.  Yes.
 4    Q.  Did you clock in and clock out?
 5    A.  I did not as a manager because I didn't have to
 6 clock in or out since I was a salary employee.
 7    Q.  And the employees who reported to you, did you
 8 make sure that they clocked in and clocked out
 9 correctly?
10    A.  Yes, that is right.
11    Q.  Did you have keys to the store?
12    A.  Yes.
13    Q.  You could open and close the store?
14    A.  Yes.  Only managers open and close stores.
15    Q.  You had the alarm code?
16    A.  Yes.  I did have that too.
17    Q.  Did the non-managerial employees have that
18 code?
19    A.  No, only managers.
20    Q.  And was there a safe on the premises?
21    A.  Yes.
22    Q.  And did you have the code to the safe?
23    A.  Yes, I did know it.
24    Q.  Did any non-manager employees know it?
25    A.  No.
                                                  Page 23
```

```
 1    Q.  Were you responsible for counting cash and
 2 keeping track of cash?
 3    A.  Yes, that is right.
 4    Q.  Would you reconcile the cash sold?
 5    A.  Sometimes.  The supervisor was in charge of
 6 that, but if he wasn't there or he was off, we would do
 7 that.
 8    Q.  Would you make sure that the product that was
 9 needed to make the tamales and other items sold were in
10 stock and being handled correctly?
11    A.  Yes.
12    Q.  Could you hire -- or could you order, excuse
13 me.
14         Could you order any products that were
15 needed to make the foods?
16    A.  Yes.
17    Q.  Would you receive product that was needed to
18 make the foods?
19    A.  Yes, that is right.
20    Q.  And if you looked at that product and saw that
21 it wasn't good or incorrect, you could send it back?
22    A.  Yes, we could return.
23    Q.  And if there was foods that were made that were
24 going to be sold to customers that did not appear to be
25 to standard, could you make the decision to not sell
                                                  Page 24
```

```
 1 those foods?
 2    A.  Yes.  If the tamale had a foul smell we had to
 3 throw it away.
 4    Q.  And all these duties we've discussed, all these
 5 responsibilities we've discussed, again, you would use
 6 your experience and judgment and discretion to make
 7 these decisions?
 8    A.  Yes.
 9    Q.  And your decisions were respected and followed
10 by the employee who reported to you?
11    A.  Yes, that is right.
12    Q.  And your supervisor respected your
13 decision-making authority, correct?
14    A.  Yes, that is right.
15    Q.  Who was your supervisor?
16    A.  Jose Hernandez was my supervisor in Mission.
17    Q.  And I think you mentioned Monica?
18    A.  Yes.  That was in -- that was in San Juan.  It
19 was Monica and then Jesus Pena.
20    Q.  Were you able to set your own schedule?
21    A.  When I needed a specific day I'd notify the
22 supervisor and he would give it to me.
23    Q.  And you never had problem taking days off when
24 you wanted to?
25    A.  No, none.
                                                  Page 25
```

```
 1    Q.  Was there ever an opportunity for you to make
 2  the decision to demote an employee?
 3    A.  No.
 4    Q.  Would you ever make the decision to reduce
 5  someone's pay?
 6    A.  No.
 7    Q.  Why are you suing Delia's?
 8    A.  For discrimination, unjustified termination,
 9  and irregularities -- labor irregularities.  And
10  intimidation.
11    Q.  Are the labor irregularities, do they fall
12  under the same thing as intimidation?
13    A.  It could -- -- but, no, no, it's different.
14    Q.  So let's take the first thing you mentioned,
15  discrimination, okay.
16    A.  Yes.  Well, that was in based that we were
17  terminated and other employees are in the same situation
18  and they're still there.
19    Q.  Okay.  So let me ask you this, the
20  discrimination, you're saying that you were
21  discriminated against because of the termination
22  decision; is that right?
23         MR. GONZALEZ:  Objection; form.
24    A.  Yes, Yes.  Because some were terminated and
25  others weren't, and that's how we ended up in this
                                                    Page 26
```

