```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    MCALLEN DIVISION
 3    JUANA CRUZ, OFELIA          )
      BENAVIDES, JOSE ELIAS       )
 4    N.G, GABRIELA VELAZQUEZ,    )
      HELESIO CRUZ, ANGELICA      )
 5    CHAVEZ, CONCEPCION PEREZ,   )
      OLGA PEREZ, MAVRIGO         )
 6    SAENZ, JORGE MAOLEON,       )
      HECTOR SANCHEZ, HECTOR      )
 7    GONZALEZ, YESSY PEREZ       )
      MARTINEZ, MARIA DE          )
 8    LOURDES CRUZ, RESENDO       )
      LIEVANOS, ELIZABETH LARA,   )
 9    LUIS ALBERTO ZUNIGIA        )
      CASTILLO, MIGUEL            )
10    CABALLERO SANCHEZ, CARLOS   )  CASE NO: 7:23-CV-00343
      DANIEL LOPEZ, GILDA         )
11    RIVAS, ARMANDO MORALES DE   )      JURY DEMANDED
      LLANO, LAZARO GARCIA,       )
12    MARIA DE JESUS MEDINA,      )
      RICHARD ESQUIVEL, RAFAEL    )
13    SANCHEZ, GUILLERMO RUIZ     )
      ROSA QUINTANILLA,           )
14
                                  )
15            PLAINTIFFS,
                                  )
16    VS.                         )
                                  )
17    DELGAR FOODS, LLC A/K/A     )
      DELIA'S TAMALES,            )
18                                )
              DEFENDANT.          )
19    ***************************************************
      ORAL DEPOSITION OF
20    OLGA PEREZ
21    June 26, 2024
22    ***************************************************
23            ORAL DEPOSITION of OLGA PEREZ, produced
24    as a witness at the instance of the Defendant, and duly
25    sworn, was taken in the above-styled and numbered cause
```

Page 1

FOR REDACTED SIGNING PURPOSES ONLY

APPENDIX
1

1    on the 26th day of June 2024, from 10:48 a.m. to

2    1:59 p.m., before Priscilla R. Maldonado, CSR, in and

3    for the State of Texas, reported by machine shorthand,

4    at the Law Offices of Ricardo Gonzalez, 124 S. 12th Ave,

5    Edinburg, Texas, pursuant to the Federal Rules of Civil

6    Procedure and the provisions stated on the record or

7    attached.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

```
1              THE REPORTER:  We are now on the record.
2    Today is June 26, 2024, and the time is 10:48 a.m.
3              This is the oral deposition of Olga Perez,
4    produced at the request of the Defendant in Case No.
5    7:23-CV-00343, styled Juana Cruz et. al. versus Delgar
6    Foods, LLC D/B/A Delia's.
7              My name is Priscilla Maldonado, Texas CSR
8    12052, representing Veritext.
9              Would counsel please state their appearance
10   for the record?
11             MR. QUEZADA:  Stephen Quezada, for the
12   Defendant.
13             MR. GONZALEZ:  Ricardo Gonzalez, for the
14   Plaintiffs.
15             MS. VALLE:  Lorena Valle, for the
16   Defendant.
17             OLGA PEREZ,
18   having been first duly sworn, testified through the
19   duly-sworn interpreter as follows:
20                    EXAMINATION
21   BY MR. QUEZADA:
22        Q.   Good morning, Ms. Perez.
23        A.   Good morning everyone.
24        Q.   For the record, there are some additional
25   plaintiffs here in the room for us, Armando Morales, the
```

Page 5

1       Q.   Did one of your former co-workers call you and

2    ask -- tell you about the lawsuit or ask you to join?

3       A.   Let me remember.

4       Q.   Or was it your idea to sue?

5       A.   Somebody was talking to an attorney, and I

6    don't recall which one of my co-workers was it -- it

7    was.

8       Q.   Okay.  When you were working at Delia's, your

9    position was a cook/team leader; is that correct?

10      A.   No.  First I was a cook, and then I was a team

11   leader.

12      Q.   Okay.  Can you tell us when you became a team

13   leader?

14      A.   I don't have an exact date, but it seems to me

15   that it was around 2019.

16      Q.   Before Covid?

17      A.   Yes.

18      Q.   And before becoming a team leader, I believe

19   you said you were a cook?

20      A.   Yes.  That's correct.

21      Q.   Your start date with Delia's was March 2, 2007,

22   correct?

23      A.   Yes.  That is correct.

24      Q.   So you were a cook from that start date

25   March 2, 2007 until sometime in 2019, correct?

Page 14

```
 1        A.    Correct.

 2               THE INTERPRETER:  Give me a second.

 3               MR. QUEZADA:  Sure.

 4               THE INTERPRETER:  Oh, I though I was going

 5    to sneeze.  Okay.

 6               MR. QUEZADA:  No problem.

 7        Q.    (BY MR. QUEZADA)  Your final rate of pay, while

 8    working at Delia's, was $12.35.  Does that sound

 9    correct?

10        A.    $12.35.

11        Q.    And before that, I believe it was $10.25.  Does

12    that sound right?

13        A.    Yes.  I don't recall.

14        Q.    Okay.  From the date you started your

15    employment with Delia's until your last day of work with

16    Delia's, were you employed continuously?  Or were there

17    any gaps?

18        A.    Continuously.

19        Q.    Did you ever take any vacations or any leaves?

20        A.    Well, we have vacations that they gave us from

21    2008 to date.

22        Q.    About how much vacation time per year did you

23    receive?

24        A.    One week first.  And then after -- after a few

25    years, they would give us two weeks vacation, but they
```

Page 15

1   some sort.  And if I asked for the day, then I would get

2   the day.  But I'm not the kind of person that would ask

3   for days off.

4       Q.    Okay.  So you mentioned being a cook and a team

5   lead while working at Delia's.  Do you recall that?

6       A.    Yes.

7       Q.    What would you do as a cook?

8       A.    Okay.  Well, at the kitchen, you had to do --

9   you had to chop the vegetables, you know, for the salad.

10  You would take lettuce, tomato, onions.  And then on

11  weekends chile, and then you would have to cook the

12  tamales.  They would cook in the oven.  And also in the

13  kitchen, what we did, we wrapped them in half dozens and

14  in dozens.  And then, of course, after that you'd have

15  to do the dishes, you have to sweep, you have to mop,

16  and you have to clean.  And we also cleaned the

17  restrooms.

18      Q.    Okay.  And just to be clear, that was as a

19  cook?

20      A.    Yes.

21      Q.    And do you -- again, I believe I asked you, but

22  I don't recall your response.  So forgive me.  But do

23  you recall when you stopped being a cook and switched to

24  team lead?

25      A.    I told you that it was apparently in 2019, but

                                          Page 19

```
 1    I don't have an exact date.

 2         Q.   Okay.  Thank you for that.  I'm sorry for

 3    asking again.

 4         A.   Okay.  No problem.

 5         Q.   Thank you.  When you became team lead, how did

 6    your duties change?

 7         A.   Actually, there was -- there wasn't a lot of

 8    change.  It was just more work for me.

 9         Q.   Okay.  And your rate of pay increased at that

10    time?

11         A.   Yes.  When they -- when they moved me -- when

12    they promoted to team lead, they also gave me a raise.

13         Q.   Did you supervise any employees as a team

14    leader?

15         A.   All of my group co-workers.  Because we were --

16    but what do you mean by supervising?

17         Q.   Thank you for asking.  So what I mean is, did

18    you become responsible for overseeing the work that they

19    also did?

20         A.   Yes.

21         Q.   So when you said that when you became a team

22    leader, really not much changed, but it was more work.

23    Was supervising those employees part of that additional

24    work?

25         A.   Okay.  When I became a team leader -- okay.
```

Page 20

```
 1    Well, it was like -- well, you know, it was like the
 2    manager.  It was like I was doing my job and now I had
 3    like managerial duties.  So I would have to supervise.
 4    I would have to make sure that the -- that the trays
 5    were full at all times with tamales.  I had to make sure
 6    that everything was done right.  And it was basically
 7    doing the manager's job, I mean, and by that I also felt
 8    kind of like discriminated, because I was now being
 9    asked to be like -- at least in my case.  I don't know
10    about the other -- about the other team leaders, but I
11    felt that I had to do all of this work that really
12    belonged to a manager.  So that was perhaps the
13    manager's problem, and yet, I was responsible for
14    that -- for that work.  So that's why I felt
15    discriminated and at the same time, asked to do more
16    work that perhaps was not really for me to do.
17         Q.    Okay.  Thank you for that.  I just want to
18    clarify what the additional team lead duties were.
19    Okay?  Okay.  And so I've got -- I'm just going to give
20    you a summary and you tell me if it's accurate.  Okay?
21    You had to supervise people?
22         A.    Yes.
23         Q.    You had to make sure the tamale trays were
24    full?
25         A.    Yes.
```

Page 21

```
 1        Q.    Make sure everything was good and functioning?

 2        A.    Yes.

 3        Q.    And are we talking about good and functioning

 4   in the kitchen with the cooks, or in other parts of the

 5   restaurant, as well?  Or just the food production?

 6        A.    Only in the kitchen.  Yes.  Anything in the

 7   kitchen.  Everything in the kitchen and our fellow

 8   workers.

 9        Q.    And so are you familiar with the term back of a

10   house, in front of a house?  Meaning like the kitchen

11   versus the dining room.

12        A.    In the front of the house, it's only the trays

13   for the tamales.  And that's it.

14        Q.    Okay.

15        A.    There was another team leader that was in

16   charge of the dining room.

17        Q.    And that's what I was about to ask you.  Thank

18   you.  That there somebody else for the front, right?

19        A.    Okay.

20        Q.    True?

21        A.    Yes.

22        Q.    Okay.  And you also mentioned that you did some

23   of the things that the -- that as team leader, you also

24   did some of the things that the manager did; is that

25   correct?
```

Page 22

```
 1          A.    Correct.

 2          Q.    And what were those tasks?

 3          A.    Well, like receiving merchandise and receiving

 4     the fast.  Basically, it's merchandise.

 5          Q.    And you're talking about the merchandise to

 6     prepare the foods?

 7          A.    Yes.  That's correct.  Also receiving the

 8     tamales when they arrive at the store.  They deliver to

 9     the store, the ones that are going to be cooked in the

10     store, so they would -- we had to receive them.  And I

11     felt that that was something that the manager should

12     have done.

13          Q.    Okay.  That's your feeling, correct?

14          A.    Yes.  That's -- that was what I felt.

15          Q.    Okay.  Any other -- you mentioned cleaning,

16     right?

17          A.    Yes.

18          Q.    And did you do that as team leader?

19          A.    Of course.

20          Q.    What about any prep work to start the cooking

21     or the production?

22          A.    What?

23          Q.    Well, like did you have to set up any machine?

24     Did you have to clean up anything before getting

25     started?  Get spices out?  Get meats out?  Any of that
```

Page 23

1   sort of prep work before the actual cooking or

2   production started?

3       A.   Okay.  Well, at the kitchen, what you do in the

4   morning, basically, is prepare the vegetables or prepare

5   the -- yeah, the vegetables before actually being able

6   to open the store and start selling.

7       Q.   Okay.  And that was something that you did as

8   well?

9       A.   Yes.  Of course.

10      Q.   Okay.  Did you ever train any employees working

11  in the kitchen?

12      A.   Yes.  Many.  And even some managers too.

13      Q.   Okay.  Did you monitor the foods that were

14  being prepared, to make sure that they were good and up

15  to standard?

16      A.   No.  Not -- not food.  Just preparing the

17  vegetables, and also to cook the tamales, which were

18  already prepared.

19      Q.   What sort of machinery did you use?

20      A.   It was not a machinery, but just the ovens.

21      Q.   Okay.  What about the stove?

22      A.   Well, yeah, the stove for the menudo -- for the

23  tripe soup.

24      Q.   You're making me hungry.  What about -- did you

25  have to keep any like records about the food or what was

Page 24

1    customers started coming in or would customers come in

2    later?

3         A.   Well, when we opened at seven, they would begin

4    to come in a little later.  But when we opened at six,

5    they would come at seven.  So it's about an hour between

6    the time we open and when the customers come in.

7         Q.   Okay.  And I guess you had a key to the

8    restaurant?

9         A.   That is correct.

10        Q.   Any other tasks or duties as a team leader that

11   we haven't covered?

12        A.   No.  I think that -- that's all.

13        Q.   Okay.  Around 2017, you recall -- did you --

14   I'm sorry.  Let me take a step back.  Did you ever hire

15   or fire any employees?

16        A.   No.

17        Q.   Did you ever discipline employees?

18        A.   No.

19        Q.   Did you ever approve vacation time or anything

20   like that?

21        A.   No.

22        Q.   Okay.  So do you recall in 2017, Delia's

23   started using a timekeeping system?

24        A.   What do you mean timekeeping?

25        Q.   Okay.  So do you recall in 2017, you started

                                                  Page 27

```
1          Q.    Yes.

2          A.    From now?  Or from then?  Or before?  Or how --

3     or what year?

4          Q.    Do you have any records?

5          A.    Well, I have all of my check stubs.  And all of

6     the schedules and hours are there.

7          Q.    Okay.  And you've looked at those check stubs?

8          A.    Yes.  They were mine.

9          Q.    And you reviewed them when you received them?

10         A.    Yes.

11         Q.    And they were accurate and correctly reflected

12    the time worked by you?

13         A.    Well, yes.  But occasionally the machine would

14    make a mistake and you would be missing hours.

15         Q.    That's right.  And when those occasions

16    happened, you'd let someone know and it would get fixed;

17    is that right?

18         A.    Yes.

19         Q.    And you did that every time you noticed an

20    error, correct?

21         A.    Of course.

22         Q.    And who would you tell?  Someone in human

23    resources?  Your supervisor?

24         A.    The manager.

25         Q.    And you never had any problem making that
```

Page 31

1        Q.   Okay.  Fair enough.  Let me ask you this.  Any

2   reason why we wouldn't be able to make a copy and give

3   you back the originals?

4        A.   Okay.  Well, because then my attorney has them.

5        Q.   Fair enough.  Any other records of time worked

6   that you've got, including anything that you wrote down

7   on a calendar or a notebook?  Or is the check stubs all

8   you've got?

9        A.   Well, yes.  For the earlier years.

10       Q.   Okay.  And what years would that be?

11       A.   Well, from the time when they didn't pay us

12   with a check, and they paid us with cash.

13       Q.   And you started receiving a check in 2017,

14   correct?

15       A.   No.  Some earlier some years before, we also

16   received checks.

17       Q.   Okay.  But in 2017, you only received a

18   paycheck?

19       A.   Yes.

20       Q.   And that was for all your hours worked?

21       A.   Yes.

22       Q.   There was no cash payment?

23       A.   No.  Because they were paying by check, but

24   before, yes.

25       Q.   And that was before 2017, correct?

Page 33

1    don't understand it well.

2                    MR. QUEZADA:  I cannot answer the question.

3                    THE INTERPRETER:  I cannot answer that

4    question -- sorry, because I don't understand it well.

5                    MR. QUEZADA:  I just want to be sure we got

6    that translation right.  I cannot answer that question

7    because I do not understand it.

8                    THE INTERPRETER:  That is the correct

9    translation.

10       Q.    (BY MR. QUEZADA)  Let me ask it this way.

11       A.    Okay.

12       Q.    If Delia says it terminated your employment

13   because the government said it could no longer continue

14   employing you, do you have any reason to dispute that?

15       A.    I'm repeating that to myself.

16                   MR. GONZALEZ:  I'm going to object to the

17   form of the question.

18       A.    Well, I'm sorry, but I cannot answer the -- I

19   cannot answer the question, even though I understand it.

20   Can I reserve the right to answer that question?

21       Q.    (BY MR. QUEZADA)  Really, ma'am, I'm sorry.

22   No.  If you -- if you understand it, we'd like to hear

23   your answer, please.

24       A.    Well, I -- I don't understand whether the

25   government told Delia to fire me or to terminate me.

                                                    Page 35

1    in a bank account?

2        A.    Yes, at my bank.

3        Q.    And what is your bank?

4        A.    Chase.

5        Q.    And is the account in your name?

6        A.    Yes.

7        Q.    Does the taqueria have it's own bank account?

8        A.    No, because I still haven't included it in the

9    bank.

10       Q.    Do you take cash only at the taqueria?

11       A.    Yes.

12       Q.    Delia's has produced time records in this case,

13   of hours worked and what's been paid to you.  Do you

14   have any documents or           to show that those records are

15   somehow inaccurate?

16       A.    I don't know what they have produced.  I can't

17   have an opinion on that.

18       Q.    It's the same pay stubs that you've gotten.

19       A.    Well, if they are the same, then we have the

20   same.

21       Q.    And they're correct, right?

22       A.    I don't know, but if we have the same and

23   they're the same, they must be correct.

24       Q.    Okay.  Fair enough.  What's your -- I'm sorry.

25   I forgot to ask you something, what's your date of

Page 70

```
 1         Q.   Did you have your glasses on at the time you
 2    reviewed this and signed it?
 3         A.   I -- yeah.  I don't wear my glasses unless I'm
 4    going to be doing something very important.  And this
 5    one is important and I think I didn't take my glasses
 6    with me, so I apologize.  But it says here that my
 7    overtime time was paid?
 8         Q.   I'm just trying to clarify what this says.  It
 9    says -- in English it says, my overtime paid is from
10    2007 the end of 2016.  Did I read that correctly?  Or
11    let me ask you this.  Do you know what that means?
12         A.   My overtime paid.  And what does that mean?
13         Q.   That -- that's what I'm asking you.
14         A.   This is the overtime -- unpaid overtime from
15    2007 to 2016.  That's what it says here.
16         Q.   Okay.  Do -- do you know what that means?
17    That's why I'm asking.  Do you know what it means?
18    'Cause it's not clear to me.  If you don't, that's okay.
19         A.   Well, I don't know.  Maybe it's gonna be better
20    for you to discuss it with the attorney, because if it's
21    not what I'm saying, then I don't know.
22         Q.   And you didn't have your glasses when you did
23    it, right?
24         A.   And I don't -- and I don't have them right now
25    with me either.
```

Page 78

1          I, OLGA PEREZ, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
4
5
                         _____
                         OLGA PEREZ
6
7
   THE STATE OF TEXAS )
8
   COUNTY OF _____ )
9
                    Before me, _____, on
10 this day personally appeared OLGA PEREZ, known to me (or
   proved to me under oath or through
11 _____.) (description of identity card or
   other document) to be the person whose name is
12 subscribed to the foregoing instrument and acknowledged
   to me that they executed the same for the purposes and
13 consideration therein expressed.
14                 Given under my hand and seal of
   office this _____ day of _____, 2024.
15
16
17 _____
   Notary Public in and for the State of Texas
18
19
20
21
22
23
24
25    Job No. HOU6734283

                                              Page 82

**AFFIDAVIT**

**STATE OF TEXAS**

**COUNTY OF HIDALGO**

Before me, the undersigned notary public, appeared _OLGA PEREZ_ and would like to state the following:

My name is _Olga P_. I am over the age of 18 and of sound mind and would like to state the following:

I started work at Delia's Tamales on 3-2-2007 til 5-2-2023 16 yrs. 5 mos. I was paid 525 a wk. I worked 60 to 80 hrs a wk I was paid 260.00 a wk. On 2009-2010, for about 6 mos I was paid with check from Delia's. From day 2007 til 2017 I was paid in cash I was never paid overtime pay on my weekly cash envelope. My overtime pay is from 2007 thru end of 2016 Never pat any signes or work rator and time pay I believed she kept two sets of books one for cash pay and the other when we got paid by check 2017 thru 2023

_Olga Perez_
Name

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 2nd day of March 2024.



ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

_Anita S. Castilleja_
NOTARY PUBLIC
My Commission Expires 4-11-25



**APPENDIX**
**I-A**

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
2                       MCALLEN DIVISION
3       JUANA CRUZ, OFELIA           )
        BENAVIDES, JOSE ELIAS        )
4       N.G, GABRIELA VELAZQUEZ,     )
        HELESIO CRUZ, ANGELICA       )
5       CHAVEZ, CONCEPCION PEREZ,    )
        OLGA PEREZ, MAVRIGO          )
6       SAENZ, JORGE MAOLEON,        )
        HECTOR SANCHEZ, HECTOR       )
7       GONZALEZ, YESSY PEREZ        )
        MARTINEZ, MARIA DE           )
8       LOURDES CRUZ, RESENDO        )
        LIEVANOS, ELIZABETH LARA,    )
9       LUIS ALBERTO ZUNIGIA         )
        CASTILLO, MIGUEL             )
10      CABALLERO SANCHEZ, CARLOS    )  CASE NO: 7:23-CV-00343
        DANIEL LOPEZ, GILDA          )
11      RIVAS, ARMANDO MORALES DE    )     JURY DEMANDED
        LLANO, LAZARO GARCIA,        )
12      MARIA DE JESUS MEDINA,       )
        RICHARD ESQUIVEL, RAFAEL     )
13      SANCHEZ, GUILLERMO RUIZ      )
        ROSA QUINTANILLA,            )
14
                    PLAINTIFFS,      )
15                                   )
        VS.                          )
16                                   )
        DELGAR FOODS, LLC A/K/A      )
17      DELIA'S TAMALES,             )
                                     )
18               DEFENDANT.          )
        ****************************************************
19                   ORAL DEPOSITION OF
20               ARMANDO MORALES DE LLANO
21                     June 26, 2024
22      ****************************************************
23               ORAL DEPOSITION of ARMANDO MORALES DE
24      LLANO, produced as a witness at the instance of the
25      Defendant, and duly sworn, was taken in the above-styled
```

Page 1

APPENDIX
2

1    and numbered cause on the 26th day of June 2024; from

2    2:04 p.m. to 4:55 p.m., before Priscilla R. Maldonado,

3    CSR, in and for the State of Texas, reported by reported

4    by stenograph, at the Law Offices of Ricardo Gonzalez,

5    124 S. 12th Ave, Edinburg, Texas, pursuant to the

6    Federal Rules of Civil Procedure and the provisions

7    stated on the record or attached.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

1              THE REPORTER:  We are now on the record.

2      Today is June 26, 2024, and the time is 2:04 p.m.

3              This is the deposition of Armando Morales

4      De Llano, produced at the request of the Defendant in

5      Case No. 7:23-CV-00343, styled Juana Cruz et. al. versus

6      Delgar Foods, LLC D/B/A Delia's.

7              My name is Priscilla Maldonado, CSR 12025,

8      representing Veritext.

9              Would counsel please state their appearance

10     for the record?

11             MR. QUEZADA:  Stephen Quezada, for the

12     Defendant.

13             MS. VALLE:  Lorena Valle, for the

14     Defendant.

15             MR. GONZALEZ:  Ricardo Gonzalez, on behalf

16     of the Plaintiffs.

17             ARMANDO MORALES DE LLANO,

18     having been first duly sworn, testified through the

19     duly-sworn interpreter as follows:

20                         EXAMINATION

21     BY MR. QUEZADA:

22          Q.   Good afternoon, Mr. Morales.

23          A.   Good afternoon.

24          Q.   So Mr. Morales, I know that you seem to

25     understand English fairly well.  We're using a

                                              Page 5

```
1          Q.    What's the highest level of education you've
2     received?
3          A.    High school.
4          Q.    And in what country was that?
5          A.    In Mexico.  Nuevo Leon, Mexico.
6          Q.    Okay.  And you worked for Delia's from 2012
7     until May 2, 2023; is that right?
8          A.    That is correct.
9          Q.    And your title was supervisor?
10         A.    That is correct.
11         Q.    Were you a supervisor the whole time?
12         A.    No.  When I came in I was a manager for about
13    two months, and then I became a supervisor.
14         Q.    Okay.  And so can -- just so we understand the
15    hierarchy, it's supervisor, then under supervisor is a
16    manager, then under manager is team leaders?
17         A.    That is correct.
18         Q.    Who was your supervisor?
19         A.    At the beginning or lately?
20         Q.    At -- at the end of your employment.
21         A.    Guadalupe Franco.
22         Q.    Okay.  And during your employment, you were
23    paid $1,326 per week, that was your last rate?
24         A.    Yes.  That is correct.
25         Q.    And for how long did you have that salary?
```

Page 10

```
 1    What years?
 2         A.   I do not recall, exactly.
 3         Q.   Okay.  And you supervised three employees; is
 4    that right?
 5         A.   I supervised all employees.
 6         Q.   About how many?
 7         A.   Between 30 to 35.  It would vary.
 8         Q.   And at what -- what restaurants or what stores?
 9         A.   At 495 and Jackson.
10         Q.   Was it just one store?
11         A.   That's correct.
12         Q.   Okay.  And just so I'm clear, the 30 to 35
13    employees were your direct reports?
14         A.   It depends on the case.
15         Q.   Okay.  So about how many employees directly
16    reported to you?
17         A.   The managers.  There's two.
18         Q.   So two managers reported directly to you?
19         A.   That is correct.
20         Q.   And those were full-time managers?
21         A.   That is correct.
22         Q.   And then, under those full-time mangers were
23    the remaining 30 to 33 employees, fair?
24         A.   Yes.  That is correct.
25         Q.   While you were a supervisor, you hired people,
```

                                                Page 11

FOR READING & SIGNING PURPOSES ONLY

```
 1    correct?
 2         A.    Lately, yes.
 3         Q.    Okay.  And you also terminated people?
 4         A.    Well, lately, I had to have the consent of
 5    human resources.
 6         Q.    Okay.  So you could recommend someone for
 7    termination, and then human resources approved?
 8         A.    That is correct.
 9         Q.    And while you were a supervisor for Delia's,
10    you did, in fact, hire some people, correct?
11         A.    That is correct.
12         Q.    And you did, in fact, make the -- make the
13    decision to terminate some people, correct?
14         A.    Correct.
15         Q.    And you also -- sorry.
16               MR. QUEZADA:  You got the correct?
17         Q.    (BY MR. QUEZADA)  And you also made decisions
18    about disciplining people?
19         A.    When authorized by human resources as well.
20         Q.    You could recommend it to human resources and
21    then they approved it?
22         A.    That is correct.
23         Q.    Was there ever a hiring, termination, or
24    disciplinary decision, that you made, that human
25    resources rejected?
```

Page 12

1      A.    Never.

2      Q.    And with regard to the store for which you were

3    responsible, other than executive level employees, were

4    you the highest-ranking employee responsible for that

5    store?

6      A.    That is correct.

7      Q.    And you were responsible for the finances of

8    the store?

9      A.    That is correct.

10     Q.    And that means making sure cash was being

11   counted correctly and deposited?

12     A.    That is correct.

13     Q.    Reconciling the cash register sales for that

14   day?

15     A.    That is correct.

16     Q.    You were responsible for managing -- you had

17   ultimate responsibility for managing the inventories?

18     A.    That is correct.

19     Q.    Did you have ultimate responsibility to make

20   sure employees were following rules?

21     A.    That is correct.

22     Q.    And that includes rules about attendance?

23     A.    Correct.

24     Q.    Rules about punching in and punching out

25   accurately?

Page 13

```
 1        A.    That is correct.

 2        Q.    Rules about wearing the correct attire?

 3        A.    That is correct.

 4        Q.    Rules about managing the food properly?

 5        A.    That is correct.

 6        Q.    You'd also -- were the ultimate authority over,

 7   perhaps, customer complaints; is that right?

 8        A.    That is correct.

 9        Q.    Were you responsible for overseeing health

10   inspections?

11        A.    That's correct.

12        Q.    And you were also responsible for receiving

13   shipments from suppliers and vendors?

14        A.    Well, I was responsible for that, but the one's

15   who actually inspected it were the managers.

16        Q.    Got it.  Would you -- would you order supplies

17   and goods to make food?

18        A.    Well, the managers did.  And I was the one who

19   checked the reports.

20        Q.    Okay.  What kind of reports did you review and

21   approve for the store?

22        A.    All kinds.

23        Q.    Can you give us some examples, please?

24        A.    Fax, calling attention to the employees'

25   tardiness, customer complaints.
```

Page 14

1      Q.    Okay.  Would you check -- well, would you

2    manage the finances of a store?  In other words, making

3    sure that the store was operating in a way that

4    generated revenue and profit for the company?

5      A.    That is correct.

6      Q.    Did you have to sign off on any sort of

7    financial reports?

8      A.    All of them.

9      Q.    For that store?

10     A.    That's right.

11     Q.    And once you signed it and approved it, that

12   report went to corporate office?

13     A.    That is correct.

14     Q.    And you were the ultimate approver of those

15   financial documents before they went to the corporate

16   office, correct?

17     A.    That is correct.

18     Q.    And with all the decisions that we've discussed

19   that you made in your position as a supervisor, you had

20   the independent discretion and judgment to make those

21   decisions, correct?

22     A.    Well, it depends.  In some of them, as I said

23   before, and I repeat again, I had to check with human

24   resources.

25     Q.    Okay.  So except for the ones that you

Page 15

```
 1    indicated to us that you had to seek approval from human
 2    resources, you still had the discretion and independent
 3    judgment to make those decisions?
 4         A.   No.   The rest I would have to consult or check
 5    with my supervisor above me.
 6         Q.   Okay.  And was that just for approval?
 7         A.   That's correct.
 8         Q.   And let's talk about that process.  Would you
 9    take the decision to your supervisor, tell the
10    supervisor what it was you wanted to do, and the
11    supervisor said okay?
12         A.   No.  She had to consult with somebody else.
13         Q.   Okay.  Were there any decisions that you felt
14    you could not make with your own judgment or discretion?
15         A.   Too many.
16         Q.   Okay.  Well, when you would recommend a
17    decision to your supervisor, would that decision
18    normally be followed?
19         A.   All the time.
20         Q.   Okay.  And that was for the entire time that
21    you were a supervisor, correct?
22         A.   That is correct.
23         Q.   And you became supervisor some -- a couple
24    months after you were hired by the company in 2012?
25         A.   That is correct.
```

Page 16

1      Q.    And any other reason?

2      A.    No.

3      Q.    And when you're talking about discrimination

4   and wrongful termination, for both things, you're

5   talking about the termination decision?

6      A.    That is correct.

7      Q.    And that's the termination decision that you

8   were informed off on May 2, 20 --

9      A.    That is correct.

10     Q.    And that was 2023.  I don't know if I got that.

11     A.    Yes.  2023.

12     Q.    Okay.  Got it.  Do you understand that the

13  reason your employment was terminated was because the

14  government informed Delta's that it could no longer

15  continue employing you?

16          MR. GONZALEZ:    Objection; form.

17     A.    No.

18     Q.    (BY MR. QUEZADA)  What do you believe is the

19  basis for the discrimination or the wrongful

20  termination?

21     A.    What the basis?  What do you mean?

22     Q.    Do you believe that there's -- are you saying

23  that you believe it is simply unfair?  Or is there a

24  basis that you believe caused the discrimination or

25  wrongful termination?

Page 18

1        A.    I believe is -- I think it's discrimination

2    because other people who were in my same conditions

3    remained.

4        Q.    And when you say "in your same condition", the

5    condition that you're talking about -- you're talking

6    about lacking authorization to work in the United

7    States?

8        A.    That is correct.

9        Q.    Do you know whether any of those people you are

10   thinking of were also identified to Delia's, by the

11   government, as being unable to continue employment?

12       A.    No.  Because they never wanted to show us

13   the -- the alleged list that the government allegedly

14   sent them.

15       Q.    And -- oh.  You had keys to the restaurants,

16   correct?

17       A.    No.  Not now.

18       Q.    I'm sorry.  When -- when you were employed by

19   Delia's?

20       A.    Yes.

21       Q.    And did you have codes to the alarm systems?

22       A.    Yes.

23       Q.    Did you have -- I don't even know if there is

24   one, but did you have codes to any safe in the store?

25       A.    Yes.

Page 19

```
 1          Q.   Did you-all have a armed vehicle service that
 2     came and picked up the cash from the store?
 3          A.   No.
 4          Q.   Did you deposit on behalf of the store?
 5          A.   Yes.
 6          Q.   And would you ever go get cash from the bank
 7     for the store?
 8          A.   No.
 9          Q.   You just deposited it?
10          A.   That is correct.
11          Q.   Who told you about the lawsuit -- this lawsuit?
12          A.   No.  I asked -- well, there was a comment and I
13     asked for information.  So I resorted to the lawyer and
14     asked for information.
15          Q.   Okay.  From whom did you hear the comment?
16          A.   I asked a co-worker.
17          Q.   And what co-worker was that?
18          A.   Carlos Lopez.
19          Q.   Who's in the room with us right now?
20          A.   Yes.  That is correct.
21          Q.   And what did Mr. Lopez tell you?
22          A.   That he was going to find out about the phone
23     of the attorney.
24          Q.   When you were a supervisor -- well, let me ask
25     you this.  In this case, there's an allegation that
```

Page 20

1        A.    Being right there in the business?

2        Q.    Just -- well, let's start with that.  About how

3    many hours a day would you be there at the business?

4        A.    It was vary between ten and twelve hours.

5        Q.    And once you left the business, let's say,

6    about how many more hours?

7        A.    Well, it would also vary.  It would depend.

8    For instance, in the morning if somebody didn't go or

9    somebody missed work, then I had to go and open, for

10   instance.  Or in the evenings, they would call me back

11   for something -- to help with something during the day.

12   But it would vary.

13       Q.    Did you keep any log or record of the time you

14   spent working?

15       A.    No.

16       Q.    What were the hours of the store that you

17   were -- that you oversaw?

18       A.    Well, open to the public it would be from

19   7:00 a.m. to 8:30 p.m.

20       Q.    And what about -- when you say "open to the

21   public", are you meaning that there were some additional

22   hours that you spent at the store?

23       A.    Yes.  Because we would open at six so that the

24   employees could come in.

25       Q.    Okay.  And then around what time would you be

                                                Page 23

```
 1    completely shut down at the store?
 2         A.    Well, likewise.  There was no specific hour.
 3    You know, it could be 9:00, 9:30, even at 10:00 p.m.
 4    they would close.
 5         Q.    Do you know of anything that would show what
 6    time the store opened or closed?
 7              THE INTERPRETER:  Would you repeat that?
 8              MR. QUEZADA:  Do you know of any -- of
 9    anything that would show what time the store opened or
10    closed?
11         A.    The alarm.
12         Q.    (BY MR. QUEZADA)  You, as a supervisor,
13    enforced workplace rules, correct?
14         A.    That is correct.
15         Q.    And that included punching in and punching out
16    and accurately recording time, correct?
17         A.    That is correct.
18         Q.    And you made sure that was done?
19         A.    That is correct.
20         Q.    Did you supervise any of the other plaintiffs
21    in this lawsuit?
22         A.    Yes.
23         Q.    And who were the -- who were they?
24         A.    Carlos.
25         Q.    Carlos Lopez?
```

Page 24

```
 1        Q.   Did you get to eat free at the store?

 2        A.   No.  Never.

 3        Q.   Did you pay for food?  Or was -- well, let

 4   me -- excuse me.  Was there a discount?

 5        A.   That's correct.

 6        Q.   What was the discount?

 7        A.   50 percent.

 8        Q.   And was that for all employees?

 9        A.   Yes.  But only to eat there.

10        Q.   Okay.   And would employees generally eat there

11   at the store?

12        A.   Most of them.

13        Q.   And this might be -- given your answer about

14   the lunch, this might be an unnecessary question, but

15   did you take any breaks during the day, other than

16   lunch?

17        A.   No.  Never.

18        Q.   Did you ever have time periods during the last

19   three years of your employment, where you were absent

20   for an extended period of time?

21        A.   No.

22        Q.   Earlier you said that you pretty much felt like

23   you worked 24/7.  Did you work seven days a week?

24        A.   Sometimes, yes.  Particularly November,

25   December, regularly, yes.
```

Page 26

```
 1        Q.    Okay.  What about in November or December?
 2        A.    Well, only when somebody was not able to cover
 3    it, you know?  If a manager missed work or something,
 4    then I would have to go and cover for that person.
 5        Q.    And how often did that happen?
 6        A.    Well, I would not be able to tell you exactly.
 7    It wasn't too often, but it did occur.
 8        Q.    Would you say once a month or once a quarter?
 9        A.    Well, it would depend.  Maybe once or twice a
10    month.
11        Q.    Did you ever discipline any employees for
12    recording time for another employee?
13        A.    No.  That never happened.
14        Q.    And you never disciplined an employee for
15    failing to accurately record their time?
16        A.    No.  Not that either.
17        Q.    While you were working at Delia's, you never
18    made a complaint about being paid improperly, correct?
19              THE INTERPRETER:  Say again?
20              MR. QUEZADA:  When you were employed by
21    Delia's, you never made a complaint about being paid
22    improperly; is that correct?
23        A.    Yes.
24        Q.    (BY MR. QUEZADA)  And when was that?
25        A.    Well, it was years ago.  It was done verbally.
```

Page 27

```
 1        Q.    What -- what year?

 2        A.    No.  I do not recall.

 3        Q.    Was it before Covid?

 4        A.    Yes.

 5        Q.    And to whom did you complain?

 6        A.    With Alberto Trevino.

 7        Q.    And what did you say to Alberto?

 8        A.    Well, I asked him why some people in the office

 9    are paid -- well, they get paid on the holidays or they

10    simply don't have to go on holidays, and if they did go,

11    they would paid -- they would be paid twice as much.

12    And we were supposed to be there regardless of holidays

13    or not holidays, and we did not get paid for overtime.

14        Q.    Did not get paid double?

15        A.    Never.

16        Q.    Okay.  Because I think you said didn't pay me

17    double?