```
 1  situation.
 2    Q.  (By Mr. Quezada)  Okay.  And you also mentioned
 3  wrongful termination.
 4    A.  Yes.
 5    Q.  And are you saying that the termination was
 6  wrongful because of the discrimination, meaning is it
 7  the same thing, or is it something different you're
 8  telling us?
 9    A.  Well, I consider each separate but they are
10  together.  Discrimination, intimidation, labor
11  irregularities, and unjustified termination.
12    Q.  Were you aware that the reason Delia's
13  terminated your employee was because it received a
14  notice from the Government that it could no longer
15  continue employing you?
16    A.  Yes.  Uh-huh.
17    Q.  And sitting here today, do you have any facts
18  or evidence that you can tell us that would show that
19  that reason is false?
20    A.  No, I do not.
21    Q.  When you are telling us irregularities, what do
22  you mean by that?
23    A.  Yes.  Well, they say -- well, supposedly our
24  documents aren't right.  Why was our insurance taken
25  out?  I mean, it was being taken out.  Where'd it go if
                                                    Page 27
```

```
 1  they weren't original?
 2    Q.  And is that the only irregularity that you're
 3  talking about in this lawsuit?
 4    A.  Yes, yes.
 5    Q.  So just so that I have this clear, you're
 6  talking about deductions that were made from pay for
 7  benefits?
 8    A.  I'm referring to Social Security deductions.
 9  If it isn't original, then where was it going?
10    Q.  Okay.  Any other deduction?
11    A.  No.  That's the only one.
12    Q.  So I'll represent to you, sir, that
13  withholdings made for Social Security were remitted to
14  the federal government.
15         Okay.  Do you have any reason to believe
16  that that's false?
17         MR. GONZALEZ:  Objection; form.
18    A.  No, it didn't add up.  I mean, if it was being
19  deducted, and it isn't original, where is it going?  I'm
20  talking about all the years.
21    Q.  (By Mr. Quezada)  Okay.  Do you have any
22  evidence or facts that Delia's was holding on to those
23  dollars and not sending them to the Government?
24    A.  No, I do not have.
25    Q.  One allegation in this case is that Delia's was
                                                    Page 28
```

```
 1  maintaining two sets of books.  Have you heard that
 2  before?
 3    A.  No.
 4    Q.  So sitting here today, you have no knowledge of
 5  two sets of books by Delia's; is that right?
 6    A.  That is un -- unknown to me.
 7    Q.  So let me ask you now about the -- well,
 8  anything else about irregularities, or did we cover it?
 9    A.  Yes, that's it.
10    Q.  Okay.  So, now, let me ask you about the
11  intimidation.  What are you claiming was intimidation?
12    A.  Yes.  When we were called upon, Delia's had her
13  attorney.  We were called without any legal
14  representation.
15    Q.  Did you ask for legal representation at that
16  time?
17    A.  No.  I mean, the day we were called, the
18  attorneys were there, she had her attorneys, and we had
19  no knowledge about it.
20    Q.  Okay.  My question was, did you ask for an
21  attorney at that time?
22    A.  Not at that time.
23    Q.  Okay.  So what other -- what else is part of
24  the intimidation?
25    A.  Just that part.
                                                    Page 29
```