18        A.    Okay.  Well, at the office if they worked on a

19    holiday, they would get paid double.  But we -- we could

20    work seven days of the entire week and we would --

21    regardless, whether it was a holiday or not, we would

22    get paid just the normal pay.  No -- no overtime.

23        Q.     Got it.  And that was the complaint you made to

24    Alberto Trevino?

25        A.    That is correct.
```

Page 28

```
1        A.   No.  Never.

2        Q.   And that was for at least the last three years

3   of your employment, right?

4        A.   That is correct.

5        Q.   Did you ever miss a paycheck?

6        A.   No.  Never.

7        Q.   And you were paid the -- I think what you're

8   telling us is that you were paid the same salary,

9   regardless of the number of days or number of hours

10  worked, correct?

11       A.   That is correct.

12       Q.   And that was true for at least the last three

13  years of your employment, correct?

14       A.   Yes.  That is correct.

15       Q.   I'm going to show you what I'm marking as

16  Exhibit 1, okay?  And I want you to review the document

17  and let me know when you're ready to discuss it.  But my

18  main question is going to be whether that's your

19  signature on the second page that we see.

20            (Exhibit No. 1 marked.)

21       A.   I'm ready.

22       Q.   (BY MR. QUEZADA)  Okay.  Is that your signature

23  we see on the second page?

24       A.   100 percent.

25       Q.   Okay.  The handwriting that we see on Items 1
```

                                            Page 30

```
1        Q.   As a supervisor, did you create the work
2    schedules?
3        A.   That is correct.
4        Q.   And nobody told you how to do that, you did it
5    with your own discretion?
6        A.   Well, I based myself on the permissions that
7    the employee's requested.
8        Q.   And you knew that part of your duty as a
9    supervisor was if an employee came to you and said their
10   pay was incorrect, that you needed to get it -- get that
11   corrected?
12       A.   No.  That was not part of my job.  I told them
13   to talk to human resources and that they took care of
14   that.
15       Q.   Got it.  Okay.  Would you do performance
16   evaluations of employees?
17       A.   Yes.
18       Q.   Okay.  Would you do employee training?
19       A.   Yes.  That too.
20       Q.   Did you do any budgeting for the store?
21       A.   How so?
22       Q.   Like at the end of the year or at the end of
23   the quarter or month, even, estimate that we're gonna
24   need X dollars of masa or whatever supplies?
25       A.   No.  Absolutely all of the merchandise was sent
```

Page 32

1    maintenance is?

2        A.    Well, using machines to mow the lawn and all

3    the grass.    And I learned to use all kinds of machines

4    of that kind.

5        Q.    Okay.    And how much are you earning in this

6    job?

7        A.    $13 an hour.

8        Q.    And how many hours a week do you work?

9        A.    40 or less.

10       Q.    And are you being paid by check or in cash?

11       A.    Check.

12       Q.    Any other jobs or sources of income that you

13   had since separating from Delia's?

14       A.    No.    None.

15       Q.    You're familiar with Delia Garza or Delia

16   Lubin?

17       A.    That is right.

18       Q.    We can call her Ms. Delia?

19       A.    Yes.

20       Q.    Do you know if Ms. Delia assigned you your

21   duties or set your pay?

22       A.    Yes.    She's the one that has the last word in

23   everything, every year.

24       Q.    How do you know that?

25       A.    Because we went to the meetings and the final

                                              Page 36

1   decisions were always -- was always made by her.  And

2   she was -- she always attended those meetings.

3       Q.   Was she making the decisions there?  Or was she

4   simply there in attendance saying hello, eating?

5       A.   No.  She made the -- she made the decisions.  I

6   mean, there were meetings and -- we had meetings and the

7   final decision for everything was always her.  Even till

8   the very last meeting.

9       Q.   And when was that very last meeting?

10      A.   All right.  Let me see.  They fired me in May,

11  so this meeting must have been in December.  Yes.  I'm

12  certain that there was a meeting in December.  Then,

13  maybe one in January.  Maybe they had another meeting in

14  January.  Well, I'm not certain whether there was a

15  meeting in January or -- I mean, if they had another

16  meeting in January.  But definitely they had a meeting

17  in December.

18      Q.   Okay.  So you're telling me that at this

19  meeting, Ms. Delia stood up and said, these are the

20  policies of the company, this is what I've decided to

21  change, this is how we're paying employees, these are

22  our revenue targets, this is our budget?

23      A.   That's what she did all the time.

24      Q.   But I'm saying in this meeting in December.

25  That's what you're telling the jury she did?

Page 37

```
 1        A.    Yes.

 2        Q.    What did she say the policy changes were going

 3   to be?

 4        A.    Well, there were no changes, actually.  She

 5   said follow the same -- follow the same procedures,

 6   everything is the same.

 7        Q.    What did she stand up and say about financials

 8   and budgeting?

 9        A.    She said that sales were dropping a little bit,

10   but that that was part of the show.

11        Q.    That was part of the show?  What does that

12   mean?

13        A.    Well, I don't know.  Those were her words.

14        Q.    And what did Ms. Delia stand up and say about

15   budgeting?

16        A.    What do you mean the budgets?

17        Q.    Well, I asked you if she stood up and said,

18   this is going to be the budget for this year, and you

19   said yes.

20        A.    Well, they spoke of sales, but not of the

21   budget.

22        Q.    Did she give a presentation?

23        A.    No.  The presentations were done by Alberto.

24        Q.    Okay.  So what specifically did Ms. Delia say?

25   Well, let me -- let me take -- let me ask a different
```

Page 38

```
 1    question.  Pardon me.
 2               How long did Ms. Delia speak?
 3         A.    During the meetings, she always spent the time
 4    talking.  It wasn't like she was given a chance to speak
 5    10, 15 minutes, half hour.  She was talking all the
 6    time.
 7         Q.    Well, I believe earlier you stated that she was
 8    giving a presentation.  So for how long was she giving
 9    that presentation?
10         A.    No, I said that the presentation was given by
11    Alberto.
12         Q.    Okay.  So that the record's clear, Ms. Delia
13    did not give a presentation?
14         A.    No.  Not her.
15         Q.    Okay.  So when you say that there was no set
16    time for Ms. Delia to speak, are you saying that she
17    went around and talked to people?
18         A.    No.  I'm not saying that she walked around.
19    She was sitting down in her place, you know, and
20    somebody was presenting -- somebody -- let's say a point
21    of some sort.  And, you know, it was discussed that they
22    were going to be changing the tamales and making them in
23    this or another way.  And then she would give her
24    opinion, she would say, no.  We're not going to do it
25    that way, we're going to do it this way because of this
```

                                                        Page 39

1    that and the other.  And what she said, went.

2        Q.   So can you tell us in the last three years of

3    your employment, whether you know of Ms. Delia making

4    any decision to fire someone?

5        A.   Like her deciding by saying fire this guy or

6    fire somebody else?  Something like that?

7        Q.   Yeah.  Making termination decisions.

8        A.   Okay.  Well, no.  The only thing that I

9    remember was that one time, you know, when they were

10   talking about employees or something, she said something

11   to the effect -- she stood up -- it's not that she made

12   the decision, she said, well, you know what you have to

13   do with those people who don't want to comply, who don't

14   want to work.  And they don't work in this way.  You

15   know exactly what you have to do come January.  You fire

16   them, and of course, don't tell anybody that I said so.

17       Q.   And -- and when was that?

18       A.   It was a meeting in December.  And it was

19   about -- since the time they terminated me -- two years

20   before.

21       Q.   Okay.  So 2021?  Or 2020?

22       A.   Around that time.  But, I mean, I don't

23   remember the exact time.  But I won't forget those

24   words.  I don't forget those words because I didn't

25   think it was the right attitude.

Page 40

```
1        Q.   And you never complained about them, did you?
2        A.   Of --
3        Q.   About those words?
4        A.   No.  Who could I complain to if she was the
5    owner?
6        Q.   Well, I didn't ask you that.  I asked, did you
7    complain?
8        A.   No.  I never complained.
9        Q.   Okay.  So the comment about -- you're saying
10   Ms. Delia made about if people don't want to work, you
11   know, you got to fire them.  You said that was a couple
12   years before you were terminated, in December.  Would
13   that have been December 2020?
14       A.   More or less.  I don't recall exactly, but
15   thereabouts.
16       Q.   Okay.  So I understand the comment.  But I want
17   to know, more specifically, whether you're contending
18   that Ms. Delia, at anytime in the last three years of
19   your employment, whether you know she made decisions
20   about hiring or firing anyone?
21       A.   Not that I know.
22       Q.   And in the last three years of your employment,
23   do you know, specifically, whether Ms. Delia set
24   anyone's pay or schedules?
25       A.   Well, the schedules, no.  But the payments,
```

Page 41

```
1    yes.  If there was a salary increase or something like

2    that, she'd have to authorize it herself.

3         Q.    And how do you know that?

4         A.    Because Alberto told me.

5         Q.    Did you ever see her do that in the last three

6    years of your employment?

7         A.    No.  As I answered before, I mean, Alberto

8    would tell me, but I never said that I saw her.

9         Q.    Okay.  Understood.  In the last three years of

10   your employment with Delia's, did you ever see Ms. Delia

11   disciplining anyone?

12        A.    No.

13        Q.    You never saw that?

14        A.    No.

15        Q.    In the last three years of your employment with

16   Delia's, did you ever see Ms. Delia make any promotions

17   or demotion decisions?

18        A.    No.

19        Q.    In your last three years of your employment,

20   did you ever see Ms. Delia authorize any particular work

21   schedules?

22        A.    No.

23        Q.    I believe you said you still have pay stubs

24   from Delia's?

25        A.    No.  I did not tell you that, but I do have
```

Page 42

```
 1              I, ARMANDO MORALES DE LLANO, have read the
        foregoing deposition and hereby affix my signature that
 2      same is true and correct, except as noted above.

 3

 4

 5                         _____

                           ARMANDO MORALES DE LLANO
 6

 7

 8      THE STATE OF TEXAS )

 9      COUNTY OF _____)

10                   Before me, _____, on
        this day personally appeared ARMANDO MORALES DE LLANO,
11      known to me (or proved to me under oath or through
        _____)(description of identity card or
12      other document) to be the person whose name is
        subscribed to the foregoing instrument and acknowledged
13      to me that they executed the same for the purposes and
        consideration therein expressed.

14
                         Given under my hand and seal of
15      office this _____ day of _____, 2024.

16

17

                        _____
18                      Notary Public in and for the State of Texas

19

20

21

22

23

24

25      Job No. HOU6734283

                                                        Page 52
```

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       MCALLEN DIVISION
 3    JUANA CRUZ, OFELIA          )
      BENAVIDES, JOSE ELIAS N.G,  )
 4    GABRIELA VELAZQUEZ,         )
      RICARDO GONZALEZ, HELESIO   )
 5    CRUZ, ANGELICA CHAVEZ,      )
      CONCEPCION PEREZ, OLGA      )
 6    PEREZ, MAVRIGO SAENZ,       )
      JORGE MAOLEON, HECTOR       )
 7    SANCHEZ, HECTOR GONZALEZ,   )
      YESSY PEREZ-MARTINEZ,       )
 8    MARIA DE LOURDES CRUZ,      )
      RESENDO LIEVANOS,           )
 9    ELIZABETH LARA, LUIS        )      CIVIL ACTION
      ALBERTO ZUNIGIA-CASTILLO,   )      NO. 7:23-CV-00343
10    MIGUEL CABALLERO SANCHEZ,   )
      GUILLERMO DE LA             )
11    CRUZ-MENDOZA, CARLOS        )      JURY DEMANDED
      DANIEL LOPEZ, GILDA RIVAS,  )
12    ARMANDO MORALES DE LLANO,   )
      LAZARO GARCIA, MARIA DE     )
13    JESUS MEDINA, RICARDO       )
      ESQUIVEL, RAFAEL SANCHEZ,   )
14    GUILLERMO RUIZ, ROSA        )
      QUINTANILLA,                )
15                                )
                                  )
16             PLAINTIFFS,        )
                                  )
      VS.                         )
17                                )
      DELGAR FOODS LLC A/K/A      )
18    DELIA'S TAMALES,            )
                                  )
19             DEFENDANT.         )
20
      ************************************************************
21                       ORAL DEPOSITION OF
22                       ELIAS GUTIERREZ
23                        June 28, 2024
24    ************************************************************
25
```

                                              Page 1



APPENDIX
3

```
 1              ORAL DEPOSITION of ELIAS GUTIERREZ, produced
 2    as a witness at the instance of the Defendant, and duly
 3    sworn, was taken in the above-styled and numbered cause
 4    on the 28th day of June, 2024, from 9:01 a.m. to
 5    10:19 a.m. before Anica Diaz, CSR, RPR, CRR, in and for
 6    the State of Texas, reported by machine shorthand, at
 7    the Law Offices of Ricardo Gonzalez, 124 South 12th
 8    Avenue, Edinburg, Texas, pursuant to the Federal Rules
 9    of Civil Procedure and the provisions stated on the
10    record or attached.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

FOR READING & SIGNING ONLY

Page 2

```
 1                P R O C E E D I N G S

 2              (Proceedings began at 9:01 a.m.)

 3              THE REPORTER:  On the record at 9:01 a.m.

 4              Counsel, would you prefer to have me read

 5     the script for a Federal Deposition and then introduce

 6     yourselves, or would you prefer to waive this?

 7              MR. QUEZADA:  We can waive.

 8              MR. GONZALEZ:  We can waive it.

 9                    ELIAS GUTIERREZ,

10     having been duly sworn, was called as a witness and

11     testified through an Interpreter as follows:

12                       EXAMINATION

13     BY MR. QUEZADA:

14         Q.   Good morning, Mr. Gutierrez.

15         A.   Good morning.

16         Q.   My name is Stephen Quezada, and I represent

17     Delgar Foods LLC, which does business as Delia's

18     Tamales.  Do you understand that?

19         A.   Yes.

20         Q.   And today we're here to take your deposition in

21     the case that you've brought against Delia's.

22         A.   Okay.

23         Q.   And you understand that when I say "Delia's"

24     I'm referring to the Defendant in the case, the entity

25     that you're suing?
```

                                                     Page 5

1    Q.   Sir, do you understand that the reason for your

2    separation was because the Government notified Delia's

3    that it could no longer continue employing you?

4             MR. GONZALEZ:   Objection to the form.

5    A.   Blanca notified me.   You were there.   I was

6    never showed a document of why.   I was told verbally and

7    then Blanca told me I could take other documents and

8    continue working.

9             MR. QUEZADA:   Objection; nonresponsive.

10   Q.   (By Mr. Quezada)   My question is just about

11   whether you understood that the Government notified

12   Delia's that it could no longer continue employing you.

13   If you know that, that's my question.

14   A.   Yes.

15   Q.   Okay.   And what's your date of birth?

16   A.   11/30/76

17   Q.   And you worked at Delia's as a cook; is that

18   right?

19   A.   Yes.

20   Q.   And your dates of employment were

21   February 26th, 2019 until May 2nd, 2023?

22   A.   Yes.

23   Q.   And your hourly pay rate was $9.50?

24   A.   Yes, but then my salary was increased.

25   Q.   Okay.

Page 12

1              MR. QUEZADA:  And I just want to note -- or

2     clarify, rather, that when he's using the term "sweldo"

3     or salary, we're talking about an hourly rate.  So I

4     just want to ask a question to clarify that.

5          Q.  (By Mr. Quezada)  When you said that your

6     "sweldo" increased, you mean your hourly rate increased?

7          A.  I was paid $9.50 per hour.

8          Q.  And then that hourly rate increased?

9          A.  Yes.

10         Q.  And then when you worked more than 40 hours in

11    a workweek, you got time and a half that rate, correct?

12         A.  Yes.

13         Q.  And so while you were working for Delia's, it

14    had a time keeping system, correct?

15         A.  Yes.

16         Q.  And that time keeping system required you to

17    punch in and punch out using your fingerprint?

18         A.  Yes.

19         Q.  And at the time you were working for Delia's,

20    you understood that you were required to accurately and

21    correctly punch in and out and record your time,

22    correct?

23         A.  Yes.

24         Q.  And while you were working for Delia's, you

25    followed that policy, correct?

                                              Page 13

```
1        A.   Uh-huh.

2        Q.   Is that a yes?

3        A.   Yes.  Sorry.

4        Q.   Did Mauricio tell you by phone or in person?

5        A.   Over the phone.

6        Q.   Do you know whose idea it was to sue Delia's?

7        A.   No.

8        Q.   Can you describe for us your duties that you

9   did as a cook?

10       A.   May I mention them all?

11       Q.   Sure.  Or I can -- I can walk you through I

12  think what they were.

13       A.   Everything referring to the kitchen.

14       Q.   Okay.  Cleaning the kitchen?

15       A.   Yes.

16       Q.   Would you wash, peel, and cut vegetables?

17       A.   Yes.

18       Q.   And meats, if needed?

19       A.   Not meats.

20       Q.   You'd mix ingredients?

21       A.   No.

22       Q.   Food handling was part of your duties?

23       A.   Yes.

24       Q.   Cook the actual food products?

25       A.   Yes.
```

Page 16

```
1        Q.   Wrap up the finished cooked products?

2        A.   Yes.

3        Q.   Put them on trays to put them out for sale?

4        A.   Yes, that too.

5        Q.   Wash trays?

6        A.   Yes.

7        Q.   Wash and clean cooking equipment?

8        A.   Yes.

9        Q.   Sanitize the cooking areas?

10       A.   Yes.

11       Q.   Cleaning the floors?

12       A.   Yes.

13       Q.   Help maintain the cooking area to health code

14  standards?

15       A.   Yes.

16       Q.   Remove items that were not needed, throw away

17  stuff that y'all were done with?

18       A.   Yes.

19       Q.   Comply with the safety and health standard

20  rules for keeping the food safe?

21       A.   Yes.

22       Q.   And you did all those things while working at

23  Delia's?

24       A.   Yes.

25       Q.   And to who did you report?
```

Page 17

```
 1        A.   My direct supervisor, McAllen north was Dulce
 2   Palacios and Cassandra Pena.
 3        Q.   That was Dulce Palacios?
 4        A.   Dulce Palacios.
 5        Q.   Did you have any other supervisors?
 6        A.   Yes.
 7        Q.   Okay.  Were those the only two immediate?
 8        A.   Yes.  They're the managers.
 9        Q.   Did you have a kitchen lead or a team lead that
10   you reported to?
11        A.   Yes.
12        Q.   And who was that?
13        A.   Juana Perez.  The other name is Rosario, and I
14   don't quite remember the rest.
15        Q.   And the direct supervisors that you just
16   provided for us, I believe you said that was at the
17   McAllen location?
18        A.   Yes.
19        Q.   Did you have different people you reported to
20   at the other location in Mission?
21        A.   Yes.
22        Q.   And who were they?
23        A.   Rosendo.  And I don't remember the name of the
24   other person.
25        Q.   And that's Rosendo Lievanos who's here with us
```

Page 18

```
 1   today?
 2        A.   Yeah.
 3        Q.   Yeah.  Did you have team leads or kitchen leads
 4   in Mission?
 5        A.   Yes.
 6        Q.   And who were they?
 7        A.   Mauricio and Jose Jimenez.
 8        Q.   The duties that we described earlier, you
 9   recall those?
10        A.   Of course.
11        Q.   All that work you did during the workday,
12   correct?
13        A.   Yes.
14        Q.   And you do that work between the time you
15   punched in and the time you punched out, correct?
16        A.   Yes.
17        Q.   What was it specifically that you were cooking?
18        A.   Tamales.
19        Q.   Anything else?
20        A.   Menudo.
21        Q.   Anything else?
22        A.   Green sauce and red sauce.
23        Q.   Other than a cook, did you hold any other
24   positions with Delia's?
25        A.   No, just cook.
```

Page 19

```
 1        Q.  And you never clocked in for any other

 2   employee, correct?