```
 1        I, ROSENDO LIEVANOS, have read the foregoing
 2   deposition and hereby affix my signature that same is
 3   true and correct, except as noted above.
 4
 5
 6        _____
 7        ROSENDO LIEVANOS
 8   THE STATE OF TEXAS)
 9   COUNTY OF _____)
10        Before me, _____, on
11   this day personally appeared ROSENDO LIEVANOS, known to
12   me (or proved to me under oath or through
13   _____) (description of identity card or
14   other document) to be the person whose name is
15   subscribed to the foregoing instrument and acknowledged
16   to me that they executed the same for the purposes and
17   consideration therein expressed.
18        Given under my hand and seal of office this
19   _____ day of _____, 2024.
20
21        _____
22        Notary Public in and for
23        The State of Texas
24
25
```
Page 42

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   MCALLEN DIVISION
 3   JUANA CRUZ, OFELIA          )
     BENAVIDES, JOSE ELIAS N.G,  )
 4   GABRIELA VELAZQUEZ, RICARDO )
     GONZALEZ, HELESIO CRUZ,     )
 5   ANGELICA CHAVEZ, CONCEPCION )
     PEREZ, OLGA PEREZ, MAVRIGO  )
 6   SAENZ, JORGE MAOLEON,       )
     HECTOR SANCHEZ, HECTOR      )
 7   GONZALEZ, YESSY             )
     PEREZ-MARTINEZ, MARIA DE    )
 8   LOURDES CRUZ, RESENDO       )
     LIEVANOS, ELIZABETH LARA,   )
 9   LUIS ALBERTO        )  CIVIL ACTION
     ZUNIGIA-CASTILLO, MIGUEL ) NO. 7:23-CV-00343
10   CABALLERO SANCHEZ,          )
     GUILLERMO DE LA             )
11   CRUZ-MENDOZA, CARLOS DANIEL )
     LOPEZ, GILDA RIVAS, ARMANDO )   JURY DEMANDED
12   MORALES DE LLANO, LAZARO    )
     GARCIA, MARIA DE JESUS      )
13   MEDINA, RICARDO ESQUIVEL,   )
     RAFAEL SANCHEZ, GUILLERMO   )
14   RUIZ, ROSA QUINTANILLA,     )
                                 )
15         PLAINTIFFS,  )
                                 )
16   VS.                         )
                                 )
17   DELGAR FOODS LLC A/K/A      )
     DELIA'S TAMALES,            )
18              )
           DEFENDANT.   )
19
     *********************************************************
20
             REPORTER'S CERTIFICATION
21        DEPOSITION OF ROSENDO LIEVANOS
                June 28, 2024
22
          I, Anica Diaz, Certified Shorthand Reporter in
23   and for the State of Texas, hereby certify to the
     following:
24
          That the witness, ROSENDO LIEVANOS, was duly
25   sworn by the officer and that the transcript of the oral
```
Page 43

```
     deposition is a true record of the testimony given by
                                  44
 1   the witness;
 2        I further certify that pursuant to FRCP Rule
     30(f)(1) that the signature of the deponent:
 3
          __X__ was requested by the deponent or a party
 4   before the completion of the deposition and that the
     signature is to be before any notary public and returned
 5   within 30 days from date of receipt of the transcript.
     If returned, the attached Changes and Signature Page
 6   contains any changes and the reasons therefor;
 7        ____ was not requested by the deponent or a party
     before the completion of the deposition.
 8
          I further certify that I am neither counsel
 9   for, related to, nor employed by any of the parties or
     attorney in the action in which this proceeding was
10   taken, and further that I am not financially or
     otherwise interested in the outcome of the action.
11
          Certified to by me this 10th day of July, 2024.
12
13
14
15
          Anica Diaz, Texas CSR(6021), RPR, CRR
16        Expiration Date: 08-31-24
          Veritext Legal Solutions
17        Firm Registration No. 571
          300 Throckmorton Street, Suite 1600
18        Fort Worth, Texas 76102
19
20
21
22
23
24
25
```
Page 44

```
 1   Ricardo Gonzalez - ric@oxfordandgonzalez.com
 2              July 10, 2024
 3   RE: Cruz, Juana, Et Al v. Delgar Foods LLC, Et Al.
 4   DEPOSITION OF: Rosendo Lievanos (# 6734289)
 5        The above-referenced witness transcript is
 6   available for read and sign.
 7        Within the applicable timeframe, the witness
 8   should read the testimony to verify its accuracy. If
 9   there are any changes, the witness should note those
10   on the attached Errata Sheet.
11        The witness should sign and notarize the
12   attached Errata pages and return to Veritext at
13   errata-tx@veritext.com.
14        According to applicable rules or agreements, if
15   the witness fails to do so within the time allotted,
16   a certified copy of the transcript may be used as if
17   signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
```
Page 45

12 (Pages 42 - 45)