 3        A.  I don't understand the question.

 4             (Mr. Quezada speaks in Spanish.)

 5        Q.  (By Mr. Quezada)  You never punched in or

 6   punched out for another employee?

 7        A.  No.

 8        Q.  You had lunch breaks while working for Delia's?

 9        A.  Yes, half hour.

10        Q.  And you took those lunch breaks?

11        A.  Yes.

12        Q.  And you punch out and punch back in for that

13   lunch break?

14        A.  Yes.

15        Q.  And I believe you said that lunch break was 30

16   minutes?

17        A.  Yes.

18        Q.  Did you have any other breaks at Delia's?

19        A.  When we had worked over eight hours we would

20   get 15 minutes of break time too.

21        Q.  You were never paid with any cash, correct?

22        A.  No.

23        Q.  Did you receive a check or direct deposit?

24        A.  I received a check.

25        Q.  And you would deposit that check in a bank
```

FOR READING & SIGNING ONLY

Page 23

```
 1        Q.  About how much did you make from G-11 during
 2   the two months before you started working at Hidalgo
 3   Cold EBI?
 4        A.  Like 350 to 400 on Sundays.  Only on Sundays.
 5        Q.  Is that the only day of the week that the post
 6   was open?
 7        A.  Yes.
 8        Q.  Did you have any other job while you were
 9   working for Delia's?
10        A.  The same.  I was selling in the flea market.
11        Q.  Okay.  Do you have any sort of bookkeeping
12   system that you use for the -- for G-11?
13        A.  No.
14        Q.  Is it all cash?
15        A.  Yes.
16        Q.  So just cash in, cash out?
17        A.  Yes.
18        Q.  Earlier, when I mentioned the reason that
19   Delia's ended your employment with it, do you recall
20   that?
21        A.  Yes.
22        Q.  And I represented to you that that was because
23   the Government informed Delia's that it could no longer
24   continue employing you.
25        A.  Uh-huh.
```

Page 28

```
 1        Q.  Yes?

 2        A.  Yes.

 3        Q.  Do you have any facts or evidence that would

 4    show that that reason is false?

 5              MR. GONZALEZ:  Objection; form.

 6        A.  No, I don't.

 7        Q.  (By Mr. Quezada)  About how many pay stubs is

 8    it that you have?

 9        A.  I don't know but they're several.

10        Q.  Is it -- is it too much to carry in a box or

11    anything like that?

12        A.  There's approximately 35 to 40 but I don't

13    know.

14        Q.  Understood.

15              And, sir, you and I have never spoken about

16    your wages, or hours, or pay at Delia's; is that right?

17        A.  No.

18        Q.  And you and I have never spoken about the

19    reason for your termination at Delia's; is that correct?

20        A.  Well, just when we were terminated.

21        Q.  And that was when you were told the reason for

22    your termination, correct?

23        A.  Yes.

24        Q.  And that reason that was given then at the time

25    of your termination is the same reason that's been
```

Page 29

```
 1   we see on Exhibit 1 is in English, correct?
 2        A.  Yes.
 3        Q.  So other than the signature, is anything else
 4   on Exhibit 1 your handwriting?
 5        A.  No.
 6        Q.  Who filled out the responses to Nos. 1 through
 7   9 on Exhibit 1?
 8        A.  The attorney, Balde.
 9        Q.  And can you walk through the process of how
10   that information was filled in on Exhibit 1?
11        A.  He would ask me and I would answer.
12        Q.  And did you review what was written before
13   signing?
14        A.  He was writing it right in front of me.  I saw
15   him.
16        Q.  So you were comfortable signing Exhibit 1?
17        A.  Yes.
18        Q.  Sir, what are you asking for in damages from
19   Delia's in this lawsuit?
20        A.  May the question be repeated?
21        Q.  Yes, sir.  What damages are you asking for in
22   this lawsuit?
23        A.  I'm only asking for my -- for my termination.
24        Q.  I believe you're saying you're only claiming
25   about your termination?
```

                                                    Page 31

```
 1        A.  Yes.

 2        Q.  Okay.  But as far as what you'll be asking the

 3   court or the jury to award you, do you have any idea

 4   what that might be?

 5        A.  I have no clue.

 6        Q.  Do you know, sir, whether -- do you know Delia

 7   Garza or Delia Ludin.

 8        A.  Yes.

 9        Q.  Do you know whether she set your -- do you know

10   whether she made the decision to hire you?

11        A.  No.  I don't know if she hired me.

12        Q.  Do you know if she made the decision about your

13   hourly rate, or bonus, or benefits?

14        A.  We do know she's the one that decides the

15   bonuses.

16        Q.  And how do you know that?

17        A.  Because she would turn into our supervisor, and

18   then she would make a gathering, a feast for us, and she

19   was there.

20        Q.  But do you know if she actually sat down and

21   looked at a list of employees and said, this employee

22   gets $500, this employee gets $1,000, anything like

23   that?

24        A.  No, not that.

25        Q.  Do you know if she made the decision to
```

Page 32

```
 1   terminate your employment?

 2        A.   No.

 3        Q.   Do you know if she made the decision -- well,

 4   you -- you testified earlier that you received a pay

 5   raise, correct?

 6        A.   Yes.  It was increased, but I do not know if

 7   she was the one that took that decision to increase my

 8   pay raise.

 9        Q.   And, to your knowledge, you don't know whether

10   she made any of those decisions that we've discussed as

11   to any employee, do you?

12        A.   No, I wouldn't be able to tell you.

13        Q.   And you never saw Ms. Delia at the restaurant

14   there supervising the day-to-day work, and the

15   day-to-day production, true?

16        A.   Yes, I would see her.

17        Q.   You would see her there telling employees how

18   to run the business and how to cook?

19        A.   No, she'd go.  Not every day, but she'd go

20   every week to the business on 10th Street and

21   just -- she would just be seeing how everything was

22   running.

23        Q.   So she'd just be there observing?

24        A.   Yes.

25        Q.   Mr. Gutierrez, are you on the group chat that
```

Page 33

```
1            I, ELIAS GUTIERREZ, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
6                                _____
7                                ELIAS GUTIERREZ
8    THE STATE OF TEXAS)
9    COUNTY OF _____)
10            Before me, _____, on
11   this day personally appeared ELIAS GUTIERREZ, known to
12   me (or proved to me under oath or through
13   _____) (description of identity card or
14   other document) to be the person whose name is
15   subscribed to the foregoing instrument and acknowledged
16   to me that they executed the same for the purposes and
17   consideration therein expressed.
18            Given under my hand and seal of office this
19   _____ day of _____, 2024.
20
21            _____
22                    Notary Public in and for
23                    The State of Texas
24
25
                                              Page 42
```

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció el notario público que suscribe, Gonzalo Esquivel García, y desea manifestar lo siguiente:

Mi nombre es Gonzalo Esquivel García. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

En septiembre de 2018 o alrededor de esa fecha solicité trabajo en Delia's Tamales en Mission, TX. No tenía documento para trabajar en Estados Unidos. Tenía una visa de turista B1-B2. El Gerente General, Benito Garza, sobrino de Delia, me dijo que fuera a la oficina principal y viera a la hija de Delia, Lorena Luban, quien era la encargada de recursos humanos de Delia en ese momento.

Benito me dijo que Delia sabía que los empleados tenían documentos falsos pero no tuvo ningún problema. Empecé de inmediato. Trabajé más de 40 horas y me pagaron horas extras. Durante mi estancia allí, los gerentes fueron muy abusivos en el lenguaje. Sin pausas para el almuerzo. Obligado a quedarse fuera de horario. Si me fuera, estarías sujeto a despido. En todo momento Tamales de Delia tuvo conocimiento de que la mayoría de sus empleados eran ilegales.

Delia solicitó fondos COVID y recibió $26,000 por empleado. Nunca recibimos nada de ese dinero. El 3 de mayo de 2023 me despidieron por mis documentos. El abogado de Blanca y Delia me dijo que si quería apelar. Esa inmigración estaría involucrada. Después de que me despidieron, Delia mantuvo al 90% de los ilegales allí trabajando con documentos falsos.

*Gonzalo Esgarvel G.*
Signature Gonzalo Esquivel Garcia

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 26th day of
Oct.            2023.

*Anita S Castilleja*
NOTARY PUBLIC
My Commission Expires 4-11-25

ANITA S. CASTILLEJA
Notary Public STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025


APPENDIX
3-A

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                        MCALLEN DIVISION
 3     JUANA CRUZ, OFELIA           )
       BENAVIDES, JOSE ELIAS N.G,   )
 4     GABRIELA VELAZQUEZ, RICARDO  )
       GONZALEZ, HELESIO CRUZ,      )
 5     ANGELICA CHAVEZ, CONCEPCION  )
       PEREZ, OLGA PEREZ, MAVRIGO   )
 6     SAENZ, JORGE MAOLEON, HECTOR )
       SANCHEZ, HECTOR GONZALEZ,    )
 7     YESSY PEREZ-MARTINEZ, MARIA  )
       DE LOURDES CRUZ, RESENDO     )
 8     LIEVANOS, ELIZABETH LARA,    )
       LUIS ALBERTO                 )       CIVIL ACTION
 9     ZUNIGIA-CASTILLO, MIGUEL     )       NO. 7:23-CV-00343
       CABALLERO SANCHEZ, GUILLERMO )
10     DE LA CRUZ-MENDOZA, CARLOS   )
       DANIEL LOPEZ, GILDA RIVAS,   )       JURY DEMANDED
11     ARMANDO MORALES DE LLANO,    )
       LAZARO GARCIA, MARIA DE      )
12     JESUS MEDINA, RICARDO        )
       ESQUIVEL, RAFAEL SANCHEZ,    )
13     GUILLERMO RUIZ, ROSA         )
       QUINTANILLA,                 )
14                                  )
                     PLAINTIFFS,    )
15                                  )
       VS.                          )
16                                  )
       DELGAR FOODS LLC A/K/A       )
17     DELIA'S TAMALES,             )
                                    )
18                 DEFENDANT.       )
19
       *******************************************************
20                    ORAL DEPOSITION OF
21                       LUIS ZUNIGA
22                      June 28, 2024
23     *******************************************************
24
25


                                                    Page 1
```

FOR READING & SIGNING ONLY

APPENDIX
4
tabber

1           ORAL DEPOSITION of LUIS ZUNIGA, produced as a
2    witness at the instance of the Defendant, and duly
3    sworn, was taken in the above-styled and numbered cause
4    on the 28th day of June, 2024, from 10:26 a.m. to
5    12:12 p.m., before Anica Diaz, CSR, RPR, CRR, in and for
6    the State of Texas, reported by machine shorthand, at
7    the Law Offices of Ricardo Gonzalez, 124 South 12th
8    Avenue, Edinburg, Texas, pursuant to the Federal Rules
9    of Civil Procedure and the provisions stated on the
10   record or attached.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FOR READING & SIGNING ONLY

                                        Page 2

```
1              P R O C E E D I N G S
2              (Proceedings began at 10:26 a.m.)
3              (Per agreement of all counsel, Federal
4     Rule 30(b)(5) Read-On was waived.)
5              THE REPORTER:  On the record at 10:26 a.m.
6              (Interpreter and Witness were sworn in.)
7              LUIS ZUNIGA,
8     having been duly sworn, testified through an Interpreter
9     as follows:
10              EXAMINATION
11    BY MR. QUEZADA:
12         Q.  Good morning, Mr. Zuniga.
13         A.  Good morning.
14         Q.  My name is Stephen Quezada.  I'm an attorney
15    representing Delgar Foods, L.L.C. in this lawsuit.
16    Okay?
17         A.  Okay.
18         Q.  And Delgar Foods goes by the d/b/a name of
19    Delia's Tamales.
20         A.  Yes.
21         Q.  And are you okay if today when I refer to the
22    Defendant in this case as Delia's, and you understand
23    that I mean Delgar?
24         A.  Yes.
25         Q.  And even though we're in your attorney's
```

Page 5

```
1        Q.   And your employment with Delia's was from
2   May 21st of 2017 until May 2nd of 2023, correct?
3        A.   I actually began working for them in 2014, but
4   we were paid in cash so it's only registered in 2017
5   when we started getting a check.
6        Q.   So beginning in 2017 is when you started
7   receiving compensation by check, correct?
8        A.   Yes.
9        Q.   And from 2017, some point in 2017, until the
10  date your employment ended with Delia's, you received
11  your pay by check; is that correct?
12       A.   Yes, with check.
13       Q.   And while you were receiving a check, you no
14  longer receive any kind of cash payment; is that
15  correct?
16       A.   Not anymore.
17       Q.   And your checks, would you receive a physical
18  check or direct deposit?
19       A.   Direct deposit.
20       Q.   And that is into your bank account?
21       A.   Yes.
22       Q.   And what's the name of your bank?
23       A.   PNC.
24       Q.   And has that been your bank since you started
25  receiving checks from Delia's in 2017?
```

                                                    Page 11

```
 1          A.   No.  Before it was with Compass.
 2          Q.   Would you ever cash any of your paychecks?
 3          A.   No.
 4          Q.   Even though you received direct deposit, you
 5     still received a pay stub?
 6          A.   Yes.
 7          Q.   And how would you receive those?
 8          A.   May the question be repeated.
 9          Q.   Yes, sir.  Thank you for asking.
10               How would you receive the pay stub?
11          A.   In an envelope.
12          Q.   And in the envelope would just be the pay stub,
13     correct?
14          A.   Yes.
15          Q.   And what would you do with those pay stubs once
16     you received them?
17          A.   Sometimes I'd store it.
18          Q.   Do you have any pay stubs from Delia's?
19          A.   Probably only about five.  I got rid of the
20     rest.
21          Q.   When you say you got rid of the rest, you would
22     throw them away?
23          A.   Yes.
24          Q.   While you were working at Delia's, your
25     position was that of a manager, correct?
```

Page 12

```
 1          A.   I first, I start as an employee, then two years
 2    after I was made in a manager.
 3          Q.   Okay.  So at some point in about 2019 you
 4    became a manager?
 5          A.   Yep.
 6          Q.   And that promotion was a good thing, correct?
 7          A.   Yes.
 8          Q.   And once you became a manager, you started
 9    earning a salary, correct?
10          A.   Yes, a salary.
11          Q.   And that was about how much per week?
12          A.   I was making 750 at first, and then it started
13    increasing.
14          Q.   750 per week?
15          A.   Yes.
16          Q.   And that's $750 per week, correct?
17          A.   Yes.  Then it started increasing.
18          Q.   Okay.  And what was your final salary when you
19    separated from Delia's?
20          A.   $1,120.
21          Q.   And you also received health insurance
22    benefits, correct?
23          A.   Yes.
24          Q.   And Delia's paid for those, the company?
25          A.   I think so.
```

Page 13

```
 1    received two weeks of paid vacation, correct?
 2         A.   Correct.
 3         Q.   And you'd take those paid vacations?
 4         A.   Yes.
 5         Q.   While you were working for Delia's, did you
 6    have any periods of times where you were absent, other
 7    than vacation periods?
 8         A.   No.
 9         Q.   So as a manager, you supervised two or more
10    full-time employees, correct?
11         A.   Yes.
12         Q.   Was it just two or was it more than two?
13         A.   It was like 30 to 35 people.
14         Q.   And those were 30 to 35 full-time employees?
15         A.   Yes.
16         Q.   And you managed a particular store; is that
17    correct?
18         A.   No.
19         Q.   Would you go to different stores?
20         A.   No.
21         Q.   So what -- what locations did you work as a
22    manager?
23         A.   San Juan.
24         Q.   Was that the only store where you worked while
25    you were employed for Delia's?
```

FOR READING & SIGNING ONLY

Page 15

```
 1        A.  Yes, the only one.
 2        Q.  Just so that I'm clear, that's the only store
 3   where you worked once you were promoted to manager,
 4   correct?
 5        A.  Yes.
 6        Q.  And above the manager position is the
 7   supervisor position?
 8        A.  Yes.
 9        Q.  And who was your supervisor?
10        A.  Luis Briones.
11        Q.  So is it appropriate to say that you were the
12   manager of the San Juan store?
13        A.  Manager.
14        Q.  Correct?
15        A.  Yes.
16        Q.  So in addition to -- well, let's talk about how
17   you supervised these 30 to 35 employees.  Okay?
18        A.  Okay.
19        Q.  You could hire those employees, correct?
20        A.  No.
21        Q.  Would you interview those employees?
22        A.  No.
23        Q.  If an employee walked in and said, I'd like to
24   work here, you wouldn't be able to interview or make a
25   decision to hire them?
```

Page 16

```
 1          A.   No.

 2          Q.   Did you ever recommend that anyone be hired?

 3          A.   No.

 4          Q.   Did you ever make a decision to fire anyone?

 5          A.   No.

 6          Q.   Did you ever make a recommendation about firing

 7     someone?

 8          A.   No.

 9          Q.   Did you know that you had authority to hire or

10     fire employees?

11          A.   I know I did have but this -- the supervisor

12     didn't give me that authority.

13          Q.   So let me break that down a little bit.

14               Okay.  You knew you had the authority to

15     hire and fire, correct?

16          A.   Supervisor would interview them and I would

17     hire them.

18          Q.   Okay.  I'm going to get to what the supervisor

19     would do okay.

20          A.   Yes.

21          Q.   I'm saying that you're aware that as a manager,

22     you had the authority to hire and fire, correct?

23               MR. GONZALEZ:  Object to the form of the

24     question.

25          Q.   (By Mr. Quezada)  And I get that you're saying
```

Page 17

```
 1        Q.   And if they were doing something that was bad
 2   enough, you could discipline them, correct?
 3        A.   Yes.
 4        Q.   Would you set people's schedules or shifts?
 5        A.   No.
 6        Q.   Would you monitor attendance?
 7        A.   No.
 8        Q.   So if nobody showed up at the store that day,
 9   there was nothing you could do?
10        A.   No.  The supervisor was in charge.
11        Q.   Was the supervisor there at the store all the
12   time?
13        A.   Yes.
14        Q.   The supervisor didn't go from store to store?
15        A.   No.
16        Q.   If you saw an employee arriving late for their
17   shift, you could correct that employee and remind them
18   of when they needed to be there?
19        A.   Yes.  I would state -- tell them.
20        Q.   Did you ever work a shift when the supervisor
21   was not there?
22        A.   Sometimes I would.
23        Q.   And when that supervisor was not there, you
24   would be the highest ranking person at the store?
25        A.   Yes.
```

                                              Page 19

```
 1         Q.   And so if the supervisor was not there, and
 2    let's say you saw two employees get into a fight, you
 3    could send those two employees home and recommend that
 4    they be fired because of what you saw?
 5         A.   I would report to human resources.
 6         Q.   And part of that report would you say, we need
 7    to fire these employees?
 8         A.   No.  Human resources would take that decision.
 9         Q.   And when you were manager, nobody told you that
10    you could not hire or fire employees, correct?
11         A.   May question be repeated.
12              MR. QUEZADA:  Will you read it back please.
13              (Requested portion was read back.)
14         A.   Yes.
15         Q.   (By Mr. Quezada)  Okay.  And you would train
16    new employees, correct?
17         A.   No.
18         Q.   Would you explain any processes or recipes to
19    new employees?
20         A.   Sometimes.
21         Q.   Would you manage employee vacation requests or
22    time off requests?
23         A.   No.
24         Q.   Would you watch employees and make sure they
25    were following Delia's policies and procedures?
```

Page 20

```
 1        A.   Yes.

 2        Q.   And, again, if they weren't following those

 3   policies and procedures, you could correct and

 4   discipline them, correct?

 5        A.   Yes.

 6        Q.   And what about customer complaints, would you

 7   resolve those?

 8        A.   No, the supervisor.

 9        Q.   So above you was the store supervisor, and

10   beneath you were the team leaders; is that right?

11        A.   Just manager and supervisor.

12        Q.   There were no team leaders?

13        A.   No.

14        Q.   Okay.  When you saw employees doing things

15   incorrectly, and you make the decision to correct them

16   and possibly discipline them, you would make those

17   decisions using your own judgment and discretion,

18   correct?

19        A.   No.

20        Q.   So if you saw someone preparing foods in a

21   manner that wasn't sanitary, you were not able to

22   identify that and take the next steps that you needed to

23   take?

24        A.   Yes.

25        Q.   Yes, you could do that?
```

Page 21

```
 1        A.  Yes, I could do that.
 2        Q.  And, similarly, if you saw an employee eating
 3   foods that they were not supposed to be eating, or
 4   allowed to be eating, you could use your judgment to
 5   identify that and take the next steps?
 6        A.  Yes.
 7        Q.  And if you saw an employee punching in or
 8   punching out for another employee, you were able to
 9   identify that and use your judgment and discretion to
10   correct it and take next steps?  Or did you ever see
11   that?
12        A.  No.
13        Q.  Did you ever suspend an employee?
14        A.  No.
15        Q.  When products would arrive to the store, would
16   you receive those products?
17        A.  No.
18        Q.  Who would do that?
19        A.  Supervisor.  The supervisor.
20        Q.  And when the supervisor wasn't there, would you
21   do that?
22        A.  If he wasn't -- if he didn't show up, yes.
23        Q.  While you were there at the store as manager,
24   were you able to identify when there was insufficient
25   foods being made for sale and tell people that they
```

Page 22

1    needed to make more of any kind of food?

2        A.  Yes.

3        Q.  Would you be able to monitor the inventories of

4    foods and say when it was you needed to order more?

5        A.  No.  It's the supervisor that keeps count of

6    all that.

7        Q.  If there were foods that needed to be thrown

8    away or disposed of, for whatever reason, would you make

9    that decision?

10       A.  I notify the supervisor.

11       Q.  Could you make that decision?

12       A.  Yes.

13       Q.  And you could also make the decision about my

14   prior question about when noticing when inventories were

15   low, correct?

16       A.  No.  The supervisor wouldn't allow us to take

17   any decision -- any decision making.  He was in charge

18   of everything.

19       Q.  Well, at least while -- at least what you've

20   already told us you were able to make decisions about,

21   right?

22               MR. GONZALEZ:  Objection to the form.

23       Q.  (By Mr. Quezada)  Is that a yes?

24       A.  Yes.

25       Q.  Did you keep any records of the number of hours

                                            Page 23

```
 1    referring to were also included on the list from the
 2    Government as individuals who Delia's could no longer
 3    continuing employing?
 4        A.  I did not know -- I did not find out.
 5        Q.  You also mentioned intimidation I believe you
 6    said.
 7        A.  Yes.
 8        Q.  In what -- what is the basis for the reason you
 9    believe you were intimidated?
10        A.  Because the day we were terminated they told us
11    immigration was going to come looking for us.  If it
12    wasn't there, they'd look for us at our house.
13        Q.  Who told you that?
14        A.  The attorney.
15        Q.  You're referring to me?
16        A.  Yes, you.
17        Q.  Do you have any recordings of that?
18        A.  No.  It was verbal.
19        Q.  Would it surprise you that that day a script
20    was followed and that the script does not include any
21    mention of immigration arresting you or going to your
22    house?
23            MR. GONZALEZ:  Objection to form.
24        A.  That's what was told to us that day, that we
25    needed other documents so we could continue working.
```

FOR READING & SIGNING ONLY

Page 25

1        Q.  No, that's not correct?  Or, no, it wasn't

2   used?

3        A.  Not arrest.  But that immigration was going to

4   look for us, that's it.

5        Q.  So you -- it's your testimony to the jury that

6   I said immigration would come looking for you?

7        A.  We were intimidated there was going to

8   be -- that there was going to -- that it was going to be

9   audited.

10       Q.  Well, I believe what you testified earlier was

11  that you were informed that the document would be

12  reviewed, correct?

13       A.  Yes.

14       Q.  And so my question is, are you telling the jury

15  that you were specifically told that immigration was

16  going to come looking for you?

17       A.  Just the ones that were being fired.

18       Q.  And just so that we have a good record, I just

19  want to be clear, are you telling us what you understood

20  or what was specifically stated to you?

21       A.  Of that day?

22       Q.  Yes, sir, that day.

23       A.  Yes, that we didn't have a job.  That's it.

24       Q.  Okay.  So the basis for which you feel you were

25  intimidated relates to your immigration status; is that

                                                    Page 28

```
1    correct?

2         A.  Yes.

3         Q.  And no other basis for that intimidation,

4    correct?

5         A.  Well, just that immigration was going to come.

6    We were told by the attorney if we didn't send it.

7         Q.  And, again, is that your understanding or are

8    you telling the jury that's what was specifically said?

9         A.  My understanding.

10        Q.  And is that still what you understand today?

11        A.  Yes.

12        Q.  Have you been asked to provide any documents

13   for this case?

14        A.  No.

15        Q.  Other than the pay stubs that you've mentioned,

16   do you have any documents that relate to your employment

17   at Delia's?

18        A.  No.

19        Q.  And regarding, sir, the manner in which you

20   feel you were intimidated about your immigration status,

21   it's true that no one has ever gone to your house

22   looking for you or to arrest you, correct?

23        A.  No.

24        Q.  No, they have not?

25        A.  They have not.
```

FOR READING & SIGNING ONLY

Page 29

```
1                    (Exhibit No. 1 marked.)
2        Q.  (By Mr. Quezada)  Okay.  I want to pass you
3    what I've marked as Exhibit No. 1 to your deposition,
4    and I'd like for you to review that, please, and let me
5    know when you've had a chance to review it.
6        A.  Okay.
7        Q.  Are you ready to discuss it?
8        A.  Yes.
9        Q.  If you'll look at the second page, please.  Can
10   you tell me if that's your signature that we see?
11       A.  Yes.
12       Q.  Can you tell me how Items 1 through 9 were
13   completed?
14       A.  The attorney was making the questions and
15   writing for us.
16       Q.  Okay.  And did you have a chance to review this
17   before you signed it?
18       A.  Yes.
19       Q.  How many days per week would you work as a
20   manager?
21       A.  Six days.
22       Q.  And about how many hours per day?
23       A.  Well, I clock in at 5:00 in the morning, but I
24   didn't have a clock out time.
25       Q.  Well, you didn't clock in or out, correct, as a
```

Page 31

```
1          Q.   Were you familiar with or did you ever have to
2     use the point of sales system at the store?
3          A.   No.
4          Q.   Sir, in terms of damages from this lawsuit,
5     what are you asking for?
6          A.   Well, that it was many hours that I worked.
7          Q.   Okay.
8          A.   We would work 80 to 90 hours all year.
9          Q.   Do you know who set your pay at Delia's?
10         A.   No.
11         Q.   Do you know who made the decision to hire you?
12         A.   No.
13         Q.   Do you know who made the decision to terminate
14    your employee -- your employment, excuse me.
15         A.   No.
16         Q.   Do you know who made the decision to promote
17    you to manager?
18         A.   No.
19         Q.   Do you know who made the decision to set your
20    pay?
21         A.   No.
22         Q.   Do you know who made the decision to give you
23    raises?
24         A.   No.
25         Q.   Do you know who made the decision as to the
```

Page 40

```
1          A.  Yes.

2          Q.  Okay.  And I also want to clarify that you did

3    not work specifically in a store where customers came

4    to, correct?

5          A.  I don't understand the question.

6          Q.  You worked at a location where tamales were

7    being produced and those tamales went to stores,

8    correct?

9          A.  Yes.

10         Q.  And I understand that production area was near

11   one of the stores but it was separate, right?

12         A.  Yes.

13         Q.  And so in that production facility, you didn't

14   really have any customer interactions, correct?

15         A.  Correct.

16         Q.  You would keep a daily production log; is that

17   right?

18         A.  Keep?  Keep in what manner?

19         Q.  Would you keep a written production log or

20   any -- I'm asking if you kept any sort of log of any

21   type of what -- of production?

22         A.  No.

23         Q.  Would you train the production employees on the

24   recipes and the policies and procedures?

25         A.  No.  The supervisor was in charge.
```

                                                     Page 44

```
 1          A.   Yes.

 2          Q.   And managing those employees and managing the

 3     production, correct?

 4          A.   Yes.

 5          Q.   And that's, in fact, what you did as a manager

 6     to the best of your abilities, and you did it well,

 7     correct?

 8          A.   Yes.

 9          Q.   Do you know about how much your pay changed

10     from when you were a production worker and you went to

11     production manager?

12          A.   Well, the day I was made manager was when my

13     pay changed.

14          Q.   Okay.  Understood.  But do you know what that

15     amount of the change was?

16          A.   I don't understand.  Amount?

17          Q.   Fair enough.

18               What was your hourly rate when you were a

19     production line worker?

20          A.   10.50.

21          Q.   Okay.  And as a production employee, what was

22     the amount of your bonuses?

23          A.   250.  250.

24          Q.   $250?

25          A.   Yes.
```

Page 47

```
1        Q.   Per year, correct?

2        A.   Yes.

3        Q.   And that was given to you in January?

4        A.   Yes.

5                  MR. QUEZADA:   Thank you, sir.   Pass the

6    witness.

7                  MR. GONZALEZ:   We'll reserve ours until the

8    time of trial.

9                  THE REPORTER:   Off the record at 12:12 p.m.

10                  (Proceedings ended at 12:12 p.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

FOR READING & SIGNING ONLY

Page 48

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     MCALLEN DIVISION
 3     JUANA CRUZ, OFELIA            )
       BENAVIDES, JOSE ELIAS N.G,    )
 4     GABRIELA VELAZQUEZ,           )
       RICARDO GONZALEZ, HELESIO     )
 5     CRUZ, ANGELICA CHAVEZ,        )
       CONCEPCION PEREZ, OLGA        )
 6     PEREZ, MAVRIGO SAENZ,         )
       JORGE MAOLEON, HECTOR         )
 7     SANCHEZ, HECTOR GONZALEZ,     )
       YESSY PEREZ-MARTINEZ,         )
 8     MARIA DE LOURDES CRUZ,        )
       RESENDO LIEVANOS,             )
 9     ELIZABETH LARA, LUIS          )
       ALBERTO ZUNIGIA-CASTILLO,     )     CIVIL ACTION
10     MIGUEL CABALLERO SANCHEZ,     )   NO. 7:23-CV-00343
       GUILLERMO DE LA               )
11     CRUZ-MENDOZA, CARLOS          )
       DANIEL LOPEZ, GILDA RIVAS,    )     JURY DEMANDED
12     ARMANDO MORALES DE LLANO,     )
       LAZARO GARCIA, MARIA DE       )
13     JESUS MEDINA, RICARDO         )
       ESQUIVEL, RAFAEL SANCHEZ,     )
14     GUILLERMO RUIZ, ROSA          )
       QUINTANILLA,                  )
15                                   )
                   PLAINTIFFS,       )
16                                   )
       VS.                           )
17                                   )
       DELGAR FOODS LLC A/K/A        )
18     DELIA'S TAMALES,              )
                                     )
19              DEFENDANT.           )
20     *****************************************************
21              REPORTER'S CERTIFICATION
                DEPOSITION OF LUIS ZUNIGA
22                   June 28, 2024
23         I, Anica Diaz, Certified Shorthand Reporter in
       and for the State of Texas, hereby certify to the
24     following:
25              That the witness, LUIS ZUNIGA, was duly sworn
```

                                              Page 51

by the officer and that the transcript of the oral

52

1    deposition is a true record of the testimony given by
the witness;

2

         I further certify that pursuant to FRCP Rule
3    30(f)(1) that the signature of the deponent:
4      __X__ was requested by the deponent or a party
before the completion of the deposition and that the
5    signature is to be before any notary public and returned
within 30 days from date of receipt of the transcript.
6    If returned, the attached Changes and Signature Page
contains any changes and the reasons therefor;

7

         ____ was not requested by the deponent or a party
8    before the completion of the deposition.
9              I further certify that I am neither counsel
for, related to, nor employed by any of the parties or
10   attorney in the action in which this proceeding was
taken, and further that I am not financially or
11   otherwise interested in the outcome of the action.
12             Certified to by me this 10th day of July, 2024.
13
14
15

16             Anica Diaz, Texas CSR(8021), RPR, CRR
               Expiration Date:  08-31-24
17             Veritext Legal Solutions
               Firm Registration No. 571
18             300 Throckmorton Street, Suite 1600
               Fort Worth, Texas 76102
19
20
21
22
23
24
25

                                        Page 52

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

    Ante mí compareció el notario suscrito, Luis Albert Zúñiga Castillo, quien desea manifestar lo siguiente:

Mi nombre es Luis Albert Zúñiga Castillo. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

En septiembre de 2014 o alrededor de esa fecha solicité trabajo en Delia's Tamales en San Juan, Texas. Estaba ilegal en el país y no tenía documentos legales. Me contrataron inmediatamente y me pagaron en efectivo semanalmente. Después de 2 años me dijeron que necesitaba documentos legales para trabajar allí. Obtuve algunos documentos falsos: una tarjeta de seguridad social y una tarjeta de residente. Un empleado me dijo dónde conseguir los documentos falsos. En 2020 o alrededor de esa fecha, trabajaría 70 horas a la semana por $935,00. No recibí pago de horas extras. Durante mi estancia en Delia las condiciones laborales fueron muy abusivas tanto física como mentalmente. Mi supervisor me negó un día libre. Durante mi tiempo trabajando supe que la mayoría de los empleados de Delia eran ilegales y tenían documentos falsos. El 3 de mayo de 2023 me llamaron a la Oficina de RRHH. Un abogado de Blanca y Delia que estuvo presente me dijo que me habían despedido y que si apelaba la decisión, llamaría a ICE.

*Luis Alberto Zuñiga Castillo*

Signature Luis Albert Zuniga Castillo

SUBSCRIBED AND SWORN TO BEFORE ME, on this the **26** day of _____ Oct. _____ 2023.

_____
NOTARY PUBLIC
My Commission Expires **4-11-25**



ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

**APPENDIX**
**4 - A**

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     MCALLEN DIVISION
 3      JUANA CRUZ, OFELIA           )
        BENAVIDES, JOSE ELIAS        )
 4      N.G, GABRIELA VELAZQUEZ,     )
        HELESIO CRUZ, ANGELICA       )
 5      CHAVEZ, CONCEPCION PEREZ,    )
        OLGA PEREZ, MAVRIGO          )
 6      SAENZ, JORGE MAOLEON,        )
        HECTOR SANCHEZ, HECTOR       )
 7      GONZALEZ, YESSY PEREZ        )
        MARTINEZ, MARIA DE           )
 8      LOURDES CRUZ, RESENDO        )
        LIEVANOS, ELIZABETH LARA,    )
 9      LUIS ALBERTO ZUNIGA          )
        CASTILLO, MIGUEL             )
10      CABALLERO SANCHEZ, CARLOS    )  CASE NO: 7:23-CV-00343
        DANIEL LOPEZ, GILDA          )
11      RIVAS, ARMANDO MORALES DE    )      JURY DEMANDED
        LLANO, LAZARO GARCIA,        )
12      MARIA DE JESUS MEDINA,       )
        RICHARD ESQUIVEL, RAFAEL     )
13      SANCHEZ, GUILLERMO RUIZ,     )
        ROSA QUINTANILLA,            )
14
15                 PLAINTIFFS,
                                     )
16      VS.                          )
                                     )
        DELGAR FOODS, LLC A/K/A      )
17      DELIA'S TAMALES,             )
                                     )
18                 DEFENDANT.        )
        ***************************************************
19                   ORAL DEPOSITION OF
20                    MIGUEL CABALLERO
21                     June 26, 2024
22      ***************************************************
23                   ORAL DEPOSITION of MIGUEL CABALLERO,
24      produced as a witness at the instance of the Defendant,
25      and duly sworn, was taken in the above-styled and
```

Page 1



```
1    numbered cause on the 26th day of June 2024, from
2    9:02 a.m. to 10:43 a.m., before Priscilla R. Maldonado,
3    CSR, in and for the State of Texas, reported by
4    stenograph, at the Law Offices of Ricardo Gonzalez, 124
5    S. 12th Ave, Edinburg, Texas, pursuant to the Federal
6    Rules of Civil Procedure and the provisions stated on
7    the record or attached.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

1              THE REPORTER:  We are now on the record.

2    The time is 9:02 a.m., and today is June 26, 2024.

3              This is the deposition of Miguel Caballero,

4    produced at the request of Defendant in Civil Case No.

5    7:23-CV-00343, styled Juana Cruz et. al. versus Delgar

6    Foods, LLC D/B/A Delia's, commencing at 9:02 a.m.

7              My name is Priscilla Maldonado, Certified

8    Court Reporter No. 12025, representing Veritext.

9              Would counsel please state their appearance

10   for the record?

11             MR. QUEZADA:  Stephen Quezada with the

12   Defendant.

13             MR. GONZALEZ:  Ricardo Gonzalez, on behalf

14   of the Plaintiffs.

15                  MIGUEL CABALLERO,

16   having been first duly sworn, testified through the

17   duly-sworn interpreter as follows:

18                     EXAMINATION

19   BY MR. QUEZADA:

20       Q.   Good morning, Mr. Caballero.

21       A.   Good morning.

22       Q.   So today we're using a translator to translate

23   from English to Spanish and Spanish to English.  Okay?

24       A.   Yes.   That's fine.

25       Q.   And so that's so that we can fully understand

Page 5

Veritext Legal Solutions
346-293-7000

```
 1    allegations in this lawsuit?
 2         A.   Well, first of all that we were fired or
 3    terminated overnight without any -- without any notice.
 4         Q.   Any other reason why you're suing Delia's?
 5         A.   No.  Only for that.
 6         Q.   And what's your date of birth, sir?
 7         A.   It's 10/28/73.
 8         Q.   Your employment with Delia's started
 9    December 5, 2005.  Does that sound about right?
10         A.   Yes.
11         Q.   Okay.  And you were continuously employed by
12    Delia's until your employment ended on May 2, 2023?
13         A.   Yes.
14         Q.   And do you understand the reason why your
15    employment was terminated?
16         A.   Because of papers.  Just -- just papers.  I
17    didn't have any.
18         Q.   Okay.  And did you understand that that was
19    based on an instruction from the government?
20         A.   No.
21         Q.   Okay.  Your position with Delia's was
22    production worker, correct?
23         A.   Yes.
24         Q.   And more specifically, you prepared masa the
25    majority of your time?
```

Page 11

1    was about it.  I don't think I ever needed anything for

2    my eyes or for dentistry either.

3        Q.    And the company paid -- Delia's paid for those

4    health insurance benefits, correct?

5        A.    Yes.

6        Q.    Were you ever suspended or disciplined while

7    working for Delia's?

8        A.    No.

9        Q.    At any time, did you take any regular

10   vacations, like for summer or spring breaks or anything

11   like that during your employment?

12       A.    Yes.  Yes over the vacations.

13       Q.    And what were -- what were those normal

14   vacations that you took?

15       A.    They gave us two weeks a year.  So I took one

16   week before the middle of the year.  And another week

17   after the half of the year.

18       Q.    And those were two weeks paid vacation,

19   correct?

20       A.    Yes.

21       Q.    And while working for Delia's, you're -- you

22   were able to take the vacations -- the paid vacations

23   that you wanted to take?

24       A.    Yes.

25       Q.    Okay.  And you were paid an hourly rate while

                                            Page 13

```
1    working for Delia's, correct?
2         A.   Only since 2007 and on.  Because when I just
3    came in, they paid us by the shift.
4         Q.   Okay.  Let me -- let me ask you a better
5    question.  From 2020 until your employment ended, you
6    were paid an hourly rate, correct?
7         A.   No.  It was before.
8         Q.   Okay.  So I believe what you're saying then,
9    from 2017 until your employment ended, you were paid an
10   hourly rate -- sometime in 2017.
11        A.   Well, that's when they started paying me by
12   check, because before that they paid me in cash.
13        Q.   Understood.  But what I'm trying to clarify is
14   when you started receiving payment by check, and, I
15   believe, based on what you've described, that sometime
16   in 2017, correct?
17        A.   Well, I really -- I don't remember, but it was
18   before.  It could have been 2008 to 2009.  I don't
19   remember.  But that's -- that's when they started paying
20   us by the hour.
21        Q.   Okay.  Okay.  When you were last working at
22   Delia's, in May of 2023, you were being paid an hourly
23   rate, correct?
24        A.   Yes.
25        Q.   And what was that, your last hourly rate?
```

Page 14

```
1        A.   11.25.

2        Q.   And from the time you started being paid by

3   check, whatever that time was, you started receiving an

4   hourly rate for your work, correct?

5        A.   Yes.  By the hour.  Yes.

6        Q.   And the only position that you held while

7   working for Delia's was that of production, correct?

8        A.   Yes.  Except for the time when I was put on --

9   in the  taken away from that to be put in the kitchen.

10        Q.   Got it.  Who was your supervisor?

11        A.   Luis Briones.

12        Q.   So I'd like to ask you about how you were paid

13   by check.  Okay?

14        A.   Yes.

15        Q.   You were aware that there was a timekeeping

16   system at the restaurant, correct?

17        A.   Yes.

18        Q.   And you clocked in using your finger or thumb?

19        A.   Or with a key code.

20        Q.   Or with a password?

21        A.   Yes.  A password.

22        Q.   Okay.  And that was a password that was unique

23   to you?

24        A.   Yes.

25        Q.   And you never shared it with anyone?
```

Page 15

```
1        Q.   Okay.   Thank you.   And all the duties we've
2    been discussing were duties that you accomplished
3    between the time that you clocked in for work and
4    clocked out at the end of the day, correct?
5        A.   Yes.
6        Q.   Were you aware of any policies that Delia's had
7    while you working there?
8        A.   No.
9        Q.   Okay.   One more question about the duties that
10   I forgot to ask you, sir.   Did -- did your duties change
11   over time or were they what we just discussed the entire
12   time you worked for Delia's, except for the time you
13   worked in the kitchen?
14       A.   Well, only the fact that when I actually
15   started there, the masa was done by hand.
16       Q.   Okay.   And -- and would you say that you -- and
17   would you say that your experience was typical, in terms
18   of punching in, starting work, punching out at the end
19   of work, it was typical for you as it was the other
20   employees?
21            MR. GONZALEZ:   Objection; form.
22       A.   Yes.
23       Q.   (BY MR. QUEZADA)   And that's true for the folks
24   sitting in the room today with us, correct?   Except for
25   Mr. Morales who was not hourly?
```

Page 20

1      Q.   Was there ever a time that you were confused,

2    or perhaps did not understand how to use it?

3      A.   No.

4      Q.   So then you feel that since that timekeeping

5    system was put in place, that you used it to correctly

6    and accurately record your time worked?

7      A.   Yes.

8      Q.   Did you ever explain to anyone how to use that

9    timekeeping system?

10     A.   No.

11     Q.   Did anyone ever ask you about how to use it?

12     A.   Well, only when somebody was trying to put

13   their thumbprint there and they actually needed to do

14   something else in order to punch in.

15     Q.   Okay.  Did you receive training on how to use

16   the timekeeping system?

17     A.   No.  Not training.  Simply Don Luis made the

18   explanation and told me you either use your fingerprint

19   or you use the number here, and this is where you punch

20   to go in and this is where you punch to go out.  And it

21   was only once.

22     Q.   Okay.  And did you feel that was adequate?

23     A.   Well, yes.

24     Q.   Okay.  While working for Delia's, you never

25   made a complaint about being paid incorrectly; is that

                                          Page 24

```
 1    true?
 2         A.   Okay.  Well, I never complained.  But there was
 3    some times when I forgot to punch in or when Don Luis
 4    would actually right down the times, I felt that they
 5    were giving me fewer hours.
 6         Q.   Okay.  Sitting here today, can you tell the
 7    jury what pay periods that issue occurred?
 8         A.   Well, no.  Actually, that was when they were
 9    doing it before the system, when they were doing it by
10    hand.  He would have a list of when we punched in, came
11    out, and so on.  And sometimes I realized or felt that
12    my hours, according to my records, didn't match the
13    hours that he had.  So I would tell him and he said, oh,
14    I'm sorry.  Or he would correct it and he would say,
15    look, I'm gonna add them to you -- for next week.  And
16    then if he did -- well, I never complained.  I just, you
17    know, told him about it.
18         Q.   And then it still got fixed, correct?
19         A.   Yes.
20         Q.   And that was before the timekeeping system was
21    put into place in 2017?
22         A.   Yes.
23         Q.   Was Luis Briones your supervisor the entire
24    time you worked at Delia's?
25         A.   No.  Well, no, not all the time.  I -- I don't
```

                                                    Page 25

1  employment was May 2, 2023, correct?

2       A.   Yes.

3       Q.   You worked the morning shift; is that correct?

4       A.   No.

5       Q.   You worked the evening shift?

6       A.   Yes.

7       Q.   And what was that evening shift?

8       A.   Well, there were several -- several hours for

9  the shift.  Sometimes it was from 10 to 10.  Sometimes

10 it was 11 to 11.  Sometimes it was from 12 to 12, from

11 12 noon to 12 midnight or 12:00 a.m.  And then there --

12 unless there wasn't a lot of work at those times, then I

13 would probably leave a little earlier.

14      Q.   Okay.  And you understand I'm just asking about

15 just the general shift, not what you actually punched in

16 and punched out, right?

17      A.   Well, see, the thing is I worked there for 18

18 years.  So at first, I was only in the morning.  Then,

19 they bought the machine and they started doing double

20 shifts, I mean, so then I was in the morning and

21 sometimes in the afternoon.  So at the end, I was only

22 working evenings.

23      Q.   Got it.  Did you have any other jobs for any

24 other employers while you were working for Delia's?

25      A.   No.

Page 28

```
 1              I, MIGUEL CABALLERO, have read the foregoing
        deposition and hereby affix my signature that same is
 2      true and correct, except as noted above.
 3
 4
 5
                        _____
                        MIGUEL CABALLERO
 6
 7
 8      THE STATE OF TEXAS )
 9      COUNTY OF _____ )
10              Before me, _____, on
        this day personally appeared MIGUEL CABALLERO, known to
11      me (or proved to me under oath or through
        _____) (description of identity card or
12      other document) to be the person whose name is
        subscribed to the foregoing instrument and acknowledged
13      to me that they executed the same for the purposes and
        consideration therein expressed.
14
                        Given under my hand and seal of
15      office this _____ day of _____, 2024.
16
17
                        _____
18              Notary Public in and for the State of Texas
19
20
21
22
23
24
25      Job No. HOU6734283

                                                Page 46
```

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     MCALLEN DIVISION
 3    JUANA CRUZ, OFELIA           )
      BENAVIDES, JOSE ELIAS N.G,   )
 4    GABRIELA VELAZQUEZ, RICARDO  )
      GONZALEZ, HELESIO CRUZ,      )
 5    ANGELICA CHAVEZ, CONCEPCION  )
      PEREZ, OLGA PEREZ, MAVRIGO   )
 6    SAENZ, JORGE MAOLEON,        )
      HECTOR SANCHEZ, HECTOR       )
 7    GONZALEZ, YESSY              )
      PEREZ-MARTINEZ, MARIA DE     )
 8    LOURDES CRUZ, RESENDO        )    CIVIL ACTION
      LIEVANOS, ELIZABETH LARA,    )    NO. 7:23-CV-00343
 9    LUIS ALBERTO                 )
      ZUNIGIA-CASTILLO, MIGUEL     )
10    CABALLERO SANCHEZ,           )    JURY DEMANDED
      GUILLERMO DE LA              )
11    CRUZ-MENDOZA, CARLOS DANIEL  )
      LOPEZ, GILDA RIVAS, ARMANDO  )
12    MORALES DE LLANO, LAZARO     )
      GARCIA, MARIA DE JESUS       )
13    MEDINA, RICARDO ESQUIVEL,    )
      RAFAEL SANCHEZ, GUILLERMO    )
14    RUIZ, ROSA QUINTANILLA,      )
                                   )
15              PLAINTIFFS,        )
                                   )
16    VS.                          )
                                   )
17    DELGAR FOODS LLC A/K/A       )
      DELIA'S TAMALES,             )
18                                 )
                DEFENDANT.         )
19
20
      *********************************************************
21                    ORAL DEPOSITION OF
22                    ROSENDO LIEVANOS
23                     June 28, 2024
24    *********************************************************
25
```

                                                    Page 1

APPENDIX
6

1          ORAL DEPOSITION of ROSENDO LIEVANOS, produced

2    as a witness at the instance of the Defendant, and duly

3    sworn, was taken in the above-styled and numbered cause

4    on the 28th day of June, 2024, from 12:27 p.m. to

5    1:56 p.m., before Anica Diaz, CSR, RPR, CRR, in and for

6    the State of Texas, reported by machine shorthand, at

7    the Law Offices of Ricardo Gonzalez, 124 South 12th

8    Avenue, Edinburg, Texas, pursuant to the Federal Rules

9    of Civil Procedure and the provisions stated on the

10   record or attached.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FOR READING & SIGNING ONLY

Page 2

```
 1                 P R O C E E D I N G S
 2                 (Proceedings began at 12:27 p.m.)
 3                 (Per agreement of all counsel, Federal
 4    Rule 30(b)(5) Read-On was waived.)
 5                 THE REPORTER:  On the record at 12:27 p.m.
 6                 (Interpreter and Witness were sworn in.)
 7                      ROSENDO LIEVANOS,
 8    having been duly sworn, testified through an Interpreter
 9    as follows:
10                      EXAMINATION
11    BY MR. QUEZADA:
12         Q.  Good afternoon, Mr. Lievanos.
13         A.  Lievanos.
14         Q.  Lievanos.
15              Good afternoon, Mr. Lievanos.  My name is
16    Stephen Quezada.  I'm an attorney representing Delgar
17    Foods, L.L.C., and Delgar Foods, L.L.C. does business as
18    Delia's.  Okay?
19         A.  Yes.
20         Q.  And, actually, Delia's Tamales.
21         A.  Delia's Tamales, yes.
22         Q.  So you understand today that when I say
23    Delia's, we're referring to the Defendant in the lawsuit
24    that you're a part of, correct?
25         A.  Yes.  Yes.
```

Page 5

```
 1          A.   Yes.

 2          Q.   And what did you study?

 3          A.   Industrial engineering.

 4          Q.   Lots of math, huh?

 5          A.   Physics and math.

 6          Q.   Better you than me.

 7               Okay.  Okay.  You worked for Delia's as a

 8   manager, correct?

 9          A.   I started in the kitchen, then I was promoted

10   to manager.

11          Q.   And you were promoted to manager in May of

12   2016, correct?

13          A.   Yes.  That is right.

14          Q.   And are you aware of a difference between a

15   production manager and a store manager?

16          A.   Yes.  I do know the difference.

17          Q.   And those are two different positions, correct?

18          A.   Yes, that is right.

19          Q.   And you were a store manager, correct?

20          A.   Yes.

21          Q.   And you supervised about 20 employees, correct?

22          A.   From 20 to 30.

23          Q.   And you worked at the locations in -- well,

24   what locations did you work at?

25          A.   At the six locations.
```

Page 10

```
 1        Q.   And would you move around from location to
 2   location, or would you be assigned at one and go to
 3   another?
 4        A.   When I started as a manager I was sent to
 5   several locations, then I went to San Juan and Mission
 6   in a stable manner.
 7        Q.   What was the last store to which you were
 8   assigned when you were a manager at Delia's?
 9        A.   Mission.  In Mission.
10        Q.   Okay.  And I believe your last rate of pay was
11   $1,100 per week?
12        A.   Yes.
13        Q.   And you also received a bonus from Delia's?
14        A.   Yes.
15        Q.   And about how much was that bonus?
16        A.   It was several amounts since I began.
17        Q.   Okay.  What was the amount of the last bonus
18   you received?
19        A.   10,000.
20        Q.   And you -- excuse me.
21             You would get that bonus in January?
22        A.   Yes.
23        Q.   So on an annual basis, what was the approximate
24   amount of your pay?
25        A.   Approximately, 50,000.
```

FOR READING & SIGNING ONLY

Page 11

```
 1    take it a little bit here and there?

 2         A.   One week the first half of the year, and the

 3    other week the second half of the year.

 4         Q.   And did you do that the entire time you were a

 5    manager?

 6         A.   Yes.

 7         Q.   I'd like to talk a little bit about what you

 8    did as a manager, okay?

 9         A.   Okay.

10         Q.   We already got that you supervised about 20 to

11    30 employees.

12         A.   Yes, that's -- that's it. That's right.

13         Q.   And these were employees who were hourly

14    employees working at the restaurant full-time, correct?

15         A.   Yes, that is right.

16         Q.   And were these employees back of the house, or

17    kitchen employees, or did they work in the front of the

18    store where the customers were?

19         A.   I was in charge of kitchen employees and

20    cashier too.

21         Q.   Okay.  Could you tell us about how many were in

22    the kitchen and about how many were cashier?

23         A.   It was about half and half, 15 and 15.

24         Q.   And as a manager you could hire employees?

25         A.   Yes.
```

Page 14

```
 1        Q.  And you could also fire employees if you needed
 2   to?
 3        A.  Yes, that too.
 4        Q.  If you saw -- well, Delia's has work policies
 5   and procedures, correct?
 6        A.  Yes, That is right.
 7        Q.  And your job as a manager was to enforce those
 8   policies and procedures, correct?
 9        A.  Yes.
10        Q.  And those policies and procedures included how
11   to -- policies about how to make the foods?
12        A.  Yes.
13        Q.  Or probably more procedures, right?
14        A.  Yes, more procedures.
15        Q.  And you would enforce those as a manager?
16        A.  I didn't quite understand that.
17        Q.  You make sure that the procedures were followed
18   for making the food?
19        A.  Yes, yes.
20        Q.  And those also included policies for how
21   employees were supposed to behave at the store, correct?
22        A.  Yes, that is right.
23        Q.  So policies and procedures about how to
24   correctly and accurately clock in and clock out,
25   correct?
```

Page 15

```
 1        Q.   Since you've been with Spectrum, have you had
 2   the same device?
 3        A.   Yes.
 4        Q.   Okay.  Going back to your duties as a manager,
 5   I'd like to ask you about a few more, okay?
 6        A.   That's fine.
 7        Q.   Would you resolve customer complaints or
 8   issues?
 9        A.   Yes.
10        Q.   So if a customer decided that their food wasn't
11   good for whatever reason and wanted a refund, you would
12   give them their money back?
13        A.   First, we offer credit in tamales.  If they
14   didn't want that, then we'd give them the refund.
15        Q.   Was there ever a situation where you thought
16   something was just really bad and so you just went
17   straight to refund?
18        A.   Yes.
19        Q.   And you used your experience and judgment to
20   make that decision?
21        A.   Yes, that is right.
22        Q.   Would you organize the shift schedules?
23        A.   No.
24        Q.   Okay.  If an employee got there late, would you
25   correct them and remind them of when they needed to be
```

Page 18

1    there?

2        A.   Yes.

3        Q.   Did you ever write anyone up?

4        A.   Yes.

5        Q.   And you would use your judgment and discretion

6    to do that?

7        A.   Yes, that is right.

8        Q.   If someone missed completely their shift, would

9    you be the person to note that and to take the

10    appropriate action?

11       A.   Yes.  That is right.

12       Q.   Would you approve vacation time for the

13    employees that reported to you?

14       A.   No.

15       Q.   Did you ever provide any performance reviews?

16       A.   Yes.

17       Q.   Would you do those annually?

18       A.   Not annually, but periodically.

19       Q.   Did you ever decide to give anyone a raise in

20    their pay?

21       A.   No.  I was not authorized.  That was the

22    supervisor.

23       Q.   Could you recommend that?

24       A.   Yes.

25       Q.   And would the supervisor follow your

                                                        Page 19

```
1         Q.   Were you responsible for counting cash and
2    keeping track of cash?
3         A.   Yes, that is right.
4         Q.   Would you reconcile the cash sold?
5         A.   Sometimes.   The supervisor was in charge of
6    that, but if he wasn't there or he was off, we would do
7    that.
8         Q.   Would you make sure that the product that was
9    needed to make the tamales and other items sold were in
10   stock and being handled correctly?
11        A.   Yes.
12        Q.   Could you hire -- or could you order, excuse
13   me.
14             Could you order any products that were
15   needed to make the foods?
16        A.   Yes.
17        Q.   Would you receive product that was needed to
18   make the foods?
19        A.   Yes, that is right.
20        Q.   And if you looked at that product and saw that
21   it wasn't good or incorrect, you could send it back?
22        A.   Yes, we could return.
23        Q.   And if there was foods that were made that were
24   going to be sold to customers that did not appear to be
25   to standard, could you make the decision to not sell
```

Page 24

```
 1          Q.  Was there ever an opportunity for you to make
 2    the decision to demote an employee?
 3          A.  No.
 4          Q.  Would you ever make the decision to reduce
 5    someone's pay?
 6          A.  No.
 7          Q.  Why are you suing Delia's?
 8          A.  For discrimination, unjustified termination,
 9    and irregularities -- labor irregularities.  And
10    intimidation.
11          Q.  Are the labor irregularities, do they fall
12    under the same thing as intimidation?
13          A.  It could -- -- but, no to, it's different.
14          Q.  So let's take the first thing you mentioned,
15    discrimination, okay.
16          A.  Yes.  Well that was in based that we were
17    terminated and other employees are in the same situation
18    and they're still there.
19          Q.  Okay.  So let me ask you this, the
20    discrimination, you're saying that you were
21    discriminated against because of the termination
22    decision; is that right?
23              MR. GONZALEZ:  Objection; form.
24          A.  Yes, Yes.  Because some were terminated and
25    others weren't, and that's how we ended up in this
```

Page 26

1   situation.

2        Q.  (By Mr. Quezada)  Okay.  And you also mentioned

3   wrongful termination.

4        A.  Yes.

5        Q.  And are you saying that the termination was

6   wrongful because of the discrimination, meaning is it

7   the same thing, or is it something different you're

8   telling us?

9        A.  Well, I consider each separate but they are

10  together.  Discrimination, intimidation, labor

11  irregularities, and unjustified termination.

12       Q.  Were you aware that the reason Delia's

13  terminated your employee was because it received a

14  notice from the Government that it could no longer

15  continue employing you?

16       A.  Yes.  Uh-huh.

17       Q.  And sitting here today, do you have any facts

18  or evidence that you can tell us that would show that

19  that reason is false?

20       A.  No, I do not.

21       Q.  When you are telling us irregularities, what do

22  you mean by that?

23       A.  Yes.  Well, they say -- well, supposedly our

24  documents aren't right.  Why was our insurance taken

25  out?  I mean, it was being taken out.  Where'd it go if

                                          Page 27

1    they weren't original?

2        Q.  And is that the only irregularity that you're

3    talking about in this lawsuit?

4        A.  Yes, yes.

5        Q.  So just so that I have this clear, you're

6    talking about deductions that were made from pay for

7    benefits?

8        A.  I'm referring to Social Security deductions.

9    If it isn't original, then where was it going?

10       Q.  Okay.  Any other deduction?

11       A.  No.  That's the only one.

12       Q.  So I'll represent to you, sir, that

13   withholdings made for Social Security were remitted to

14   the federal government.

15           Okay.  Do you have any reason to believe

16   that that's false?

17           MR. GONZALEZ:  Objection; form.

18       A.  No, it didn't add up.  I mean, if it was being

19   deducted, and it isn't original, where is it going?  I'm

20   talking about all the years.

21       Q.  (By Mr. Quezada)  Okay.  Do you have any

22   evidence or facts that Delia's was holding on to those

23   dollars and not sending them to the Government?

24       A.  No, I do not have.

25       Q.  One allegation in this case is that Delia's was

Page 28

1    maintaining two sets of books.  Have you heard that

2    before?

3        A.  No.

4        Q.  So sitting here today, you have no knowledge of

5    two sets of books by Delia's; is that right?

6        A.  That is un -- unknown to me.

7        Q.  So let me ask you now about the -- well,

8    anything else about irregularities, or did we cover it?

9        A.  Yes, that's it.

10        Q.  Okay.  So, now, let me ask you about the

11    intimidation.  What are you claiming was intimidation?

12        A.  Yes.  When we were called upon, Delia's had her

13    attorney.  We were called without any legal

14    representation.

15        Q.  Did you ask for legal representation at that

16    time?

17        A.  No.  I mean, the day we were called, the

18    attorneys were there, she had her attorneys, and we had

19    no knowledge about it.

20        Q.  Okay.  My question was, did you ask for an

21    attorney at that time?

22        A.  Not at that time.

23        Q.  Okay.  So what other -- what else is part of

24    the intimidation?

25        A.  Just that part.

Page 29

```
1    I had.  I had some late payments.
2         Q.  What kind of accounts were they?  Were they --
3         A.  They were loans.
4         Q.  Oh, okay.  Did you have to withdraw any money
5    from savings?
6         A.  Yes.
7         Q.  And about how much was that?
8         A.  I don't know, about 5,000.
9         Q.  Okay.  So other than the truck and the payments
10   on the loans, were there any bills or payments that you
11   were not able to make?
12        A.  The rent for the house too.
13        Q.  Were you ever evicted from the house?
14        A.  We weren't evicted but we weren't able to pay
15   so we left.
16        Q.  Okay.  So where did you move?
17        A.  I used to live next to my mother-in-law, and
18   well, now, I'm living with my mother-in-law.  We moved
19   next door.
20        Q.  Okay.
21             (Exhibit No. 1 marked.)
22             MR. QUEZADA:  I'm going to pass you what's
23   marked as Exhibit 1.  And it's not stapled, Rick.  And
24   all I've got is one copy because --
25             MR. GONZALEZ:  That's fine.
```

Page 35

Veritext Legal Solutions
346-293-7000

```
 1   sir?

 2        A.  Yes.

 3        Q.  And, again, my question for you is, on the

 4   first page, that is your signature?

 5        A.  Yes, yes.

 6        Q.  And you had a chance to review Exhibit 2 before

 7   you signed it?

 8        A.  Yes.

 9        Q.  And you signed it because everything was true

10   and correct in Exhibit 2?

11        A.  Yes, that is right.

12        Q.  Mr. Lievanos, do you know who made the decision

13   to hire you?

14        A.  Yes.

15        Q.  Who was that?

16        A.  Albert Trevino.   Alberto Trevino.

17        Q.  Do you know who made the decision to terminate

18   your employment?

19        A.  Delia's company.

20        Q.  Do you know who at the company?

21        A.  No.

22        Q.  Do you know who made the decision to promote

23   you from a regular employee to a manager?

24        A.  Yes.

25        Q.  Who was that?
```

Page 37

```
 1        A.  Alberto Trevino.
 2        Q.  Do you know who made the decision or decisions,
 3   rather, about how much you would be paid?
 4        A.  The first promotion, I did.
 5        Q.  And who was that?
 6        A.  Alberto Trevino.
 7        Q.  Do you know who made the decision about whether
 8   you would receive a bonus and if so how much that bonus
 9   would be?
10        A.  No.
11        Q.  Okay.  Do you know who made the decision about
12   what stores you'd work at?
13        A.  No.
14        Q.  Do you know who made the decisions what about
15   benefits to offer?
16        A.  No.
17        Q.  Do you know who made any decisions about
18   whether you should be written up?
19        A.  Written up for what?  I don't understand.
20        Q.  You mentioned that you received a write up or
21   some discipline before.
22        A.  Oh, yes.  Yes.
23        Q.  Do you know who made the decision to do that?
24        A.  Monica Juarez, the supervisor.
25        Q.  Who is the employee who directed you on a
```

Page 38

```
 1          I, ROSENDO LIEVANOS, have read the foregoing
 2    deposition and hereby affix my signature that same is
 3    true and correct, except as noted above.
 4
 5
 6                              _____
 7                              ROSENDO LIEVANOS
 8    THE STATE OF TEXAS)
 9    COUNTY OF _____)
10          Before me, _____, on
11    this day personally appeared ROSENDO LIEVANOS, known to
12    me (or proved to me under oath or through
13    _____) (description of identity card or
14    other document) to be the person whose name is
15    subscribed to the foregoing instrument and acknowledged
16    to me that they executed the same for the purposes and
17    consideration therein expressed.
18          Given under my hand and seal of office this
19    _____ day of _____, 2024.
20
21                         _____
22                         Notary Public in and for
23                         The State of Texas
24
25
                                              Page 42
```

TRANSLATION

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció el notario público que suscribe, Rosendo Lievanos, quien desea manifestar lo siguiente:

Mi nombre es Rosendo Lievanos. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

En o alrededor de octubre de 2013. Comencé a trabajar en Delia's Tamales en North 10th St. McAllen, TX. Me pidieron mis documentos legales y presenté mis documentos falsos. Nadie cuestionó mis documentos falsos y comencé a trabajar. Comencé a trabajar en el área de cocina como cocinera hace aproximadamente 2 años y 7 meses. Después de eso me ascendieron a gerente de tienda. Me pagaban 600 dólares por semana por 52 a 60 horas semanales. Más tarde me dieron un aumento de sueldo a 800 dólares por 60 horas de trabajo. Cuando me despidieron, me pagaron $1100.00 por semana por cada año en noviembre y diciembre, trabajando de 70 a 80 horas por semana. Nunca me pagaron horas extras por todas las horas extra de trabajo. Durante el tiempo que trabajé en Delia's, las condiciones laborales eran abusivas tanto mental como físicamente debido a que la gerencia exigía más trabajo todo el tiempo.

El 3 de mayo de 2023 me dijeron que fuera a la Oficina de RRHH en San Juan. Llegué y me reuní con HR Blanca y el abogado de Delia. Me dijeron que me despidieron de mi trabajo porque mis documentos falsos eran sospechosos. Blanca me preguntó si tenía otros documentos o si podría conseguir algún otro documento para poder regresar a trabajar.

_____
Signature Rosendo Lievanos

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 17th day of
Nov. 2023.

_____
NOTARY PUBLIC
My Commission Expires 4-11-25

ANITA S. CASTILLEJA
Notary Public STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025



APPENDIX
6 - A

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció la notaria que suscribe, Juana Cruz, y quisiera manifestar lo siguiente:

Mi nombre es Juana Cruz. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

Alrededor de junio de 2001 solicité trabajar en Delia's Tamales en S. 23rd en McAllen, TX. Estaba ilegal en el país y no tenía documentos legales. La señora Delia Garza, la dueña, nos contrató a mi tía Euferria Cárdenas y a mí para trabajar en la tienda. Dos años después dejé de trabajar en Delia. Siempre me pagaron en efectivo. En el año 2006 volví a trabajar nuevamente en Delia. La hermana de Delia, Mirta Garza, me dijo que buscara documentos. Luego obtuve documentos falsos por mi cuenta para trabajar en Delia.

En 2006 nunca me pagaron horas extras, sin importar cuántas horas trabajara, normalmente unas 80 horas por semana. En 2008 volví nuevamente a lo de Delia. Le entregué mis documentos falsos a Lorenzo Luben. Lorenzo supo todo el tiempo que mis documentos eran falsos durante mi estancia en Delia. Las condiciones de trabajo eran abusivas verbal y físicamente y nunca me dieron un descanso para almorzar. Me amenazaron con despedirme si rechazaba cualquier horario que me asignaran, especialmente en los meses de noviembre y diciembre.

El 2 de mayo de 2023 mi supervisor Roselto Castaneda me dijo que fuera a Recursos Humanos. Fui a Recursos Humanos con Blanca y ella me despidió. El abogado de Delia me dijo que si apelaba llamaría a ICE. Después del despido, Delia mantuvo trabajando a alrededor del 90% de los empleados que son ilegales y todos tienen documentos falsos. Hasta el día de hoy mi tía sigue trabajando en Delia y ella es como yo una ilegal con documentos falsos.

Signature Juana Cruz

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 30th day of
Oct . 2023.

ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

NOTARY PUBLIC
My Commission Expires 4-11-25

APPENDIX
7

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Rosa Quintanilla personally appeared before me and stated under oath.

"My name is Rosa Quintanilla . I am over the age of 18. I am competent to testify and therefore make this Affidavit.

This Affidavit is based on my personal knowledge and the facts are true and correct. I declare under penalty of perjury that this information is based on my personal knowledge of what happened during my employment with Delia's.

I started working at Delia's from 2002 to May 2023. I was paid $240.00 per week working 60 to 85 hours a week. From 2002 thru 2017 I was paid in cash. I do have copies of the envelopes they would use to put the cash in.

I was promoted to manager the last few years working at Delia's but I did not have the power to hire and fie or even recommend. That was HR dept. The majority of my duties as manager were the same ones as when I was on hourly wage. I believe she put me on salary because she did not want to pay the extra hours I was working.

I did ask to go back to hourly since I was basically doing the exact same thing as a manager and I wanted to get compensated for the overtime but was denied.

*Rosa Quintanilla*

STATE OF TEXAS

COUNTY OF HIDALGO

Sworn to and subscribed before me on the 6th of Nov 2024, by Rosa Quintanilla .

*Anita S Castilleja*
Notary Public, State of Texas

ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

APPENDIX

**8**

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Hector Gonzalez personally appeared before me and stated under oath.

"My name is Hector Gonzalez . I am over the age of 18. I am competent to testify and therefore make this Affidavit.

This Affidavit is based on my personal knowledge and the facts are true and correct. I declare under penalty of perjury that this information is based on my personal knowledge of what happened during my employment with Delia's.

I was on salary with no overtime pay. I worked 80 to 85 hours a week. I never had the authority to hire and fire or even recommend to HR about other employes.

I did work in the mornings while I was still clocked out. I also clocked out and continued to work.

I did catch Delia's modifying the hours worked on other employees. I did work during my break and during my lunch on multiple

The majority of my duties as manager were the same ones as when I was on hourly wage. I believe she put me on salary because she did not want to pay the extra hours I was working.

I did ask to go back to hourly since I was basically doing the exact same thing as a manager, and I wanted to get compensated for the overtime but was denied.

STATE OF TEXAS

COUNTY OF HIDALGO

Sworn to and subscribed before me on the ___5ᵗʰ___ of ___Nov___ _____ 2024, by Hector Gonzalez  .

Notary Public, State of Texas

ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

APPENDIX

9

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció el notario público que suscribe, Héctor González Cabera, quien desea manifestar lo siguiente:

Mi nombre es Héctor González Cabera. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

En septiembre de 2016 o alrededor de esa fecha solicité trabajo en Delia's Tamales en Edinburg. Unos días después me llamaron para ir a la tienda de San Juan para una entrevista. Fui a la tienda de San Juan y me entrevistó Alberto Treviño. Le entregué al señor Treviño mis documentos falsos, mi tarjeta de seguro social y mi tarjeta de residente. Le dije al señor Treviño que los documentos eran falsos y su respuesta fue que él no era Inmigración y me contrató como cocinero. Posteriormente me ascendieron a gerente de tienda. Gestionaba unas 5 tiendas y me di cuenta de que casi todos los empleados eran ilegales y todos tenían documentos falsos. Delia Garza sabía que estaba contratando gente ilegal. Durante mi trabajo en Delia's me dijeron que les dijera a los empleados que trabajaran horas extras o que redujeran sus horas y no les diera trabajo. Como gerente, trabajaría 55 horas a la semana por $1200 sin pago de horas extras. Como gerente me dijeron que hiciera un trabajo que no formaba parte de mis funciones. El 3 de mayo de 2023 me pidieron que fuera a Recursos Humanos y hablara con Blanca. Fui a Recursos Humanos y Blanca me dijo que hablara con el abogado de Delia, Stephen Quezada. El Sr. Quezada me dijo que me despidieron porque una auditoría de inmigración mostró que mis documentos eran falsos y que si quería apelar llamaría a ICE.

_____

Signature Héctor Gonzalez Cabera

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 26ᵗʰ day of
Oct.          2023.

_____
NOTARY PUBLIC
My Commission Expires _____

ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció el notario público que suscribe, Jorge Mauleón, y quisiera manifestar lo siguiente:

Mi nombre es Jorge Mauleón. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

Alrededor de 2018 solicité trabajar en Delia's Tamales en Mission, Texas. Me contrataron inmediatamente. Presenté mi tarjeta de seguridad social y de residente falsa. En 2020 fui ascendido a gerente de la tienda de San Juan. Todos en Delia sabían que la mayoría de los empleados eran ilegales y no tenían documentos legales. Durante mi trabajo en Delia las condiciones laborales eran abusivas tanto física como mentalmente. Horarios amplios durante los meses de diciembre. El 3 de mayo de 2023 me llamaron a la Oficina de RRHH con Blanca. Allí el abogado de Blanca y Delia me dijo que me habían despedido y que si quería apelar llamaría a ICE. Me gustaría decir que en el momento en que me despidieron, Delia's continúa con más de 909 empleados necesarios para operar todas sus tiendas, son ilegales con documentos falsos. La señora Delia Garza supo en todo momento que la mayoría de sus empleados eran ilegales con documentos falsos.

_Jorge Mauleón_
Signature Jorge Mauleon

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 26ᵗʰ day of
_Oct._ 2023.

_Anita S Castilleja_
NOTARY PUBLIC
My Commission Expires _4-11-25_

ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025



**APPENDIX**

**10**

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO


Angelica Chavez personally appeared before me and stated under oath.

"My name is Angelica Chavez. I am over the age of 18. I am competent to testify and therefore make this Affidavit.

This Affidavit is based on my personal knowledge and the facts are true and correct. I declare under penalty of perjury that this information is based on my personal knowledge of what happened during my employment with Delia's.

I was working on a salary and also working hourly with my time at Delia's.

I was on salary when I was a manager. I was working 85 hours a week and was only getting a salary. Most of my duties as manager, were the same duties I had while I was hourly.

I never had the authority to hire, fire, or recommend the hiring and firing of employees. I also worked while I was clocked out and we had to write our hours by hand.

On many occasions I also clocked out and continued working. I told Delia on several occasions that I wanted to go back working hourly, because I was making more money.

Working 85 hours a week and was just on a salary was not working out. I was making more money as an hourly working 85 hours a week. I was paid in cash on several occasions for my weekly pay and also my overtime pay. I don't recall the dates. I also worked during my break and also during my lunch break, where I was never paid for that.

I did also work extra holidays but was not given extra pay for that. I figured Delia wanted me on salary, so she didn't have to pay the extra 45 hours I was working a week.

Angelica Chavez

STATE OF TEXAS

COUNTY OF HIDALGO

Sworn to and subscribed before me on the 6th of Nov. _____ 2024, by Angelica Chavez.

Anita S. Castilleja

Notary Public, State of Texas

ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

APPENDIX

11

## AFFIDAVIT

**STATE OF TEXAS**

**COUNTY OF HIDALGO**

Before me, the undersigned notary public appeared, Ofelia Benavides and would like to state the following:

My name is Ofelia Benavides. I am over the age of 18 and would like to state that everything in the original petition is correct and true. I also would like to state the following:

On or about August 2006, I went to Delia's Tamales looking for work. I told the owner Delia Garza that I was illegal and did not have any documents. Ms. Garza agreed to hire me anyway. Immediately I was paid in cash by shift at $45.00 per shift. About six years later I was told to get a legal document to work, like a social security card and a resident card. The office lady clerk told the employees that she knew who would give us fake documents. I got the documents from the clerk Letty's husband, and he told me that her husband would get the documents to me that her husband would get the documents to me for a price. After that, I was paid with a Delia Tamales check and social security deductions and Medicare were taken from my salary.

A few years later, I was paid with cash again. After a few years of getting paid in cash I was told to get new documents again. I got the new documents from a person who other employees knew was selling the documents. I started getting paid with Delia Tamales checks and the social security and Medicare insurance started getting deducted again.

On May 3rd, 2023, I was terminated because of my documents. HR told me that if I would appeal my termination Immigration would be called. Delia's Tamales attorney Steven Quesada also told me that ICE, Immigration would investigate and be called on me. It was best to accept my termination. I left the building and never went back.

_Ofelia Benavides Bautista_
Signature Ofelia Benavides

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 24th day of
_Oct_ .    2023.

_Anita S Castillejo_
**NOTARY PUBLIC**

ANITA S. CASTILLEJA
Notary Public STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

**APPENDIX**
**12**

My Commission Expires    4-11-25

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció la notaria pública abajo firmante, Gabriela Velazqoez y quisiera manifestar lo siguiente:

Mi nombre es Gabriella Velázquez. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

En julio de 2018 o alrededor de esa fecha solicité trabajar para Delia's Tamales en North McAllen. Era ilegal en este país y tenía mis propios documentos falsos. Dejé en 2022 por unos meses y regresé en enero de 2023. Durante mi tiempo trabajando en Delia's las condiciones laborales fueron muy abusivas tanto mental como físicamente. Sin pausas para el almuerzo. No se permite ir al baño. Me obligaron a trabajar horas extras. Me amenazaron con despedirme si no hacía las horas extras.

El 3 de mayo de 2023 me avisaron para acudir a Recursos Humanos. Fui y hablé con Blanca. Ella me informó que me habían despedido del trabajo. Un hombre al lado de Blanca que dijo ser el abogado de Delia me dijo que si apelaba la terminación, llamaría a ICE. Luego salí del edificio.

_____
Signature Gabriela Velázquez

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 30ᵗʰ day of
_Oct._ 2023.



_____
NOTARY PUBLIC
My Commission Expires _4-11-25_

ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025



APPENDIX
_13_

**AFFIDAVIT**

**STATE OF TEXAS**

**COUNTY OF HIDALGO**

Mi nombre es Melesio Cruz. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

Alrededor del 8 de junio de 2002 solicité trabajo en Delia's Tamales en San Juan. Les dije que no tenía documentos legales. En la oficina de Delia me dieron una tarjeta de residente extranjero falsa y una tarjeta de seguro social falsa. Empecé a trabajar inmediatamente. Durante mis años de trabajo, las condiciones laborales eran muy abusivas, involucrando abuso verbal y físico. No se dieron pausas para el almuerzo ni se realizaron horas extras no deseadas. Te amenazaron con despedirte si no trabajas más cuando te lo pidieron. Letty Sumaya que trabaja en la oficina vino y me dio documentos falsos. Hacia el final, el supervisor Luis Briones me dijo que buscara nuevos documentos. El 3 de mayo de 2023 me dijeron que me habían despedido. El abogado de Delia estaba presente y dijo que si me quedaba, ICE vendría al día siguiente. Después de que un grupo de nosotros fuimos despedidos. Delia retuvo a alrededor del 90% de los empleados, todos ilegales, con documentos falsos.

_Signature_

Signature Melesio Cruz

SUBSCRIBED AND SWORN TO BEFORE ME, on this the $26$ day of

_____ 2023.

_Signature_

NOTARY PUBLIC

My Commission Expires 4-11-25

ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12528217-9
My Comm. Exp. 04-11-2025

**APPENDIX**

**14**

**AFFIDAVIT**

STATE OF TEXAS

COUNTY OF HIDALGO

Mi nombre es Yessy Pérez. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

En noviembre de 2013 o alrededor de esa fecha, un empleado de Delia's Tamales me recomendó trabajar en Delia's en San Juan. Cuando comencé a trabajar me pagaban en efectivo. Después de 2 o 3 meses de trabajo, González, el gerente de Delia, me dijo que necesitaba documentos para trabajar. González me dijo además que no importaba si los documentos eran falsos o si los de Delia eran de inmigración. El Sr. González me dijo que preguntara a los demás empleados dónde ir a buscar los documentos. Uno de los empleados me dio un número de teléfono al que llamar para obtener mis documentos falsos. Más tarde obtuve una seguridad social, una identificación y una tarjeta verde falsas. Renové los documentos dos veces en los 9 años y medio que trabajé en Delia's. Durante mi trabajo en casa de Delia. La gestión de Delia fue muy abusiva, me acosaba, me amenazaba si no trabajaba las horas que querían que trabajara.

Cada diciembre, el gerente nos daba bebidas Red Bull y chocolates para quedarnos y trabajar muchas horas. Unas 20 horas diarias sin pausas para el almuerzo. El 2 de mayo de 2023 me llamaron a la Oficina de Recursos Humanos. Una señora y un hombre me despidieron por los documentos falsos. La señora me dijo que el hombre era el abogado de Delia y me dijo que si apelaba la terminación llamaría a inmigración.

Signature Yessy Pe rez

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 34th day of
_____ 2023.

NOTARY PUBLIC
My Commission Expires 4-25-

ANITA S. CASTILLEJA
Notary Public STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

**APPENDIX**

**15**

tabbies

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció el notario público que suscribe, Mauricio Sánchez, y quisiera manifestar lo siguiente:

Mi nombre es Mauricio Sánchez. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

En septiembre de 2013 o alrededor de esa fecha solicité trabajo en Delia's Tamales en Mission, TX. Yo era ilegal en este país. Presenté mis documentos falsos. Durante mi trabajo durante unos 10 años, las condiciones laborales fueron muy abusivas tanto física como mentalmente. Me obligaron a trabajar durante un tiempo que no quería trabajar. Me amenazaron con despedirme si no trabajaba en la ~~casa~~ que me dieron después de ~~estudiar~~ ~~en casa~~. Me despidieron el 3 de mayo de 2022. En el momento del despido, el abogado de Delia me dijo que si apelaba el despido, ICE vendría a buscarme.



**Signature Mauricio Sanchez**

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 9 day of
꞊Nov.꞊ 2023.

NOTARY PUBLIC
My Commission Expires  4-11-25



ANITA. S. CASTILLEJA
Notary Public STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

**APPENDIX**
**16**

## AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció el notario suscrito, Rafael Sánchez, y quisiera manifestar lo siguiente:

Mi nombre es Rafael Sánchez. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

Alrededor de septiembre de 2008 solicité trabajar en Delia's Tamales en San Juan, Texas. No tenía ningún documento legal para estar en Estados Unidos. No tenía tarjeta de seguro social, ni tenía tarjeta verde. Sofia Luben me dijo que tenían un hombre que vendía documentos falsos. Creo que la persona que me vendió las tarjetas falsas fue su prima. Me dijeron que si no encontraba los documentos, Delia me los entregaría. A los dos días comencé a trabajar y un empleado de Delia me entregó documentos falsos. Le pagué $300.00 a un hombre en Delia's por los documentos. Durante mi tiempo trabajando en Delia's las condiciones laborales fueron abusivas tanto físicas como verbales y mentales. ¡Sin pausas para el almuerzo! Nos obligaron a hacer horas extras y nos amenazaron con que me despedirían si no trabajaba las horas que querían. El 3 de mayo de 2023 fui despedido por HR Blanca y el abogado de Delia, quienes me dijeron que si quería apelar el despido llamaría a ICE. Después de mi despido, Delia continuó operando con el 90% de sus empleados que eran ilegales y el 90% de los empleados que tenían documentos falsos. Quiero decir que sé que Delia's Tamales estuvo involucrado en la venta de documentos falsos a muchos otros empleados mientras yo trabajaba allí.

*Rafael Sanchez*

Signature Rafael Sanchez

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 30th day of
Oct. 2023.

*Anita S. Castilleja*

NOTARY PUBLIC
My Commission Expires _____

ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025



EXHIBIT
17

TRANSLATION

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció el notario público que suscribe, Héctor Sánchez, y quisiera manifestar lo siguiente:

Mi nombre es Héctor Sánchez. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

Alrededor de abril de 2008 comencé a trabajar en Delia's Tamales en S. 23rd en McAllen. Tenía documentos falsos con el nombre de Rogelio Garza. Usé esos documentos durante un año. Luego me pagaron en efectivo semanalmente durante aproximadamente 2 años. Después de que la hija de Delia que manejaba el negocio me dijo que consiguiera documentos. Otro empleado me dijo que fuera a la oficina de Delia y les diera mis datos para poder conseguir documentos falsos. Recuerdo que el nombre de la señora era Letty Zumaya. Le di mi información y me reuní con un chico allí en Delia y luego me dio mis documentos falsos y pagué $100.00. Estuve trabajando con esos documentos durante unos 10 años. Trabajé en el área de producción y como cocinera. Durante el tiempo que trabajé en Delia's las condiciones laborales fueron muy abusivas tanto mental como físicamente debido a la demanda de más trabajo. El 3 de mayo de 2023 me pidieron que fuera a ver a Blanca y ella me dijo que estaba despedido. Un hombre identificado como el abogado de Delia me dijo que si apelaba mi despido, llamaría a inmigración porque trabajaba con los documentos falsos que me dieron.



Signature Hector Sanchez

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 17th day of Nov, 2023.



NOTARY PUBLIC
My Commission Expires  4-11-25

ANITA S. CASTILLEJA
Notary Public STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

APPENDIX
18

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció la notaria pública abajo firmante, María De Lourdes Cruz y quisiera manifestar lo siguiente:

Mi nombre es María De Lourdes Cruz. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

El 18 de agosto de 2018 o alrededor de esa fecha comencé a trabajar en Delia's Tamales en Mission, Texas. Presenté algunos documentos falsos al inicio del empleo. Durante el tiempo que trabajé en Delia's, el ambiente de trabajo era abusivo tanto mental como físicamente, y nadie se detenía ni siquiera durante mis pausas para el almuerzo.

El 5 de mayo de 2023 me pidieron que fuera a Recursos Humanos y hablara con Blanca. Hablé con Blanca y un señor que estaba con ella. Blanca me dijo que me despidieron por mis documentos. El hombre que era el abogado de Delia me dijo que podía apelar mi despido pero que llamaría a inmigración.

Firma María De Lourdes Cruz

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 23ʳᵈ day of Nov. 2023.

NOTARY PUBLIC

My Commission Expires 4-11-25

ANITA S. CASTILLEJA
Notary Public
STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

APPENDIX
19

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció la notaria que suscribe, Patricia Conde, y quisiera manifestar lo siguiente:

Mi nombre es Patricia Conde. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

Alrededor de julio de 2003 solicité trabajo en Delia's Tamales en S. 23rd St. en McAllen, TX. Hablé con la hija de la Sra. Delia Garza, Sofía Luben, y le dije que yo era ilegal en este país. Sofía me dijo que no importaba que pudiera conseguirme documentos legales falsos para trabajar.

Recibí una tarjeta de seguro social y una tarjeta de residente permanente legal falsa de Laura Luben.

Letty Sumaya y Lázaro Martínez me llamaron a la oficina principal de Delia y recibí los documentos. Ya estaba trabajando con Delia antes de obtener los documentos. Mientras trabajaba desde julio de 2003 hasta mayo de 2010, la Sra. Delia Garza, Sofía Luben y Lozenca Garza abusaron verbalmente de mí en el trabajo. Debía trabajar 20 horas al día sin descansos y sin pago de horas extras después de repetidos años de abuso. Me despidieron en mayo de 2010. Durante el verano fui a México y el hermano de Delia, El Güero Garza, fue la persona a quien ver en México para así que podría pasarme de contrabando.

Signature Patricia Conde

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 23rd day of
Oct. 2023.

NOTARY PUBLIC
My Commission Expires 4-11-25

ANITA S. CASTILLEJA
Notary Public STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

**APPENDIX**
**20**

## AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Before me, the undersigned notary public appeared, Patricia Conde and would like to state the following:

My name is Patricia Conde. I am over the age of 18 and would like to state that everything in the original petition is correct and true. I also would like to state the following:

On or about July 2003 I applied for work at Delia's Tamales on S. 23rd St. in McAllen, TX. I spoke with Ms. Delia Garza's daughter, Sofia Luben and told her I was illegal in this country. Sofia told me it didn't matter that she could get me fake legal documents to work.

I received a social security card and fake legal permanent resident card from Laura Luben.

Letty Sumaya and Lazaro Martinez called me to Delia's main office and I received the documents. I was already working with Delia's before I had gotten the documents. During work from July 2003 till May of 2010 I was verbally abused at work by Ms. Delia Garza, Sofia Luben and Lozenca Garza. I was to work 20 hours a day with no breaks, and no overtime pay after repeated years of abuse I was terminated May of 2010. During the summertime I went to Mexico and Delia's brother El Guero Garza was the person to see in Mexico to so that he could smuggle me across.

_____

Signature Patricia Conde

SUBSCRIBED AND SWORN TO BEFORE ME, on this the ____day of _____2023.

_____
NOTARY PUBLIC
My Commission Expires _____

IN RE: FLSA CLAIMS AGAINST        \*        COLLECTIVE ACTION

DELGAR FOODS LLC        \*

A/K/A DELIA'S TAMALES        \*        NOTICE OF CONSENT

I am a current employee or former employee of Delgar Foods LLC, a/k/a Delia's Tamales and/or its affiliated entities. I consent to be a party plaintiff in an action to collect unpaid wages. I am in agreement with the terms of the Professional Services Agreement with Richard R. Alamia/Douglas Ahern Attorneys at Law.

Soy un empleado actualmente or antiguamente empleado por Delgar Foods LLC, a/k/a Delia's Tamales y/o sus entidades afiliadas. Consiento ser un demandante en una demanda para sueldos no pagados. Estoy de acuerdo con los terminus del Acerdo de los Servicios Prfesionales con Abogados Richard R. Alamia y Douglas Ahern.

Signature/Firma

Full Legal Name (print)/Nombre Completo (letras separadas)

## AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Ante mí compareció la notaria que suscribe, Norma Conde, y quisiera manifestar lo siguiente:

Mi nombre es Norma Conde. Soy mayor de 18 años y me gustaría declarar que todo lo contenido en la petición original es correcto y verdadero. También quisiera manifestar lo siguiente:

Alrededor de mayo de 2003 busqué trabajo en McAllen, Texas. Mi tía me dijo que Sofía Luben buscaba sirvienta. Me puse en contacto con la Sra. Luben y ella me contrató para trabajar en su casa limpiando. Le dije a Sofía que era ilegal en este país y no tenía documentos. Sofía me dijo que no importaba. Sofía también me llevaría a trabajar a Delia's Tamales en S. McAllen. Trabajaba 7 días a la semana en casa de Delia y 3 días en su casa. Trabajé alrededor de 80 horas a la semana por $250,00. Sin pago de horas extras.

Alrededor del 28 de junio de 2004 me entregaron documentos falsos que eran una tarjeta de residencia y una tarjeta de seguridad social. La huella digital en la tarjeta de residente era falsa y no es mi huella digital. Durante mi empleo en Delia's me pagaban $400.00 por semana por 80 horas de trabajo y sin horas extras durante varios años.

Durante mi empleo en Delia's fui abusada verbalmente todos los días en la tienda. Fui maltratada por Delia Garza, Sofía Luben, Lázaro Martínez y Lorena Garza.

Me despidieron en junio de 2010.

_____

Signature Norma Conde

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 23rd day of
October, 2023.

_____

NOTARY PUBLIC
My Commission Expires 4-11-25

ANITA S. CASTILLEJA
Notary Public STATE OF TEXAS
Notary ID# 12526217-9
My Comm. Exp. 04-11-2025

**APPENDIX**
**21**

# AFFIDAVIT

STATE OF TEXAS

COUNTY OF HIDALGO

Before me, the undersigned notary public appeared, Norma Conde and would like to state the following:

My name is Norma Conde. I am over the age of 18 and would like to state that everything in the original petition is correct and true. I also would like to state the following:

On or about May 2003 I looked for work in McAllen, Texas. My aunt told me that Sofia Luben was looking for a maid. I made contact with Ms. Luben and she hired me to work at her house for cleaning. I told Sofia that I was illegal in this Country with no documents. Sofia told me it didn't matter. Sofia would also take me to work at Delia's Tamales in S. McAllen. I worked 7 days a week at Delia's and 3 days at her house. I worked about 80 hours a week for $250.00. No overtime pay.

On or about June 28th, 2004 I was given fake documents which was a residence card and social security card. The finger print was fake on the resident card and is not my thumb print. During my employment at Delia's they would pay me $400.00 a week for 80 hours of work and no overtime for several years.

During my employment at Delia's I was verbally abused on a daily basis at the store. I was mistreated by Delia Garza, Sofia Luben, Lazaro Martinez and Lorena Garza.

_____

Signature Norma Conde

SUBSCRIBED AND SWORN TO BEFORE ME, on this the ____ day of _____ 2023.

_____
NOTARY PUBLIC
My Commission Expires _____

IN RE: FLSA CLAIMS AGAINST     *       COLLECTIVE ACTION

DELGAR FOODS LLC            *

A/K/A DELIA'S TAMALES       *       NOTICE OF CONSENT

I am a current employee or former employee of Delgar Foods LLC, a/k/a Delia's Tamales and/or its affiliated entities. I consent to be a party plaintiff in an action to collect unpaid wages. I am in agreement with the terms of the Professional Services Agreement with Richard R. Alamia/Douglas Ahern Attorneys at Law.

Soy un empleado actualmente or antiguamente empleado por Delgar Foods LLC, a/k/a Delia's Tamales y/o sus entidades afiliadas. Consiento ser un demandante en una demanda para sueldos no pagados. Estoy de acuerdo con los terminus del Acerdo de los Servicios Prfesionales con Abogados Richard R. Alamia y Douglas Ahern.

_____

Signature/Firma

Norma Irene Conde Gutierrez.

Full Legal Name (print)/Nombre Completo (letras separadas)